## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Parker Tirrell, by her parents and next friends Sara Tirrell and Zachary Tirrell, *and*<br><br>Iris Turmelle, by her parents and next friends Amy Manzelli and Chad Turmelle,<br><br>      Plaintiffs.<br><br>      v.<br><br>Frank Edelblut, *in his official capacity as Commissioner of the New Hampshire Department of Education*;<br><br>Andrew Cline, Kate Cassady, Ann Lane, Philip Nazzaro, Rajesh Nair, James Fricchione, and James Laboe, *in their official capacities as members of the New Hampshire State Board of Education*;<br><br>Pemi-Baker Regional School District;<br><br>Lisa Ash, Bernice Sullivan, Sheila Donahue, Tony Torino, Carolyn Varin, Peter Jackson, Phil McCormack, Greg Aprilliano, Bonnie Acton, Barbara Noyes, Paul Ciotti, Sam Brickley, and Paul Pizzano, *in their official capacities as members of the Pemi-Baker Regional School Board*;<br><br>Pembroke School District; and<br><br>Andrew Camidge, Gene Gauss, Kerri Dean, and Melanie Camelo, *in their official capacities as members of the Pembroke School Board*,<br><br>      Defendants. | Civil Action No. 1:24-cv-00251 |

**PLAINTIFFS PARKER TIRRELL AND IRIS TURMELLE'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION AND PLAINTIFF PARKER TIRRELL'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

Without immediate injunctive relief from this Court, Plaintiffs Parker Tirrell and Iris Turmelle face the imminent and unlawful denial of a critical aspect of their education because of a newly enacted New Hampshire law barring transgender girls from participation on girls' school sports teams. Federal appellate and district courts across the country have enjoined similar laws passed in other states. *Eg.*, *B.P.J. v. West Va. Bd. of Educ.*, 98 F.4th 542, 565 (4th Cir. 2024), *petition for cert. filed* (summary judgment granted for plaintiff challenging similar West Virginia school sports ban); *Doe v. Horne*, 683 F. Supp. 3d 950, 970 (D. Ariz. 2023) (granting preliminary injunction on Title IX and Equal Protection claims against Arizona sports ban). With the new school year just weeks away, and with Parker's first soccer game scheduled for **August 30, 2024**, preliminary relief is vital to preserving the status quo and protecting Plaintiffs' rights under federal law and the United States Constitution. Absent preliminary relief, Parker and Iris will have no relief from the impact of HB 1205 on their upcoming school year.

Parker and Iris are transgender teenage girls attending New Hampshire public high schools. Each knew from an early age that she was a girl. Each has been diagnosed with gender dysphoria, a health condition characterized by distress resulting from an incongruence between one's birth sex and gender identity. As part of their prescribed medical treatment for gender dysphoria, Parker and Iris live and interact with others as girls in every aspect of their lives; they are accepted as girls by their parents, family, schools, peers, teammates, and coaches. This ability to live consistently with their female gender identities is critical to their health and well-being, and social acceptance is a key component of each girl's medical course of care. Parker and Iris are also receiving puberty-blocking medication and hormone therapy to align their bodies with their female identities and to alleviate the distress of physical characteristics that conflict with their gender identity. They will not go through testosterone-driven puberty, nor will they

experience physical changes caused by testosterone, including the muscular development characteristic of males.

Parker is 15 years old, and she is entering tenth grade at Plymouth Regional High School. She has always played sports, including in elementary, middle, and high school as well as in town recreational leagues. Sports has been a source of joy for her and has been the primary way she makes friends and experiences a sense of belonging and connection to others. Soccer is her real passion. She played on the girls' soccer team last year in ninth grade and is excited to rejoin her team when the season officially starts again on August 30, 2024. However, on August 15, 2024, Parker's school informed her mother that Parker will not be allowed to participate in practice, which begins on August 19, 2024.

Iris is 14 years old and she is entering ninth grade at Pembroke Academy. She played intramural tennis in middle school. She wants to try out for and play on the girls' tennis and track and field teams, which are winter and spring sports. Iris hopes that participation in these sports will help her to make additional friends, establish a peer group, and cope with the stresses she experiences in life.

The New Hampshire law, enacted on July 19, 2024 and effective on August 19, 2024, excludes Parker and Iris from educational opportunities solely because they are transgender girls, even though they have no physiological or biological advantage in sports. HB 1205, as applied to the Plaintiffs, violates their constitutional right to Equal Protection because it discriminates against them based on their sex and transgender status. HB 1205 also denies them equal educational opportunities in violation of Title IX of the Education Amendments of 1972, 20 U.S.C., § 1681, *et seq.,* which prohibits sex discrimination in public school programs and activities.

Plaintiffs submit this Memorandum of Law in support of their Motion for a Preliminary Injunction to preserve their right to play school sports, and in support of Parker Tirrell's Motion for a Temporary Restraining Order, which also references this Memorandum of Law.

## STATEMENT OF FACTS

### I.  Medical Background on Transgender Girls and Treatment for Gender Dysphoria

"Gender identity" is the medical term for a person's internal, innate, deeply-held sense of their own gender. Decl. of Daniel Shumer, M.D. ¶ 14. Everyone has a gender identity. *Id*. ¶ 15. There is a medical consensus that a person's gender identity is not subject to voluntary change and has a significant biological foundation. *Id*. ¶¶ 15, 17.

A transgender girl is a girl whose birth sex is male. *Id*. ¶ 20. When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy, which is commonly referred to as the person's "birth sex." *Id*. ¶ 19. In most cases, that initial designation matches the person's gender identity. *Id*. Most children who are identified as female at birth grow up to be female, and most children who are identified as male at birth grow up to be male. *Id*. For a transgender person, however, that initial designation turns out to be inaccurate because it does not match the person's gender identity. *Id*.

Gender dysphoria is a serious medical condition characterized by intense and, in some cases, disabling distress due to the incongruence between a person's gender identity and birth sex. *Id*. ¶ 21. The treatment for gender dysphoria is well-established and highly effective. *Id*. When individuals with gender dysphoria are diagnosed and receive appropriate medical care, they can thrive and grow into healthy adults. *Id*. ¶ 22. If untreated, however, gender dysphoria causes serious harms, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. *Id*. ¶ 21.

The major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society, have endorsed medical standards of care for treating gender dysphoria in adolescents, which were developed by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society. *Id.* ¶¶ 24–25. The goal of treatment is for transgender adolescents to live consistently with their gender identity in all aspects of their lives. *Id*. ¶ 23.

Before puberty, boys and girls do not differ significantly in athletic performance. *Id*. ¶ 29. After puberty, adolescent boys begin to produce higher levels of testosterone, which over time causes them to become, on average, stronger and faster than adolescent girls. *Id*. ¶ 30. There is a scientific consensus that the biological driver of average group differences in athletic performance between adolescent girls and adolescent boys is the difference in their respective levels of testosterone, which begin to diverge significantly only after the onset of puberty. *Id.*

When a child with gender dysphoria begins puberty, doctors may prescribe puberty-blocking medication to prevent the development of physical characteristics that conflict with the young person's gender identity and, when indicated, hormone therapy to induce the puberty associated with the adolescent's gender identity. *Id*. ¶¶ 26–27. Transgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls. *Id.* ¶¶ 32, 33, 36, 38. Because they do not go through testosterone-driven puberty, these transgender girls do not experience the physiological changes in strength and speed caused by testosterone. *Id*. ¶ 26. Transgender girls who are treated with puberty-blocking medication and hormone therapy will have the same levels of circulating hormones as other girls. *Id*. ¶ 27.

When transgender youth are provided with parental and social support and are able to live consistent with their gender identity, they are able to experience health and well-being and flourish during their critical childhood and adolescent years. *Id*. ¶¶ 18, 22, 23.

## II.   Plaintiffs' Medical Treatment and Participation in School Athletic Activities.

Plaintiff Parker Tirrell is a fifteen-year-old transgender girl with gender dysphoria who is entering her sophomore year at Plymouth Regional High School. Decl. of Luisa Aguiar, M.D. ¶ 3; Decl. of Sara Tirrell ¶¶ 15–16. Parker has always known she was a girl. Tirrell Decl. ¶ 2. From a very young age, she consistently expressed a preference for feminine clothing, like dresses and nightgowns, and feminine activities, like painting her nails and watching *My Little Pony* on television. *Id*. In the summer after seventh grade, after Parker had been showing signs of mental distress, her pediatrician referred her to a transgender health clinic, where she was evaluated by a team of providers who specialize in diagnosing and treating gender dysphoria in children and adolescents. *Id*. ¶¶ 4–5. These experts diagnosed Parker with gender dysphoria and recommended that she transition to living as a girl to alleviate her symptoms. *Id.* ¶¶ 6–7. At the beginning of eighth grade, Parker started the school year using female pronouns, wearing feminine clothes, and participating in school activities as a girl. *Id*. ¶ 7. Parker has lived as a girl in all aspects of her life from that time forward. *Id*. ¶ 8.

Sports have brought joy and exhilaration to Parker at every stage of her life, helping her build connections with others and to feel a sense of belonging. *Id*. ¶ 12. After playing on the girls' soccer team last year, in ninth grade, she found her "real passion" is soccer. *Id*. ¶¶ 14, 15. Soccer has become a primary motivator and source of happiness for her, sometimes causing her to dance with joy on the field, even though her team did not win a single game all season. *Id*. ¶¶ 14, 15, 17. Parker's friend group is made up mostly of her soccer teammates, who have become an important source of acceptance, emotional support, and social development for her. *Id*. ¶ 17.

Parker has learned, and continues to learn, valuable lessons through team sports, including the ability to work hard to improve and accept the difficulty of losing while at the same time building confidence and self-esteem. *Id*. ¶¶ 15–17.

Parker is excited to rejoin the girls' soccer team again as she enters tenth grade, with her first game coming up fast on August 30, 2024. *Id*. ¶ 16. Because Parker has been on puberty-blocking medication since the end of eighth grade and hormone therapy since the middle of ninth grade *Id*. ¶ 9, "she will not go through male puberty and has no biological or physiological differences from other girls that would impact her performance in school sports, including soccer." Shumer Decl. ¶ 36.

Plaintiff Iris Turmelle is a fourteen-year-old transgender girl with gender dysphoria who is entering her freshmen year at Pembroke Academy, which is a public high school. Decl. of Amy Manzelli ¶¶ 2, 14. Iris has always known she is a girl and asked Santa Claus to make her a girl when she was very young. *Id*. ¶ 2. She chose to play with toys typically considered feminine, and she chose to wear feminine clothing. *Id*. ¶ 2. In first grade, she insisted on wearing girls' clothes to school, and by that summer, she began using the name "Iris" and feminine pronouns. *Id*. ¶¶ 4–6. Since that time, she has been living as a girl in all aspects of her life, including at school. *Id*. ¶ 7.

Iris's parents brought her to see an endocrinologist, who confirmed her diagnosis of gender dysphoria, in 2017, the summer after first grade,. *Id*. ¶¶ 8, 9. That diagnosis was confirmed a year and a half later by specialists at a gender clinic. *Id*. ¶ 9.

Iris has participated in a variety of sports since childhood, but has taken a special interest in tennis, playing in an intramural tennis club in seventh grade. *Id*. ¶ 13. Unfortunately, the tennis club was not offered during eighth grade, but Iris is excited to try out for the girls' tennis team

now that she is starting high school when the season begins on March 25, 2025. *Id.* ¶¶ 13, 14.

She also wants to experience a new challenge and is excited to try out for the girls' winter track

and field teams, which begins on December 2, 2024. *Id.* ¶¶ 14–15.

School sports is important to Iris as a way to be physically active, establish a fun and

positive peer group, cope with the stresses she experiences in life, and develop a feeling of

inclusion at her new high school, especially in light of bullying she experienced in middle

school.  *Id.* ¶¶ 14, 16.  Because Iris has been on puberty blockers since the end of fifth grade and

hormone therapy since the end of seventh grade,  *Id.* ¶ 10, "she will not go through male puberty

and has no biological or physiological differences from other girls that would impact her

performance in school sports, including track and field of tennis." Shumer Decl. ¶ 38.

In sum, "[t]here is no medical justification for New Hampshire to exclude Parker Tirell

and Iris Turmelle from girls' interscholastic athletic teams because they are transgender." *Id.* ¶

34.

## ARGUMENT

### I.        STANDARD OF REVIEW.

To obtain a preliminary injunction, the plaintiffs must show that they are likely to

succeed on the merits of their claims, that they will likely suffer irreparable harm in the absence

of preliminary relief, that the balance of impositions on the parties tips in the plaintiffs' favor,

and that an injunction is in the public interest. *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023)

(quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Irreparable harm and

likelihood of success are the factors that "weigh heaviest in the analysis." *Braintree Lab'ys, Inc.

v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 40–41 (1st Cir. 2010). When the government is a

party, the balance of equities and public interest merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st

Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When the opposing party has notice and

8

an opportunity to respond and an adversarial hearing is held, the standards for issuing a TRO are substantively similar to those for a preliminary injunction." *Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*, 564 F. Supp 2d 63, 66 (D. Maine 2008).

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   *HB 1205 and its impact on the plaintiffs.*

Since 2015, the New Hampshire Interscholastic Athletic Association (NHIAA) has had a policy that establishes eligibility guidelines for transgender girls who wish to play on girls' sports teams. *See* Compl. Ex. A. Under those guidelines, both Parker and Iris have been, and would continue to be, eligible to play on girls' sports teams at their schools.

Under HB 1205, however, both girls are prohibited from playing school sports on girls' teams in New Hampshire, solely because they are transgender. HB 1205 requires New Hampshire public schools[1] to designate all sports teams as male, female, or mixed "based on the biological sex at birth of intended participants," N.H. REV. STAT. ANN. ("RSA") § 193:41, II(a), and commands that girls' teams "shall not be open" to students whose "biological sex" as printed on their original birth certificate is male. *See id.* §§ 193:41, II(b), III.

HB 1205 facially discriminates against transgender girls by requiring that all girls who wish to play on girls' teams have a birth certificate designating their sex as female at the time of birth, or produce "other evidence" establishing their "biological sex" is female. *Id.* §§ 193:41, III, IV. Girls like the plaintiffs are ineligible to be on girls' teams because they cannot establish that their birth sex is female. *See id.* § 193:41, III.

---

[1] Under New Hampshire law, schools are not entities that can be sued. Rather, school districts, such as Defendants Pemi-Regional School District and Pembroke School District, are the relevant legally responsible entities for schools' obligations under HB 1205. *See* RSA § 194:2.

Parker and Iris are transgender girls, meaning they are girls whose birth sex is not female. Shumer Decl. ¶¶ 20, 35, 37. Both girls want to be on school sports teams in the coming school year. Tirrell Decl. ¶¶ 16–17; Manzelli Decl. ¶¶ 14–17. Under HB 1205, both Parker and Iris are barred from playing on girls' sports teams, solely because they are transgender girls. They cannot play on boys' teams. Tirrell Decl. ¶ 19; Manzelli Decl. ¶ 17.  As a result, they will be devastated and their psychological, social, and educational development will suffer. Tirrell Decl. ¶ 20; Manzelli Decl. ¶ 18.

The local school board defendants, school districts, and the New Hampshire Board of Education are charged under HB 1205 with adopting, enforcing, and implementing a policies and practices that effectuate the requirements of HB 1205. RSA § 193:41, V. By complying with the requirements of HB 1205, the defendants collectively will exclude Parker and Iris from school sports absent injunctive relief from this Court.

### B.     Courts have ruled that it is unlawful to exclude transgender students from school sports and have enjoined similar state statutes.

Two federal courts of appeal have enjoined legislation that, like HB 1205, categorically bans transgender girls from participating in school sports. *B.P.J.*, 98 F.4th at 565 (reversing summary judgment and remanding with instructions to enter summary judgment for the plaintiff because the West Virginia ban violates plaintiff's rights under Title IX); *Hecox v. Little*, 2024 U.S. App. LEXIS 13929, *64 (9th Cir. June 7, 2024) (upholding preliminary injunction on Idaho ban because plaintiff likely to succeed on Equal Protection claim). These appellate decisions are in line with a host of other federal district and state court rulings.[2]

---

[2] *E.g.*, *L.E. v. Lee*, 2024 U.S. Dist. LEXIS 57803, at *73–74 (M.D. Tenn. Mar. 29, 2024) (granting summary judgment on Equal Protection claim against Tennessee sports ban); *Horne*, 683 F. Supp. at 970 (granting preliminary injunction on Title IX and Equal Protection claims against Arizona sports ban); *A.M. v. Indianapolis Pub. Sch.*, 617 F. Supp. 3d 950 (S.D. Ind.

Earlier this year, in *B.P.J.*, a Fourth Circuit panel granted summary judgment to a transgender girl who was barred from school sports in West Virginia because of a state law very similar to HB 1205. 98 F.4th at 551. Like Parker and Iris, the plaintiff in *B.P.J.* is a girl in all aspects of her life and she is being treated medically for gender dysphoria. *Id*. at 564. The court held that the West Virginia law violates the plaintiff's right to equal educational opportunities under Title IX because it "forbids one—and only one—category of students from participating in sports teams 'corresponding with [their] gender': transgender girls. . . . And it does so on a categorical basis, regardless of whether any given girl possesses any inherent athletic advantages based on being transgender." *Id.* at 563.

Last summer, a federal court similarly issued a preliminary injunction on behalf of two transgender girls who challenged Arizona's law excluding transgender girls from girls' school sports teams. *Horne*, 683 F. Supp. 955–56. The plaintiffs in that case, like Parker and Iris, are two transgender girls who will not experience testosterone-driven puberty. *Id*. at 959-60. The court determined that the Arizona law unlawfully discriminated against the transgender girls, which is unlawful sex discrimination under Title IX because "[i]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id*. at 974 (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020)).

2022), *appeal dismissed*, U.S. App. LEXIS 1994 (7th Cir. Jan. 19, 2023) (granting preliminary injunction on Title IX claim against Indiana sports ban); *Roe v. Utah High School Activities Ass'n*, 2022 WL 3907182, at *1 (Utah Dist. Ct. Aug. 19, 2022) (granting preliminary injunction on state constitutional Equal Protection claim against Utah sports ban). *Cf. Barrett v. Montana*, 547 P.3d 630 (Mont. 2024) (upholding summary judgment on state constitutional separation of powers claim against Montana sports ban); *Moe v. Yost*, 24CVH03-2481 (Franklin Cty. Ohio Ct. of Common Pleas, Apr. 16, 2024) (Exhibit A) (granting temporary restraining order on state constitutional "single-subject" claim). *But see D.N. v. DeSantis*, 2023 U.S. Dist. LEXIS 198678, at *64 (S.D. Fla. Nov. 6, 2023) (dismissing Title IX and Equal Protection claims against Florida sports ban without prejudice with leave to amend Title IX and Equal Protection claims; First Amended Complaint filed Jan. 11, 2024).

The weight of authority is clear: state laws discriminate on the basis of sex when they categorically exclude transgender girls like Parker and Iris from playing school sports. This Court should follow this persuasive reasoning and rule that HB 1205, as applied to the Plaintiffs here, violates federal constitutional and statutory protections.

### C.    *Title IX guarantees the plaintiffs the right to participate on school sports teams, an essential educational opportunity, on the same terms as other girls.*

Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).

To prove a claim under, the plaintiffs must show: "(1) that [they] w[ere] excluded from participation in an education program 'on the basis of sex'; (2) that the educational institution[s] w[ere] receiving federal financial assistance at the time; and (3) that improper discrimination caused [them] harm." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

Turning to the first element, Title IX's prohibition of discrimination "on the basis of sex" protects transgender students from discrimination. This principle was conclusively embraced by the U.S. Supreme Court in *Bostock*, which held that Title VII's prohibition against employment discrimination based on sex applies with equal force to discrimination based on transgender status. 590 U.S. at 660 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.").[3]

---

[3] Courts regularly look to Title VII cases when evaluating claims under Title IX. *See Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896–98 (1st Cir. 1998) ("[T]he Title VII standard for proving discriminatory treatment should apply to claims of sex discrimination arising under Title IX."); *see also Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992) (sexual harassment by

Although no court in this Circuit has had occasion to consider Title IX's protections for transgender students, other courts have done so persuasively. *See, e.g.*, *A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024) ("Applying *Bostock*'s reasoning to Title IX, we have no trouble concluding that discrimination against transgender persons is sex discrimination for Title IX purposes, just as it is for Title VII purposes."); *Grimm*, 972 F.3d at 616-19 ("Although *Bostock* interprets Title VII . . . , it guides our evaluation of claims under Title IX."); *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("Given the similarity in language prohibiting sex discrimination in Titles VII and IX, we do not think *Bostock* can be limited in the manner the district court suggested."); *Doe v. Boyertown Area Sch. Dist.*, 893 F.3d 179, 199 (3d Cir. 2018) ("Title IX prohibits discrimination against transgender students in school facilities . . . .").

Applying these principles to HB 1205, the law discriminates against the plaintiffs, and excludes them from an important educational program and activity (school sports), based on transgender status by barring girls from participation only if their birth sex is not female. The plaintiffs wish to participate on girls' sports teams because they are girls, yet they cannot because their birth sex is not female. In other words, they are excluded from participation in an educational program because they are transgender girls, a type of sex discrimination prohibited by Title IX. *See B.P.J.*, 98 F.4th at 563; *Horne*, 683 F. Supp. 3d at 955-56; *see also Indianapolis Pub. Sch.*, 617 F. Supp. at 966 (quoting *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017)) ("A law that prohibits an individual from playing on

---

supervisor under Title VII analogous to sexual harassment by a teacher under Title IX); *Wills v. Brown Univ.*, 184 F.3d 20, 25 n.3 (1st Cir.1999) (aside from damages, "the two statutes are construed *in pari materia*"); *Doe v. Oyster River Co-op. Sch. Dist.*, 992 F. Supp. 467, 474 (D. N.H. 1997) ("[I]n some circumstances, courts have looked to Tile VII . . . when interpreting Title IX.").

a sports team that does not conform to his or her gender identity 'punishes that individual for his or her gender non-conformance,' . . . which violates the clear language of Title IX.").

The second and third elements of Plaintiffs' Title IX claims are evident. The harm that Parker and Iris will experience based on their transgender status is unmistakable. They are "excluded from" and "denied the benefits of" participation in their schools' athletic teams. No further showing is needed, although the facts before this Court amply demonstrate the hugely consequential impact on both Parker and Iris's medical treatment plans and psychological and social development. Finally, there can be no real dispute, and discovery if necessary will inevitably bear out, that all Defendants are recipients of federal funds. The school districts which operate Parker and Iris's schools are direct recipients of federal funding.[4] The school board, state education commissioner, and state board of education members are subject to Title IX because they control and manage direct recipients of federal funds.[5] *See B.P.J.*, 98 F.4th at 554 (quoting *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994)) ("[Title IX] also covers organizations that 'control[] and manage[]' direct funding recipients."); *see also Cohen*, 991 F.2d

---

[4] *See, e.g.,* Compl. Ex. B (Pemi-Baker Regional School District FY 2025 Budget); Compl. Ex. C (Pembroke School District FY 2023 Financial Report).

[5] Local school boards are responsible for directing expenditures for the purpose of providing education to each districts' pupils. RSA § 189:1-a, I ("It shall be the duty of the school board to provide, at district expense, elementary and secondary education to all pupils who reside in the district . . . ."). The New Hampshire Board of Education exercises "powers of management, supervision, and direction over all public schools in this state as the directors of a business corporation have over its business . . . ." *Id.* § 186:5; *see also id.* § 186:13, XI(a); *id.* § 186:39–186:40-a; *id.* § 186:7. The Department of Education, its Commissioner, and its other officials, are responsible for "[p]lanning and applying for federal and other grants on a department-wide basis," *id.* § 21-N:4, VI; "fiscal management of all federal and other grants," *id.* § 21-N:5, I(h); "[a]dministering federal and state programs designed to assist the education of students and teachers," *id.* § 21-N:6, III; and "[i]nsur[ing] compliance with federal grant requirements…," *id.* § 21-N:7, VI(b). It is beyond dispute that all Defendants are subject to the provisions of Title IX.

at 894 ("[I]f any arm of an educational institution receive[s] federal funds, the institution as a whole must comply with Title IX's provisions.").

Because Plaintiffs have demonstrated that HB 1205 will result in their exclusion from girls sports teams "on the basis of sex" (i.e., their transgender status), they have a reasonable likelihood of success on their claims under Title IX.

### D.     HB 1205 Violates the Constitutional Guarantee of Equal Protection.

#### 1.     The framework for analyzing the plaintiffs' equal protection claim.

The Constitution's guarantee of equal protection is "essentially a direction that all persons similarly situated . . . be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When considering an equal protection claim, a court must first determine what level of scrutiny applies. The Supreme Court requires "all gender-based classifications [to be subjected to] heightened scrutiny." *U.S. v. Virginia*, 518 U.S. 515, 555 (1996) (citations omitted). *See also Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 & 9 n.5 (1st Cir. 2012) ("Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective.") (citing *Virginia*, 518 U.S. at 532–33; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973) (plurality opinion)). "Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *Virginia*, 518 U.S. at 531 (citations omitted). A justification cannot be based on "overbroad generalizations . . . ." *Id.* at 533. Any asserted justification must reflect the law's "actual purpose" when enacted, not a hypothetical rationale or one "invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. Heightened scrutiny serves to "smoke out" illegitimate motives by ensuring that the government can prove that the

classification has a sufficiently persuasive justification. *See City of Richmond v. J.A. Croson Co*., 488 U.S. 469, 493 (1989).

To show that HB 1205 violates the plaintiffs' right to equal protection, they must show that HB 1205 "purposefully discriminates against them because of their membership in a particular class." *Fowler v. Stitt*, 104 F.4th 770, at 783–84 (10th Cir. June 18, 2024). There are two paths to this objective: direct evidence or circumstantial evidence. *Id*. "When a distinction is facially apparent, purposeful discrimination is presumed and no further examination of intent is required." *Id*. at 802. If, however, HB 1205 could somehow be viewed as facially neutral, despite its clear language, heightened scrutiny is also required where, as here, the exclusion was motivated by a discriminatory purpose as gleaned from an "inquiry into such circumstantial and direct evidence of intent as may be available." *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Bos. Parent Coal. for Acad. Excellence Corp*. v. *Sch. Comm. of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021).

Finally, even if this Court were to review HB 1205 under rational basis review, the Supreme Court and the First Circuit have "intensified scrutiny of purported justifications where minorities are subject to discrepant treatment[,] . . . the . . . group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Massachusetts*, 682 F.3d at 10.

### 2.  *HB 1205 classifies and discriminates against the plaintiffs intentionally on the basis of transgender status, which is a sex-based classification.*

The impermissible classification in HB 1205 is apparent on the face of the law. Because the plaintiffs are transgender girls, their original birth certificates do not designate them as

female, making them ineligible to participate on girls' sports teams.[6] The only girls who are ineligible to play on girls' teams under HB 1205 are transgender girls. Legislative classifications that disadvantage transgender girls are sex-based classifications subject to heightened scrutiny. *See B.P.J.*, 98 F.4th at 556 (citing *Grimm*, 972 F.3d at 610-13)) ("The [West Virginia law] declares a person's sex is defined only by their 'reproductive biology and genetics at birth.' . . . The undisputed purpose—and the only effect—of that definition is to exclude transgender girls from the definition of 'female' and thus to exclude them from participation on girls sports teams. That is a facial classification based on gender identity. And, under this Court's binding precedent, such classifications trigger intermediate scrutiny.") (internal citation omitted ).

United States Courts of Appeal have agreed that heightened scrutiny applies when the government treats people adversely because they are transgender because it is a classification based on sex. *E.g.*, *Fowler*, 104 F.4th at 794; *B.P.J.*, 98 F.4th at 556 (citing *Grimm*, 972 F.3d at 610–13); *A.C. v. Martinsville*, 75 F.4th at 772–73; *Snyder*, 28 F.4th at 113 (citing *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019)). *See BAGLY v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021) ("Though *Bostock* was a Title VII case, the Supreme Court's reasoning applies equally outside of Title VII. . . . Accordingly, the Court will apply intermediate scrutiny.").

HB 1205 also requires heightened scrutiny because it classifies students based on their conformity with expectations and stereotypes related to sex. *See, e.g.*, *Grimm*, 972 F.3d at 608–10 (discriminating against transgender people is a form of discrimination on the basis of

---

[6] Some transgender girls have birth certificates that have been corrected to identify them as female, whether they were born in New Hampshire or in another state. HB 1205 specifically addresses those transgender girls by disqualifying any birth certificate that "does not appear to be the student's original birth certificate or does not indicate the student's sex upon birth." RSA § 193:41, IV.

"fail[ure] to conform to . . . sex stereotype[s]" prohibited by the Equal Protection clause); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."); *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group."). Parker and Iris are denied opportunities in school sports because they are girls who do not conform to expectations and stereotypes about the physical attributes typically associated with girls. *See Whitaker*, 858 F.3d at 1049 (citing *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000)) ("[C]ourts have applied *Price Waterhouse* and found that transgender plaintiffs can state claims based upon a sex-stereotyping theory under" federal statutes). Parker and Iris are girls but are treated differently from other girls under HB 1205 because of a stereotype: that someone whose birth sex is male is not—and can never be—a girl.

### 3. *HB 1205 fails any level of constitutional review.*

The New Hampshire state Defendants, the Commissioner of the Department of Education and the Board of Education, bear the substantial burden to prove that HB 1205 survives heightened scrutiny. They cannot meet that burden. Barring the plaintiffs from school sports will not advance any legitimate governmental interest. For the purposes of school sports, there is no physiological or biological difference between the plaintiffs and other girls. Shumer Decl. ¶¶ 28–38; Tirrell Decl. ¶ 9; Aguiar Decl. ¶¶ 5–6; Manzelli Decl. ¶ 10. Because the plaintiffs had access to medical care to treat their gender dysphoria at a sufficiently young age, neither has experienced any of the physical changes associated with testosterone-driven puberty. *Id*. Because of their medical treatment, their bodies are developing secondary-sex characteristics associated with estrogen-driven puberty. *Id*. Their hormone levels are within the range of typical adolescent

girls. *Id*. There is no medical basis for excluding Parker and Iris girls' sports teams because they are transgender. Shumer Decl. ¶ 34.

HB 1205 fares no better under rational basis review. Any consideration of rational basis review in this case requires a more searching and "intensified" inquiry into the law's relationship to a legitimate governmental objective. *See Massachusetts*, 682 F.3d at 10. In *Massachusetts*, the First Circuit surveyed Supreme Court cases in which the Court conducted a more searching and demanding review, nominally under rational basis, when the targeted group was "historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Id*. (discussing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432 (1985); and *Romer v. Evans*, 517 U.S. 620 (1996)). The Court noted that there has been "a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review" in cases where there exist "historic patterns of disadvantage suffered by the group adversely affected by the statute." *Id*. at 11.

Parker and Iris illustrate how the legislature's exclusive reliance on birth sex to establish eligibility for girls' sports participation has no relationship to any legitimate state interest. The only interest served by HB 1205, as applied to the plaintiffs, is exclusion based on their membership in a politically unpopular class. Therefore, HB 1205 fails to survive even rational basis review as applied to Parker and Iris.

## III.   HB 1205 WILL CAUSE IMMEDIATE, IRREPARABLE HARM TO PLAINTIFFS.

The irreparable harm to Parker and Iris by HB 1205's enforcement is immediate and concrete. Parker is scheduled to compete in her first soccer game of the school year on August 30. Iris hopes to be on the winter track and field team not too long after. They will be excluded

from their schools' sports teams, a pillar of public education that is vital to their physical and mental health and their social development.

They are young adolescents at a critical stage of their personal development. They will never get their early high school years back and, as such, a preliminary injunction is necessary to avoid the denial of a critical and unique educational program that cannot be repeated or replaced, let alone adequately compensated by money damages. *See Horne*, 683 F. Supp. at 975-76 (enforcement of sports ban against transgender student causes irreparable harm); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 19 (1st Cir. 1996) ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel").

Further, the exclusion from a school program solely because they are transgender girls will likely be deeply scarring to their healthy development and self-esteem, in addition to undermining their medical course of treatment. *See Grimm*, 972 F.3d at 618 (explaining stigma of exclusion "publicly brand[s] all transgender students with a scarlet 'T'") (internal quotation marks and citation omitted); see also *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015) (describing irreparable "dignitary wounds" associated with experiencing the state's moral disapproval of a core aspect of identity, an injury that "cannot always be healed with the stroke of a pen"). In their short high school careers, a single day that they miss out on essential educational opportunities will cause them great harm.

## IV.   <u>THE BALANCE OF EQUITIES FAVORS PRELIMINARY INJUNCTIVE RELIEF.</u>

When an injunction is sought against government entities, the public interest and the balancing of hardships merge into a single factor. *Nken*, 556 U.S. at 435-36. As an initial matter, it is "always in the public interest to prevent the violation of a party's constitutional rights," particularly where injunctive relief will merely maintain the status quo by ensuring that Parker

and Iris continue to have access to opportunities in school sports. *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 10002 (9th Cir. 2012)); *see also Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of P.R.*, 437 F. Supp. 3d 119, 137 (D. P.R. 2020) ("Just as a government has no interest in enforcing an unconstitutional law, the public interest is harmed by the enforcement of laws repugnant to the United States Constitution."). The balance of equities tips heavily in the plaintiffs' favor, and the public interest is best served by enjoining enforcement of an unconstitutional law and violating the rights granted to the plaintiffs under Title IX.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motions for a temporary restraining order and preliminary injunction.

Respectfully submitted,

PARKER TIRRELL, by her parents and next friends SARA TIRRELL and ZACHARY TIRRELL,

and

IRIS TURMELLE, by her parents and next friends AMY MANZELLI and CHAD TURMELLE,

By and through their attorneys,

*/s/ Kevin J. DeJong*
Kevin J. DeJong (NH Bar No. 17633)
kdejong@goodwinlaw.com
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1156

Louis L. Lobel* (MA Bar No. 693292)
llobel@goodwinlaw.com

Chris Erchull (NH Bar No. 266733)
cerchull@glad.org
Bennett H. Klein* (MA Bar No. 550702)
bklein@glad.org
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350

Gilles Bissonnette (NH Bar No. 265393)

Elaine H. Blais* (MA Bar No. 656142)
eblais@goodwinlaw.com
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

Samira Seraji* (CA Bar No. 338979)
sseraji@goodwinlaw.com
GOODWIN PROCTER LLP
601 S. Figueroa Street
Suite 4100
Los Angeles, CA 90017

Ben See* (NY Bar No. 6019202)
bsee@goodwinlaw.com
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018

Emmett Weiss* (MA Bar No. 713784)
eweiss@goodwinlaw.com
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036

gilles@aclu-nh.org
Henry Klementowicz (NH Bar No. 21177)
henry@aclu-nh.org
AMERICAN CIVIL LIBERTIES UNION OF
NEW HAMPSHIRE FOUNDATION
18 Low Avenue
Concord, NH 03301
(603) 224-5591

*Applications for admission *pro hac vice* to follow.

August 16, 2024