UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Parker Tirrell, et al.

    v.                                               Case No. 24-cv-251-LM-TSM
                                                  Opinion No. 2024 DNH 069 P

Frank Edelblut, et al.

**O R D E R**

Two minor plaintiffs, by and through their respective parents and next friends, bring this action against the Commissioner of the New Hampshire Department of Education, members of the New Hampshire State Board of Education, the Pemi-Baker Regional School District and members of its School Board, and the Pembroke School District and members of its School Board. Plaintiffs allege that defendants' enforcement of a recently enacted New Hampshire law prohibiting transgender girls (i.e., people who were born biologically male but who identify as female) from participating in girls' sports violates their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. Presently before the court is plaintiff Parker Tirrell's motion for a temporary restraining order.[1] Doc. no. 6. The court held a hearing on Parker's motion on August 19, 2024. The court orally granted Parker's motion at that hearing and

---

[1] While both Parker and the other plaintiff, Iris Turmelle, seek a preliminary injunction as well, see doc. no. 7, Parker is the only plaintiff seeking emergency relief. As such, the court defers ruling on doc. no. 7 at this time.

explained that a written order would follow setting forth the court's finding of facts and rulings of law. This is that order.

## STANDARD OF REVIEW

"A temporary restraining order 'is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available.'" Ginzburg v. Martínez-Dávila, 368 F. Supp. 3d 343, 347 (D.P.R. 2019) (quoting Pro-Choice Network v. Schenck, 67 F.3d 377, 388-89 (2d Cir. 1995)). A temporary restraining order ("TRO") is nevertheless an extraordinary remedy which must be granted "sparingly and only in cases where the need for extraordinary equitable relief is clear and plain." Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs, 453 F. Supp. 2d 333, 338 (D.N.H. 2006) (quotation omitted).

In evaluating a motion for a TRO, the court considers the same four factors that apply to a motion for a preliminary injunction. Karlsen v. Town of Hebron, Civ. No. 18-cv-794-LM, 2018 WL 11273651, at *1 (D.N.H. Sept. 28, 2018). Those factors are: the movant's likelihood of success on the merits; the movant's likelihood of irreparable harm in the absence of relief; the balance of equities; and whether injunctive relief is in the public interest. Id. Likelihood of success and irreparable harm are the most important factors. Strahan v. McNamara, 642 F. Supp. 3d 204, 207 (D.N.H. 2022). When, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and the public interest factors merge. Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).

## FINDINGS OF FACT[2]

The phrase "gender identity" is an accepted medical term for a person's innate sense of gender. Everyone has a gender identity, and it may or may not align with their biological sex or anatomy. A transgender girl is a person who was born with a male anatomy but whose gender identity is female.

Transgender people experience a medical condition known as gender dysphoria. Gender dysphoria is a medical condition recognized in the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM-V"). Gender dysphoria results from a lack of alignment between one's birth sex and gender identity. If left untreated, it may result in anxiety or depression, eating disorders, substance abuse, and even suicide. Providers treat gender dysphoria through medical interventions that allow patients to live more consistently with their gender identity. In addition, social acceptance of one's gender identity is critical to a transgender person's mental health and sense of well-being.

When a transgender girl and her parents seek treatment for gender dysphoria prior to the onset of puberty, providers may prescribe puberty-blocking medication to prevent the development of physical characteristics that conflict with the child's gender identity. When this occurs, the transgender girl will not

---

[2] The following findings of fact are based upon the declarations of Sara Tirrell, Luisa Fontes Aguiar, M.D., and Daniel Shumer, M.D., all of which are attached to the plaintiffs' motion for a preliminary injunction. <u>See</u> doc. nos. 7-4, 7-5, & 7-6. Neither the State nor the Pemi-Baker defendants contest the assertions contained in those declarations for purposes of Parker's TRO motion.

experience male puberty and will not experience physical changes caused by testosterone, such as male muscular development, facial hair, or an Adam's apple. The provider may thereafter prescribe hormones to induce female puberty. If this course of treatment is followed, the transgender girl typically has the same levels of estrogen and testosterone as other girls and significantly lower testosterone than pubescent boys.

Before puberty, there are no significant differences in athletic performance between boys and girls. After puberty, boys on average perform better than girls in most sports. Disparities in testosterone production drive this divergence. After puberty, boys produce significantly more testosterone than girls, which results in increased muscle mass and strength. A transgender girl who does not experience male puberty and who receives hormone therapy to induce female puberty will not have an athletic advantage over other girls as a result of being born with a male anatomy.

Plaintiff Parker Tirrell is a fifteen-year-old transgender girl entering her sophomore year at Plymouth Regional High School. She knew she was a girl from an early age, and preferred dressing as a girl when at home, engaging in stereotypically female childhood activities, and socializing with other girls. At age twelve, Parker, who had not yet begun living as a girl in all aspects of her life, began experiencing mental distress. She and her parents sought mental health treatment. During the summer between her seventh- and eighth-grade years, Parker was evaluated at a health clinic by a team of providers that specialize in

4

diagnosing and treating gender dysphoria in children and adolescents. Ultimately, Parker was diagnosed with gender dysphoria.

Parker's treatment for gender dysphoria first involved socially transitioning and living as a girl. At the start of her eighth-grade year in school, Parker began using female pronouns, wearing dresses and skirts to school, and living as a girl in all aspects of her life. This included participating in girls' sports and using girls' facilities at school. She began taking medications to block male puberty in May 2023, toward the end of her eighth-grade year. She began female hormone therapy in December 2023 while in ninth grade. Her treatment has caused her to develop physiological changes associated with female puberty. She will not undergo male puberty.

Sports have always been a big part of Parker's life. She has played in elementary, middle, and high school and in town recreational leagues. Sports are how Parker makes friends and connects with others. While she has participated in a variety of school sports, soccer is her passion. In eighth grade, she played on the girls' soccer and track teams at Plymouth Elementary School.[3] In ninth grade, she played on the girls' soccer team at Plymouth Regional High School. Her high school soccer team is her primary social outlet, both on and off the field. Most of her friends are her teammates, and they have given Parker an important source of acceptance, belonging, and emotional support.

---

[3] Plymouth Elementary is a K-8 school.

Playing on a boys' soccer team is not a realistic option for Parker. Parker's providers have prescribed treatment requiring her to live and participate in the world as a girl. Playing on a boys' soccer team would likely have adverse impacts on Parker's mental health and would exacerbate symptoms of gender dysphoria.

On July 19, 2024, New Hampshire enacted House Bill 1205 [hereinafter "HB 1205"]. 2024 N.H. Laws Ch. 228. In general terms, HB 1205 prohibits transgender girls from participating in girls' school sports. See RSA 193:41. The law took effect on August 18, 2024—one day before the first day of practice for Parker's high school soccer team.

Parker and another minor plaintiff, Iris Turmelle (by and through her parents and next friends), filed this action on August 16, 2024. The complaint brings four counts, two of which relate to Parker. In Count I, Parker alleges that HB 1205 violates her rights under the Equal Protection Clause of the Fourteenth Amendment. In Count II, Parker alleges that HB 1205 violates her rights under Title IX. Both counts seek declaratory and injunctive relief. All individually named defendants are sued only in their official capacities.

On the same day plaintiffs filed their complaint, Parker also filed a motion for a TRO (doc. no. 6) and both plaintiffs filed a motion for a preliminary injunction (doc. no. 7). The TRO motion relates only to Parker, while the preliminary injunction motion relates to both plaintiffs.[4] Parker argues in the TRO motion that

---

[4] Iris does not plan to try out for school sports until the winter, so she has not requested emergency relief.

the denial of immediate relief would cause her irreparable harm because she would be prohibited from playing on her school soccer team solely because she is a transgender girl, which would stigmatize her, undermine her treatment, and deprive her of the critical developmental experience of participating in high school sports. At a hearing on August 19, 2024, the court orally granted Parker's motion for a TRO and indicated that a written order setting forth findings of fact and rulings of law would follow.

## RULINGS OF LAW

As noted, to obtain a TRO, a plaintiff must demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of relief, that the balance of equities is in her favor, and that injunctive relief is consistent with the public interest. Karlsen, 2018 WL 11273651, at *1. The court will consider each area in turn.

I.   Parker Is Likely to Succeed on the Merits of Her Equal Protection Claim

The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "requires that 'all persons similarly situated be treated alike.'" Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 10 (1st Cir. 2013) (ellipsis omitted) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). In considering an equal protection challenge, the court's first task is to discern the applicable standard of review. Laws that treat similarly situated people differently because of sex or gender trigger what is known as intermediate or heightened

7

scrutiny. See United States v. Virginia (VMI), 518 U.S. 515, 555 (1996). The plaintiffs contend that heightened scrutiny applies to HB 1205. The State defendants conceded as much at the hearing on Parker's TRO motion. And the Pemi-Baker defendants took no position on the matter.[5] Given the lack of dispute on this issue, the court applies heightened scrutiny to HB 1205.[6]

    To satisfy heightened scrutiny, the challenged law "must be substantially related to achieving an important governmental objective." Massachusetts v. U.S. Dep't of Health & Hum. Servs., 682 F.3d 1, 9 (1st Cir. 2012). The justification for the challenged law must be "exceedingly persuasive." VMI, 518 U.S. at 531 (quotation omitted). The burden of demonstrating a satisfactory justification "is demanding and rests entirely on the State." Id. at 533. Moreover, the proffered justifications must represent the law's "actual . . . purposes," and cannot be "hypothesized or invented post hoc in response to litigation." Id. at 533, 535 (italicization omitted).

---

[5] The Pemi-Baker defendants made clear at the hearing that they are taking no position in this case as to whether HB 1205 violates the plaintiffs' rights under the Equal Protection Clause or Title IX, and that they merely seek to ascertain their legal obligations so that they may administer their athletic programs in compliance with the law.

[6] Even if the matter had been disputed, the court notes that, "while the First Circuit has not spoken on the subject, other circuits have held that intermediate scrutiny applies to discrimination based on transgender status in the equal protection context." Bos. All. of Gay, Lesbian, Bisexual, and Transgender Youth v. U.S. Dep't of Health & Hum. Servs., 557 F. Supp. 3d 224, 244 (D. Mass. 2021) (collecting cases); see also Bostock v. Clayton Cnty., 590 U.S. 644, 669 (2020) ("[D]iscrimination based on . . . transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.").

At the TRO hearing, the State argued that HB 1205 serves the important governmental objectives of ensuring that girls' school sports competitions are fair and safe. Putting aside the fact that the State has put forth no evidence at this juncture that these objectives represent the law's actual purposes, the State has failed to demonstrate that application of the law to Parker is substantially related to achieving these goals.

With respect to fairness, although the State did not articulate its reasoning at the August 19 hearing as to how HB 1205 enhances fairness in girls' sports, this argument has been raised in defense of similar laws in other actions. See, e.g., Hecox v. Little, 104 F.4th 1061, 1081-82 (9th Cir. 2024). Ensuring competitive fairness in girls' sports is indeed an important state interest. See id. at 1081. The State has failed to show, however, that applying HB 1205 to Parker is substantially related to achieving this goal. It is currently undisputed that, because Parker received treatment to block male puberty and induce female puberty, she does not enjoy the testosterone-driven advantage in average athletic skill that pubescent males enjoy relative to pubescent girls. Therefore, barring Parker from playing on her high school soccer team does nothing to advance competitive fairness in girls' sports. See B.P.J. by Jackson v. W.V. State Bd. of Educ., 98 F.4th 542, 559 (4th Cir. 2024) (reversing grant of summary judgment to defendants on equal protection claim in similar action where plaintiff "presented evidence that transgender girls with her background and characteristics possess no inherent, biologically-based competitive advantages over cisgender girls when participating in sports" (emphasis

9

omitted)). For the same reason, the State has failed to demonstrate that applying HB 1205 to Parker is substantially related to advancing safety in girls' sports.

For these reasons, the court finds, at this early stage, that Parker is likely to succeed on the merits of her equal protection claim for purposes of granting a TRO.

II.     Parker Is Likely to Succeed on the Merits of Her Title IX Claim

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To prove her Title IX claim, Parker must show that, as applied to her, HB 1205 would (1) exclude her from participation in, deny her the benefits of, or subject her to discrimination in (2) an educational program receiving Federal financial assistance (3) on the basis of sex or gender. Doe v. Harv. Univ., 410 F. Supp. 3d 332, 334 (D. Mass. 2019). It is currently undisputed that the Pemi-Baker Regional School District receives federal financial assistance and that Parker would be excluded from participation in girls' sports at Plymouth Regional High School under HB 1205. The only question presently before the court with respect to Parker's Title IX claim is whether her exclusion would be on the basis of sex or gender. The court has little difficulty answering that question in the affirmative.

HB 1205 created two new statutes: RSA 193:41 and RSA 193:42. RSA 193:41 provides that interscholastic sports teams "must be expressly designated as one of the following . . . : (1) Males, men, or boys; (2) Females, women, or girls; or (3) Coed or mixed." RSA 193:41, II(a). These designations must be "based on the biological

10

sex at birth of intended participants." Id. A student's sex "shall be determined by the student's biological sex on the student's official birth certificate," which must have been "[i]ssued at or near the time of the student's birth" and cannot have been modified except to correct clerical errors in denoting the student's biological sex. RSA 193:41, III. "Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." RSA 193:41, II(a). This bar on participation in girls' sports includes transgender girls: girls whose sex was designated as male at the time of their birth based on their external anatomy. See id.

Compelling authority on this issue is found in the Supreme Court's opinion in Bostock v. Clayton County. Bostock involved Title VII. Similar to Title IX's proscription of discrimination "on the basis of sex" in educational programs receiving Federal financial assistance, Title VII prohibits employers from taking certain actions against an employee "because of [the employee's] sex." 42 U.S.C. § 2000e-2(a)(1). In Bostock, the Supreme Court held that an employer who discriminates against an employee based on transgender status violates Title VII's ban on discrimination "because of . . . sex." Id.; see Bostock, 590 U.S. at 683. "[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. at 660.

Courts have applied Bostock's interpretation of Title VII to Title IX to hold that discrimination on the basis of transgender status constitutes discrimination on the basis of sex in violation of Title IX. See, e.g., A.C. by M.C. v. Metro. Sch. Dist. of

11

Martinsville, 75 F.4th 760, 769 (7th Cir. 2023). At the hearing on Parker's TRO motion, the State could not articulate why the Supreme Court's textual interpretation of materially identical language in Title VII would not apply to Title IX. At this early juncture, the court finds for purposes of Parker's TRO motion that HB 1205's exclusion of transgender girls from girls' sports constitutes an exclusion on the basis of sex in violation of Title IX, and that Parker is therefore likely to succeed on the merits of her Title IX claim.

III. <u>Parker Is Likely to Suffer Irreparable Harm in the Absence of Immediate Relief</u>

Parker's soccer team began practicing for the fall season on August 19, 2024. Their first game is on August 30. In the absence of immediate relief, Parker would be barred from participating on her soccer team—her primary source of social and emotional support and acceptance—solely because she is a transgender girl. In treating Parker in this way, HB 1205 would be "very publicly branding [her] with a scarlet 'T.'" Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 618 (4th Cir. 2020) (brackets omitted) (quoting Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 530 (3d Cir. 2018)). Not only would such public stigmatization harm Parker, it would run directly counter to her medical providers' recommendation that she seek social acceptance of her gender identity to alleviate the misalignment between her birth sex and her innate sense of gender. See Doe v. Horne, 683 F. Supp. 3d 950, 975 (D. Ariz. 2023) (ruling that similar plaintiffs in similar case were likely to suffer irreparable harm in the absence of preliminary relief because "[p]laintiffs' mental health is dependent on living as girls in all aspects of their lives"). Although the

factual record in this suit currently indicates that gender dysphoria is highly treatable, severe consequences may result in the absence of treatment, including substance use disorder, eating disorders, mental health disorders, and even suicide. At this critical stage of her youth, to bar Parker from participating in the primary means by which she achieves social acceptance of her gender identity would cause immediate, substantial, and irreparable harm. See Grimm, 972 F.3d at 618; Horne, 683 F. Supp. 3d at 975.

IV.  The Balance of Equities and the Public Interest Weigh in Favor of a TRO

As noted, when the defendants are government entities or officials sued in their official capacity, the balance of equities and public interest factors merge. Does 1-6, 16 F.4th at 37. Here, as just discussed, Parker would suffer immediate, substantial, and irreparable harm in the absence of a TRO. By contrast, the defendants stand to suffer little harm if a TRO is granted. Prior to HB 1205's enactment, Parker had been participating in girls' sports at Plymouth Elementary School and Plymouth Regional High School. Issuing a TRO would only provisionally maintain that status quo while the court considers plaintiffs' motion for a preliminary injunction. See Ginzburg, 368 F. Supp. 3d at 347. Moreover, the court has determined (at least for purposes of the TRO motion) that Parker is likely to succeed in arguing that HB 1205 is unconstitutional. The State "has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." Siembra Finca

13

Carmen, LLC v. Sec'y of Dep't of Agric. of P.R., 437 F. Supp. 3d 119, 137 (D.P.R. 2020). Thus, the balance of equities and the public interest favor a TRO.

## CONCLUSION

For the reasons stated herein and on the record at the hearing on August 19, 2024, the defendants listed in doc. no. 35 are enjoined in the manner set forth in that order.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 22, 2024

cc:     Counsel of Record