*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO NOVEMBER 23, 2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
PARKER TIRRELL, et al,            *
                                  *
              Plaintiffs,         *
                                  *   1:24-cv-251-LM-TSM
          v.                      *   August 19, 2024
                                  *   2:25 p.m.
FRANK EDELBLUT, et al,            *
                                  *
              Defendants.         *
                                  *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

Appearances:

| | |
|---|---|
| For the Plaintiff: | Chris Erchull, Esq.<br>Bennett H. Klein, Esq.<br>GLBTQ Legal Advocates and Defenders |
| | Henry Klementowicz, Esq.<br>Gilles Bissonnette, Esq.<br>ACLU of New Hampshire |
| For the Defendant,<br>the State of NH: | Michael P. DeGrandis, Esq.<br>NH Attorney General's Office |
| For the Defendant,<br>Pemi-Baker Regional<br>School District: | Diane M. Gorrow, Esq.<br>Soule Leslie Kidder Sayward &<br>Loughman |
| For the Defendant,<br>Pembroke School District: | Michael Gregory Eaton, Esq.<br>Wadleigh Starr & Peters PLLC |

<u>Court Reporter</u>:                Liza W. Dubois, RMR, CRR
                                     Official Court Reporter
                                     U.S. District Court
                                     55 Pleasant Street
                                     Concord, New Hampshire 03301
                                     (603) 225-1442

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  This court is in session and has for
 3   consideration a hearing on plaintiffs' motion for a temporary
 4   retraining order in the matter of Parker Tirrell, et al, vs.
 5   Frank Edulblut, et al, civil case number 24-cv-251-LM.
 6            Could I have counsel identify themselves for the
 7   record, please, beginning with counsel for the plaintiff.
 8            MR. ERCHULL:  Chris Erchull for the plaintiffs.
 9            THE COURT:  Good afternoon.
10            MR. KLEIN:  Good morning -- or good afternoon, your
11   Honor.  Bennett Klein for the plaintiffs also.
12            MR. KLEMENTOWICZ:  Henry Klementowicz from the ACLU
13   of New Hampshire.
14            MR. BISSONNETTE:  Gilles Bissonnette for the
15   plaintiffs.
16            THE COURT:  Good to see you.
17            MR. DEGRANDIS:  Michael DeGrandis with the Attorney
18   General's Office on behalf of the state defendants.
19            MS. GORROW:  Diane Gorrow on behalf of all the
20   Pemi-Baker School District defendants.
21            MR. EATON:  Good afternoon, your Honor.  Mike Eaton
22   on behalf of the Pembroke School District defendants.
23            THE COURT:  All right.  Nice to see you in person
24   today as opposed to on the video screen.
25            All right.  Let me -- first of all, let me find out,
```

```
 1    are you putting on any evidence today or is it all by

 2    submission?

 3              MR. ERCHULL:  No, your Honor, it's all by

 4    submission.  Thank you.

 5              THE COURT:  All by submission.  Okay.

 6              And this is the hearing on Parker Tirrell's request

 7    for the TRO, and it's limited to that motion.

 8              And that's your understanding.  I see you shaking

 9    your heads.  Okay.

10              All right.  Okay.  Now, does the state have any

11    evidence that you are going to put forward that would

12    contradict the evidence contained in the declaration of

13    Parker's mom, Sara Tirrell?

14              MR. DEGRANDIS:  No, we don't, your Honor.  For the

15    purposes of this hearing --

16              THE COURT:  Okay.

17              MR. DEGRANDIS:  -- we're happy to accept the

18    statement just that those allegations are true for the purposes

19    of --

20              THE COURT:  Okay.  That's my question for you.

21              MR. DEGRANDIS:  Yes.

22              THE COURT:  And let me ask the same thing about

23    Parker's treating physician, Dr. Aguiar.

24              MR. DEGRANDIS:  The same answer there as well, your

25    Honor.
```

1          THE COURT:  Same answer?

2          MR. DEGRANDIS:  Yes.

3          THE COURT:  Okay.  That would be Document 7-5.

4          And then there is Document 7-6.  This is Dr. Shumer,

5     which is the expert witness the plaintiffs have submitted.

6          MR. DEGRANDIS:  Same answer for that doctor as well.

7          THE COURT:  Okay.  All right.  So then for the

8     record and for this hearing, purposes of this hearing,

9     Document 7-4 -- 7-4, 7-5, and 7-6, those three declarations are

10    not contested.

11         Okay.  I think, since it's just submissions and just

12    argument, I think -- let me run this by you and see how this

13    sounds.

14         30 minutes from the plaintiffs at most and

15    30 minutes to respond, both defendants.  I say both.  I know

16    you're representing more than two, but the school districts'

17    lawyer as well as the state's.

18         And so 30 minutes each side and then 15 minutes,

19    15 minutes.  How does that work?

20         MR. ERCHULL:  Your Honor -- your Honor, the

21    plaintiffs need 10 to 15 minutes, I think, at best.

22         THE COURT:  Excellent.  Okay.

23         MR. DEGRANDIS:  The state defendants have a very

24    short presentation.  I don't think we would need that much

25    time.

 1                THE COURT:  All right.  Well, that sounds good then.

 2      Let's -- let's begin then.

 3                And let me ask the school district:  You agree with

 4      the state, in terms of the purposes of this hearing, that

 5      you're not contesting these three declarations?

 6                MS. GORROW:  That's correct.  And also, your Honor,

 7      the school district's not taking a position on the law itself.

 8      We will follow whatever the law requires us to do.

 9                THE COURT:  All right.  Thank you.  Okay.  All

10      right.

11                Attorney Erchull, go ahead, sir.

12                MR. ERCHULL:  Good afternoon, your Honor.  Thank you

13      again for setting this hearing on short notice.

14                I'm Chris Erchull for the plaintiffs, Parker Tirrell

15      and Iris Turmelle.

16                Parker and Iris are teenage transgender girls

17      enrolled in New Hampshire public high schools.  They are here

18      with us today in the courtroom behind me.  Each plaintiff knew

19      from an early age that she was a girl.  Each plaintiff has been

20      diagnosed with gender dysphoria.

21                We're here today asking the Court to consider a

22      temporary restraining order on behalf of Parker only because

23      Parker is set to officially begin her soccer season today.

24                For background, gender dysphoria is a serious but

25      highly treatable health condition which manifests as clinically

1    significant distress resulting from an incongruence between

2    one's gender identity and birth sex.

3              Treatment for gender dysphoria has developed over

4    the past several decades and the standards of care have been

5    established by the World Professional Association for

6    Transgender Health and the Endocrine Society.  Every major

7    medical association endorses these standards of care.

8              For adolescents like the plaintiffs, treatment for

9    gender dysphoria involves a combination of social transition

10   and hormone treatment.  For the plaintiffs, hormone treatment

11   involves puberty-blocking medication and estrogen therapy.  The

12   effect of puberty-blocking medication is to prevent the

13   plaintiffs from going through a testosterone-driven puberty.

14   Because they were treated with puberty-blocking medication,

15   neither will develop secondary sex characteristics associated

16   with males, including increased musculature.  They're not going

17   to be any faster or any stronger than typical girls.

18             The other critical element of the course of their

19   treatment is social transition, which means living and

20   interacting with others in all aspects of their lives as girls.

21   They live as girls at home, where they are loved and supported

22   by their families, and they are accepted as girls at school.

23   That includes their teachers, their classmates and, for Parker,

24   her coaches and teammates on the soccer team.  It is critical

25   for their health and for their well-being that they live as

1    girls in all aspects of their lives.

2         Parker is 15 years old.  She is entering the 10th

3    grade at Plymouth Regional High School.  She has always played

4    sports, including in elementary school, middle school, high

5    school, and even on town recreational leagues.  Like for so

6    many other young people, sports has been a source of joy for

7    her and it's been a primary way she makes friends and

8    experiences a sense of belonging and connection with others.

9         Soccer is her real passion.  She played on the

10   girls' soccer team last year in the ninth grade and is excited

11   to rejoin the team this year.  But last Thursday, on

12   August 15th, Parker's school informed her mother that Parker

13   will not be allowed to participate in practice, which begins

14   today.  Without this Court's immediate intervention, Parker

15   will be denied the chance to participate in a vital educational

16   opportunity solely because she is transgender, even though she

17   has no physiological or biological advantage in sports.

18        The New Hampshire Legislature passed HB 1205 this

19   year, which the governor signed last month.  As of yesterday,

20   the new statute is now in effect and it singles out the

21   plaintiffs by categorically barring transgender girls from

22   school sports.  HB 1205 violates their constitutional right to

23   equal protection because it discriminates against them based on

24   their sex and transgender status.  HB 1205 also denies them

25   equal educational opportunities in violation of Title IX.

1    Courts across the country, including the Fourth

2    Circuit and the Ninth Circuit, have ruled on similar claims

3    about similar statutes, that they violated the rights of

4    transgender students.

5    For the Title IX claim, Parker needs to show that

6    she is excluded from an educational program on the basis of

7    sex; that the school district receives federal funding; and

8    that she is harmed by being excluded from school sports.

9    As the Supreme Court made crystal clear four years

10    ago in *Bostock vs. Clayton County*, it is impossible to

11    discriminate against Parker for being transgender without

12    discriminating against her against based on sex.  Many courts

13    have applied the reasoning from *Bostock* in the Title IX

14    context.

15    For the Equal Protection Claim, classifications

16    based on transgender status are entitled to heightened

17    scrutiny.  Many courts have considered sex-based

18    classifications under the Fourteenth Amendment, including since

19    *Bostock* was decided, and have concluded that laws targeting

20    transgender people create sex-based classifications warranting,

21    at a minimum, intermediate scrutiny.

22    The state bears a very heavy burden to justify

23    HB 1205 and they cannot show that they have an important

24    governmental interest in preventing Parker from going to soccer

25    practice.

1           Parker seeks a temporary restraining order on an

2    emergency basis because her mother was told on Thursday that

3    she would not even be allowed to practice with her teammates

4    and her first official practice is, again, this evening.

5           If she can't practice with her teammates, she will

6    be harmed in a number of ways.  Of course, practice is

7    essential to team-building but, also, her teammates are going

8    to notice Parker's not there and they're going to wonder why,

9    if they don't already know.  This will be have a permanent

10   stigmatizing impact on Parker.

11          The state and Pemi-Baker School District will suffer

12   no harm if this Court issues a TRO preserving status quo until

13   the motion for preliminary injunction is resolved.  No harm

14   arises to anyone from allowing Parker to practice and play with

15   her team.

16          Thank you, your Honor.

17          THE COURT:  Thank you.

18          Attorney DeGrandis, go ahead, sir.

19          There's no dispute that the school receives federal

20   funding?

21          MR. DEGRANDIS:  There is no dispute there, your

22   Honor.

23          THE COURT:  Okay.

24          MR. DEGRANDIS:  Thank you.

25          THE COURT:  Go ahead.

1          MR. DEGRANDIS:  At the outset, what I'd like to say

2    is I'd like to thank the Court and the parties for your

3    patience and the efforts that the parties made to work with us

4    to -- to get to some sort of stipulation.  We weren't able to

5    get there.  We are still wrapping our arms around the

6    allegations in the case, the controlling law of this case.  We

7    are in the very, very early stages and so we appreciate very

8    much everyone's patience and efforts in that regard.

9          But where we ended up landing, part of the problem,

10   what we're seeing here, is that the TRO as articulated by the

11   plaintiffs hasn't sufficiently stated that emergency need and

12   that it would make a lot more sense for the parties to instead

13   take a little bit longer period to have a more thoughtful

14   consideration about whether a preliminary injunction would

15   apply.

16         And so along those lines, what I would hope to do

17   today, very briefly, is to address, really, just four points.

18   They will be brief and succinct, but I think these four points

19   will make it clear where the state defendants lie on the issue

20   of the TRO, which we don't think should be granted today.

21         The first point that we hope to make is that I would

22   like to describe what the challenged law is.

23         I think secondarily what we'd like to do is we'd

24   like to discuss what we perceive to be problems regarding the

25   success -- likelihood of success on the merits for the

1    plaintiff.  We don't think the plaintiff gets there.

2         Third, I think we can lump together the issue of

3    irreparable harm, balancing of the equities, and the public

4    interest.  I would like to discuss that.

5         And then, lastly, I think I would like to address

6    Attorney Erchull's discussion of *Bostock*.  I don't think

7    *Bostock* applies, and I think that could be important to the

8    Court's determination of the TRO.

9         And so then the first category -- categorical point

10   that I'd like to make is what this law is.  The people, through

11   their elected representatives, identified a public policy or

12   made a public policy decision, a public policy decision where

13   the people of New Hampshire decided that they want to protect

14   female sports and to ensure that females playing high school

15   female sports will have fair and safe competition.  That's the

16   public policy choice made by the state, made by people through

17   their representatives.

18        The second point that I wanted to get to --

19        THE COURT:  Well, don't leave that point for a

20   moment.

21        What -- how does this law -- as applied to Parker,

22   how does that law serve that interest where the evidence that I

23   have in front of me is that there is no physiological or

24   biological advantage at this point?  How does the law serve

25   that?

1          MR. DEGRANDIS:  I -- I think that's related probably

2    most to -- it's certainly related to both the Equal Protection

3    Clause and the Title IX claim, but I think probably more

4    directly to the Title IX claim.

5          And so -- and the whole point of Title IX is

6    consistent with the point of this statute and the purpose and

7    the policy goals of this statute and so that -- that being to

8    prohibit and to protect women from discrimination in education.

9    And part of that discrimination that Congress identified back

10   when it passed Title IX was discrimination in sports.

11         And I think all the parties agree that there is

12   educational value to sports and that -- that if there is an

13   opportunity for someone, when you have an objective standard

14   like a birth certificate, that's different from actually

15   considering a classification, a new statutory classification.

16         And so when you have this objective standard of

17   saying we want to protect women's sports with an objective

18   standard so that it isn't something that someone who identifies

19   as being a female, a biological male could then interrupt this

20   process, the ultimate policy goal of Title IX of ensuring that

21   there is not discrimination.

22         THE COURT:  Okay.

23         MR. DEGRANDIS:  That's how the policy works.

24         THE COURT:  But how does -- as applied to Parker,

25   how does it serve that goal?  And the reason I'm asking that is

1    obviously Dr. Shumer's expert report and the evidence, the

2    scientific evidence, that shows -- and this is uncontested

3    because that's what I have in front of me -- the uncontested

4    reality that there is no physiological or biological advantage

5    because Parker has not gone through puberty with testosterone.

6              If, in fact, we were talking about a different kind

7    of case at a different level of sports, different age, I -- I

8    can see perhaps an argument.  But how do you articulate an

9    argument that it is serving that policy purpose with respect to

10   Parker?

11             MR. DEGRANDIS:  It -- because it's an objective

12   policy purpose.  It's not designed to -- to specifically

13   address Parker's unique circumstance.  That is -- that is the

14   point of the law and it's not creating any statutory

15   classifications along any lines.  It's using the objective

16   standard of -- of a birth certificate.

17             And so it -- it wouldn't -- it -- Parker's

18   circumstance is neither here nor there in application of this

19   particular law that wants to take an evenhanded approach to

20   who -- who is in -- who is able to play on a female high school

21   sports team.

22             THE COURT:  Go ahead.

23             MR. DEGRANDIS:  Okay.  I wanted to make sure I

24   addressed your question.

25             So I've already mentioned most of the other points I

1    wanted to make regarding likelihood of success through the

2    course of those questions and answers.

3        I think when it comes to Equal Protection Clause

4    challenges, you really do have to have a statutory

5    classification.  There is no statutory classification here.

6    And -- and this may also be related to your last question as

7    well.

8        Laws aren't inherently unlawful where they have

9    different impact, where one group is perhaps more impacted than

10   another.  They're not just inherently unconstitutional, not

11   just inherently unlawful.  And we would agree -- I should note

12   we would agree with Attorney Erchull's statement that this

13   probably does need to be reviewed under an intermediate

14   scrutiny.  I think we -- I addressed -- that's one of the

15   reasons why I addressed the public policy purpose and why I

16   emphasized the objective standard, the objective mechanism for

17   achieving the public policy goal being the issuance of a birth

18   certificate and looking to see the -- the sex on the birth

19   certificate.

20       If -- and I should say at this early stage, I don't

21   mean to put words in plaintiff's mouth and I don't want to

22   misconstrue plaintiff's argument, but as I understand

23   plaintiff's argument when it comes to the Title IX issue that

24   they aren't saying that sex distinction in gender-specific --

25   gender-specific boys' or girls' teams that that is the core

1    objection here.  I really think that the core objection that

2    they're trying to articulate is that Title IX requires schools

3    to make this qualitative specific judgment with respect to

4    gender identity.  I do not believe that Title IX does that.

5    That is not the purpose and function of Title IX.

6            And that's related probably also to the fourth point

7    I was going to make, which is to address *Bostock*.  *Bostock* was

8    dealing with a very different statutory scheme.  I believe it

9    was Title VII.

10           In *Bostock*, the Supreme Court had held that

11   determine -- that sex cannot be a factor in hiring or firing in

12   employment.  That is an entirely different regime than the

13   Title IX regime, where the whole purpose of Title IX is to

14   specifically protect women in education and to protect them

15   from discrimination in education.  That is an entirely -- so

16   even using *Bostock's* very expansive definition of sex, that

17   doesn't fit with the statutory scheme and purpose of Title IX.

18           The -- the last point I'll make just about

19   irreparable harm, balancing the equities, and public

20   interest -- and I don't want the next thing I say to in any way

21   be construed as dismissive or insensitive or doubting the

22   stress and strain the plaintiffs experience in not being able

23   to practice or in not being able to play a game.  Of course --

24   of course it is stressful and straining to them, not

25   disparaging that any way, shape, or form or doubting that.  But

1    does that rise to the legal level of irreparable harm?  Is

2    missing some practices irreparable harm?  Is missing some games

3    irreparable harm?

4            I understand, too, that there are psychological

5    factors here as well, but when we look at the flip side of the

6    coin, so part of the balancing the equities of harm, the

7    Supreme Court and district courts throughout the country have

8    consistently held that a state -- enjoining a state's

9    enforcement of a validly enacted law is irreparable harm.

10           So we know that there's irreparable harm to the

11   state if the Court awards the temporary retraining order.  I

12   question whether the harm alleged by the plaintiffs rises to

13   that same level.  I believe the balance of the equities would

14   tip in favor of the state in that regard.

15           And so, your Honor, what we would ask -- the state

16   defendants would ask that the Court deny the temporary

17   restraining order, but -- because it's clear there is urgency

18   here.  These are serious, important issues -- they're important

19   to the children, they're important to the state -- that we have

20   instead an ambitious schedule to brief the issues for a hearing

21   on preliminary injunction, that we would offer to have a

22   deadline of 14 days from this Court's order for the state

23   defendants to file an objection to the preliminary injunction.

24           THE COURT:  Do you have cases that support the

25   argument that you're making?  I know you're saying *Bostock* is

1    dealing with Title VII, but it was interpreting -- it was a

2    textual analysis of on the basis of sex, which is the same

3    language in Title IX.  And Justice Gorsuch made clear that

4    gender identity is included in on the basis of sex.

5           How -- and every court that's looked at this

6    question, two federal circuits -- in fact, one of those

7    circuits, I believe the Fourth, actually granted summary

8    judgment on appeal on Title IX --

9           MR. DEGRANDIS:  That's correct.

10          THE COURT:  -- for a very similar claim.

11          And then there are four or five district courts

12   across the country that have also held against your position.

13          So what -- what's your best case?  What -- what is

14   the case that you're relying on that supports the arguments

15   that you're making?

16          MR. DEGRANDIS:  The case that I hope to cite in the

17   future is this one, your Honor.

18          I appreciate very much that, yes, the Fourth Circuit

19   has ruled in the manner in which you articulated there.  I

20   believe that it's not correctly decided.  And it's certainly

21   not controlling on this court and I think this Court needs

22   to -- to cut a different path on that issue.  I don't think

23   that that fit -- that that notion of on the basis of sex fits

24   within the context of Title IX.

25          THE COURT:  All right.  Okay.  And you talked about

```
 1    the purpose of the statute.  Do you have legislative history
 2    you can point me to that I can look at?  And obviously you'll
 3    be briefing this for purposes of a PI hearing, but do you have
 4    anything that you can give me now?
 5              MR. DEGRANDIS:  I do not have anything that I can
 6    give you now.
 7              THE COURT:  Okay.
 8              MR. DEGRANDIS:  We have not had a chance for that
 9    yet --
10              THE COURT:  Okay.
11              MR. DEGRANDIS:  -- but we will.
12              THE COURT:  All right.  Understood.
13              And, Attorney Gorrow, would you like to be heard?
14              MS. GORROW:  Your Honor, as I said earlier, the
15    state is -- I mean the district is not taking a position on the
16    statute.  We'll leave the state defending the statute.
17              THE COURT:  Okay.
18              MS. GORROW:  We're just trying to figure out what
19    our obligation is under the law and to meet that obligation.
20              THE COURT:  Okay.  Thank you.
21              All right.  Attorney Erchull, would you like to
22    respond?  Take as much time as you need.
23              MR. ERCHULL:  I just want to address a few points,
24    your Honor, that defendants raised.
25              One, I want to explain that the classification in
```

1    the statute on its face is directed at transgender girls.

2    Transgender girls are the only girls who are excluded from

3    playing sports on girls' teams under the statute.

4         In addition to the fact that this is a -- an

5    as-applied case, I just want it to be absolutely clear that

6    there is a facial classification in the statute and transgender

7    girls are the only girls who are not permitted to play on

8    girls' sports teams.

9         The state also bears a heavy burden when they defend

10   under intermediate scrutiny to justify the statute and they

11   have not and cannot meet that burden in this case.

12        And I also just want to make the point that the harm

13   that Parker is about to face if she is prevented from playing

14   sports, playing soccer tonight, is irreparable.  It's not

15   compensable with money damages, which is the real definition of

16   what irreparable harm is, but the stigma that's attached to

17   being excluded because of discrimination, because you are

18   transgender, is not something that can ever be remedied in any

19   way and so an ambitious schedule is not sufficient.

20        But that's all I have, your Honor.

21        THE COURT:  Thank you.

22        Anything further?  Go ahead.

23        MR. DEGRANDIS:  Just one quick point, if I may.

24        THE COURT:  Sure.

25        MR. DEGRANDIS:  So my -- thank you for hearing me

1    again.

2            Just my one pushback there, I just want to point out

3    that RSA 193:41, that's the codification of the house bill

4    that's being challenged here, it does not target transgender at

5    all.  The statement in II, sub (b), subpart (b), is athletic

6    teams or sports designated for females, women, or girls shall

7    not be open to students of the male sex.

8            That's -- that's the standard that the statute puts

9    forth and it's one of the reasons why earlier I was mentioning

10   that just because this does end up affecting the plaintiffs, it

11   does end up affecting transgender, that is true, but that

12   doesn't inherently make an objective statement like this

13   inherently unlawful.

14           THE COURT:  I understand.

15           Okay.  Anything further?

16           MR. ERCHULL:  No, thank you.

17           THE COURT:  Anything further?

18           MR. DEGRANDIS:  No, thank you.

19           THE COURT:  All right.  I'm prepared to rule right

20   now from the bench.

21           I will issue a short endorsed order and then I'll

22   issue a more detailed order with my findings and rulings,

23   hopefully soon.

24           And I want to start with the standard, which is in a

25   case like this where the opposing party has notice and an

```
1    opportunity to respond and a hearing is held, as we just did,

2    the standards for issuing a TRO are substantively similar to

3    those for a preliminary injunction.

4         The plaintiff as the moving party has the burden of

5    establishing, one, that they are likely to succeed on the

6    merits; two, that they are likely to suffer irreparable harm in

7    the absence of preliminary relief; three, that the balance of

8    equities tip in their favor; and, four, that an injunction is

9    in the public interest.

10        Having carefully considered the submissions and the

11   parties' arguments today, I am granting plaintiff Parker

12   Tirrell's motion for a temporary restraining order, which is

13   document number 6.  I find that Parker has satisfied each of

14   the four factors to justify the issuance of a TRO.

15        First, Parker has demonstrated that she is likely to

16   succeed on the merits of both her Equal Protection Clause claim

17   under Count One and her Title IX claim under Count Two; second,

18   Parker has established that she is likely to suffer irreparable

19   harm in the absence of this order; third, I find that the

20   balance of the equities tilt in her favor; and, fourth, I find

21   that an injunction of HB 1205 as applied to Parker is in the

22   public interest.

23        Additionally, defendants have agreed that plaintiffs

24   are not required to post a bond in this case.  Therefore, I'm

25   waiving the security requirement under Rule 65(c).
```

1        For these reasons, a TRO is hereby issued with

2   notice.  The terms of the TRO -- and I will list all the

3   defendants' names specifically in my endorsed order after this

4   hearing, but defendants are enjoined from enforcing or

5   threatening to enforce HB 1205 codified at RSA 193:41 against

6   plaintiff Parker Tirrell.

7        Further, the listed defendants, their employees,

8   agents, appointees, or successors and any other persons

9   enumerated in Rule 65(d) must permit plaintiff Parker Tirrell

10  to try out for, practice with, compete with, and play on the

11  school sports teams designated for girls on the same terms and

12  conditions as other girls.

13       This TRO shall take effect immediately unless

14  extended at the Court's hearing on plaintiff's motion for a

15  preliminary injunction, which will be scheduled within the

16  14-day time limit.  The TRO will dissolve on that date.

17       A written decision, as I said, consistent with this

18  short order with findings of fact and conclusions of law as

19  required under Rule 52(a)(2) will follow.

20       Court is adjourned.  Thank you.

21       THE CLERK:  All rise.

22           (Proceedings concluded at 2:56 p.m.)

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 8/23/24          */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR