**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

PARKER TIRRELL and IRIS TURMELLE,

    *Plaintiffs*,

    v.

FRANK EDELBLUT, in his official capacity as
Commission of the New Hampshire Department
of Education, *et al.*,

    *Defendants*.

Case No. 1:24-cv-00251-LM-TSM

---

**DEFENDANTS FRANK EDELBLUT, ANDREW CLINE, KATE CASSADY, ANN
LANE, PHILIP NAZZARO, RAJESH NAIR, JAMES FRICCHIONE, AND JAMES
LABOE[1] MEMORANDUM OF LAW IN OBJECTION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

### INTRODUCTION

New Hampshire enacted RSA 193:41 and 193:42 (collectively, "RSA 193:41") to protect

the fairness, integrity, and safety, of middle and high school competition among female athletes.

*See* 46 H. Rec. 11, at 16 (Mar. 15, 2024) (statement in support).  RSA 193:41 is a duly enacted

law and a proper exercise of the state's inherent police power.  *See Soucy v. State*, 127 N.H. 451,

454 (1985) ("The police power is legislative in nature, to enact 'general regulations . . . necessary

to the common good and general welfare.' *State v. Griffin*, 69 N.H. 1, 23-24 (1896)[.]").  The

General Court observed physical harm and a loss of opportunity for biological girls where

transgender girls competed with and against them in athletic competition.  *See* 46 H. Rec. 11, at

---

[1] Hereinafter, "State Defendants."  Of note, State Defendants do not concede that they are proper defendants to this action. Private parties enforce the statute, not the Board of Education.  RSA 193:42.  *Ex parte Young* carves out a narrow exception to state sovereign immunity, where state executive officials who enforce laws contrary to federal law may be enjoined from doing so by a federal court.  *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).  Accordingly, State Defendants are not proper parties to this action because they do not have enforcement authority under RSA 193:42.  State Defendants reserve their rights to challenge whether they are proper parties to this action in subsequent proceedings.  Were the Court to dismiss State Defendants, the New Hampshire Attorney General's Office would nevertheless intervene to defend the statute pursuant to Fed. R. Civ. P. 5.1.

16 (Mar. 15, 2024) (RSA 193:41 is an act to protect "fairness, integrity, and safety in female competition."). So, to ensure that New Hampshire girls would not face fewer or less meaningful athletic opportunities than those available to boys, the legislature acted on its important governmental objective to protect girls from discrimination. *See id.* RSA 193:41 is a policy choice, and reasonable people may disagree regarding the wisdom of that choice. If New Hampshire voters reject RSA 193:41's policies, they can and will do so at the ballot box. This Court should not undo the policy determinations of lawmakers by judicial fiat. That is not the Court's role.

State Defendants accept Plaintiffs' well-pleaded allegations of fact as true for the *sole* purpose of objecting to Plaintiffs' Motion for a Preliminary Injunction, and without waiving State Defendants' right to challenge Plaintiffs' factual allegations as this case proceeds. Plaintiffs are two transgender girls who play or intend to play on their schools' girls' sports teams. Due to the sex recorded on Plaintiffs' birth certificates, RSA 193:41 prohibits them from doing so. The Plaintiffs have moved for a preliminary injunction seeking to enjoin the statute from applying to them. Plaintiffs are not challenging the legality of separating out a "girls" team from a "boys" team. Rather, they challenge the exclusion of transgender girls from female-designated teams. For the following reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

## I.    LEGISLATIVE HISTORY

House Bill 1205, now codified at New Hampshire Revised Statutes Annotated §§ 193:41 and 193:42 (attached as Exhibit A), is an act to protect "fairness, integrity, and safety in female

competition." 46 H. Rec. at 16 (statement in support).[2]  In enacting HB 1205, the legislature found that in other jurisdictions where transgender females have competed on female teams, cisgender females have lost scholarship opportunities and have suffered injuries.  *See id.*  The law only applies to grades 5 through 12 interscholastic sports sponsored by a public school, or a private school whose students or teams compete against a public school, and it does not apply to intramural teams designated as mixed or coed.  *See id.*  Opponents of the bill charged that it is discriminatory and that participation in female sports should be based on the *bona fide* gender identity of each student, as vetted by the New Hampshire Interscholastic Athletic Association ("NHIAA").[3]  *See id.* at 16-17 (statement in opposition).  The law was enacted on July 19, 2024, and went into effect on August 18, 2024.

## II.      STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary remedy that may be granted only by a clear demonstration by a plaintiff of the merits of such a request."  *Dupont v. Dubois*, Nos. 97-1167, 97-1786, 97-2134, 1998 U.S. App. LEXIS 16313, *2-3 (1st Cir. July 15, 1998) (quoting 13 Moore's Fed. Prac. § 65.20, at 65-29 (3d ed. 1998)) (internal quotations omitted).  The bar is a high one.  This "extraordinary form of relief" requires a plaintiff to show that the party "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023) (quoting *Winter v. Nat. Res. Def.*

---

[2]  The House Record, Vol. 46, No. 11, is attached as Exhibit B.  Exhibit B includes only the introductory pages and excerpted portions related to House Bill 1205.  The entire House Record is available at https://www.gencourt.state.nh.us/house/calendars_journals/viewer.aspx?fileName=Calendars\2024\No11%20March%2015%202024.PDF.

[3]  NHIAA is a private 501(c)(3) nonprofit. *See* https://tinyurl.com/4uux88cx (last visited Aug. 22, 2024).

*Council, Inc.*, 555 U.S. 7, 20 (2008)) (internal quotations omitted).  The plaintiffs bear the

burden with respect to each element.  *March v. Mills*, 867 F.3d 46, 52–53 (1st Cir. 2017).

## III.    ARGUMENT

Plaintiffs have not met their high burden to demonstrate that they are entitled to the

extraordinary relief of a preliminary injunction.  They are unlikely to succeed on the merits

because they have not shown that enforcement of RSA 193:41 violates their Fourteenth

Amendment rights to Equal Protection, or that RSA 193:41 runs afoul of Title IX of the

Education Amendments of 1972.  But even were Plaintiffs likely to succeed on the merits,

Plaintiffs have not shown that preliminary relief is necessary to avoid irreparable harm, or that

the balance of the equities and the public interest tip toward enjoining enforcement of a duly

enacted state law.

### A.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims Because RSA 193:41 Does Not Violate Plaintiffs' Constitutional or Statutory Rights

#### 1.    Plaintiffs' Equal Protection Claim Is Not Likely to Succeed on the Merits

A state may not "deny to any person within its jurisdiction the equal protection of the

laws."  U.S. Const. amend. XIV, § 1, cl. 4.  The purpose of the Equal Protection Clause is to

protect "against intentional and arbitrary discrimination, whether occasioned by express terms of

a statute or by its improper execution through duly constituted agents."  *Willowbrook v. Olech*,

528 U.S. 562, 565 (2000) (internal quotations and citations omitted).  The Fourteenth

Amendment, therefore, requires states to treat "all persons similarly situated … alike."  *Bourque

v. Town of Hampton*, No. 06-cv-090-JM, 2007 U.S. Dist. LEXIS 39300, *39 (D.N.H. May 30,

2007) (quoting *Pagan v. Calderon*, 448 F.3d 16, 34 (1st Cir. 2006) (quoting *City of Cleburne v.

Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985))) (internal quotations omitted).

### a. Rational Basis Applies Because Plaintiffs Are Not Challenging RSA 193:41's Sex-Based Classifications, but Are Instead Making a Textbook Underinclusiveness Claim

Plaintiffs are not challenging RSA 193:41 on the grounds that it contains sex-based classifications.  Rather, they premise their equal protection claim on a disagreement with how RSA 193:41 relies upon "sex" as designated by birth certificates.  In other words, Plaintiffs do not challenge the classification itself, but rather the legislature's choice of what to include within the classification.

When asked "to examine the parameters of the beneficiary class" but ***not*** "to pass on the constitutionality of [a classification] itself," courts engage in "a traditional 'rational basis' inquiry as applied to social welfare legislation."  *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986).  In canonical equal protection cases, segregation provides the cause of action. But here, according to Plaintiffs, segregation by gender on sports teams provides the remedy. That distinction reveals the truth about the nature of the claim at issue.

For instance, in *Jana-Rock Construction, Inc. v. New York Department of Economic Development*. 438 F.3d 195 (2d Cir. 2006), the plaintiffs challenged "New York's 'affirmative action' statute for minority-owned businesses," which applied to "Hispanics" but did "not include in its definition of 'Hispanic' people of Spanish or Portuguese descent."  *Id.*  The plaintiff owned a construction company and was "the son of a Spanish mother whose parents were born in Spain," but he was not considered Hispanic for purposes of the New York program, *id.* at 199, despite Luiere's sworn affidavit stating, "I am a Hispanic from Spain[,]" *id.* at 203. The plaintiff did not "challenge the constitutional propriety of New York's race-based affirmative action program," but only the state's decision not to classify him as Hispanic for purposes of the program.  *Id.* at 200, 205.

In rejecting the plaintiff's claim, the Second Circuit confirmed that "[t]he purpose of [heightened scrutiny] is to ensure that the government's choice to use racial classifications is justified, not to ensure that the contours of the specific racial classification that the government chooses to use are in every particular correct." *Id.* at 210. Because "[i]t [was] uncontested by the parties" that the classifications in the New York statute satisfied heightened level of review, the Second Circuit concluded that heightened scrutiny retained "little utility in supervising the government's definition of its chosen categories." *Id.* The Second Circuit thus "evaluate[d] the plaintiff's underinclusiveness claim using rational basis review." *Id.* at 212.

Similarly, in *Orion Ins. Grp. v. Wash. State Off. of Minority & Women's Bus. Enters.*, No. 16-5582-RJB, 2017 WL 3387344, at *2 (W.D. Wash. Aug. 7, 2017), *aff'd sub nom. Orion Ins. Grp. v. Wash.'s Off. of Minority & Women's Bus. Enters.*, 754 F. App'x 556 (9th Cir. 2018), the plaintiff "received results from a genetic ancestry test that estimated that he was 90% European, 6% Indigenous American, and 4% Sub-Saharan African." *Id*. at *2. He took these results to mean that "he had Black ancestry." *Id.* Taylor then classified himself as "Black" and applied for benefits under state and federal affirmative-action programs—and then filed suit when his applications were denied, arguing that the state and federal governments' restrictive definition of "Black" violated his constitutional and statutory rights. *Id.* at *2-4. He advocated an expansive definition of "Black," asserting that he fit into the category because "Black Americans are defined to include persons with 'origins' in the Black racial groups in Africa," and his genetic testing revealed he had African ancestry. *Id.* at *11.

The court rejected this argument. *Id.* Rather than apply heightened scrutiny and force the state to justify its definition of "Black," the court applied rational-basis review and concluded that the defendants "offered rational explanations for the denial of the applications." *Id.* at *13;

*see also Hoohuli*, 631 F. Supp. at 1160–61 (rejecting equal protection claim because government's "definition of 'Hawaiian' … ha[d] a rational basis").

By challenging the lawfulness of a classification's definitional contours rather than the lawfulness of the classification itself, Plaintiffs' claims here are similarly subject to rational-basis review. The plaintiffs do not challenge the sex-based classifications in RSA 193:41 as unconstitutional. Rather, they disagree with what the legislature chose to include in each classification. The "purpose" of heightened scrutiny "is to ensure that the government's choice to use [protected] classifications is justified," not to police the classifications' "contours." *Jana-Rock*, 438 F.3d at 210; *Cf. Hoohuli*, 631 F. Supp. at 1159 n.23 ("The mere mention of the term 'race' does not automatically invoke the 'strict scrutiny' standard.").

Under the "forgiving rational basis standard," State Defendants will prevail "so long as they articulate some reasonably conceivable state of facts that could provide a rational basis for the action." *Donahue v. City of Boston*, 371 F.3d 7, 15-16 (1st Cir. 2004) (cleaned up). Courts have recognized that protecting athletic opportunities and fairness of competition are ***important*** governmental interests, not merely rational ones. *See, e.g.*, *D.N. v. DeSantis*, No. 21-cv-61344, 2023 U.S. Dist. LEXIS 198678, *18-19 (S.D. Fla. Nov. 6, 2023) (quoting *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1302, 1307 (1980)). Even if RSA 193:41 has its critics, it is rational under the law. That is enough to survive rational-basis review.

> **b.  RSA 193:41 Does Not Classify on the Basis of Transgender Status and Any Such Classification Would Be Subject to Rational Basis Review, in Any Event**

Plaintiffs argue that RSA 193:41 does not merely include classification on the basis of sex, but also on the basis of transgender status. *See* ECF No. 7-1 at 3. They contend that these

classifications are independently subject to heightened scrutiny.  *See* ECF No. 7-1 at 15.  Neither

contention is correct.

RSA 193:41 does not discriminate on the basis of transgender status.  "[A] policy can

lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of

transgender status."  *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4[th] 791, 809 (11th Cir. 2022).

Transgender status is not mentioned anywhere in RSA 193:41.  Transgender status therefore

does not determine whether an individual may compete on a girls' sports team.  Rather, athletic

participation depends solely on biological sex as displayed on one's birth certificate.

In any event, as numerous courts have found, transgender status is not a quasi-suspect

class that would trigger heightened scrutiny.  *L.W. v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023)

("[N]either the Supreme Court nor this court has recognized transgender status as a quasi-suspect

class."); *Johnston v. Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ.*, 97 F. Supp.

3d 657, 668 (W.D. Pa. 2015) (Third Circuit has not recognized transgender as a suspect

classification); *Gregory v. Bustos*, No. 21-cv-4039, 2023 U.S. Dist. LEXIS 146192, *24 (C.D.

Ill. Aug. 21, 2023) (Seventh Circuit has not recognized transgender as a suspect classification);

*Poe v. Drummond*, 697 F. Supp. 3d 1238, 1252 (N.D. Okla. 2023) (Tenth Circuit has not

recognized transgender as a suspect classification).  Courts that have concluded differently have

carved the class out of whole cloth.  *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586,

611 (4th Cir. 2020) (using a four-factor test to determine whether transgender status is a quasi-

suspect class).  The Sixth and Eleventh Circuits have expressly refused to do so.  *L.W.*, 73 F.4th

at 420; *Eknes-Tucker v. Governor, of the State of Ala.*, 80 F.4th 1205, 1227 (11th Cir. 2023).

Moreover, even where a court, such as the Fourth Circuit, has demarcated a new quasi-suspect

transgender class, it has acknowledged that the Supreme Court has admonished not to name new

suspect classes in the first instance. *See, e.g., Grimm*, 972 F.3d at 613. "The bar for recognizing a new quasi-suspect class … is a high one." *L.W.*, 73 F.4th at 420. In the context of transgender status, courts should not put their thumbs on the public policy scale because "[g]ender identity and gender dysphoria pose vexing line-drawing dilemmas for legislatures." *Id.*

Establishing a new suspect class must be left to the Supreme Court because recognizing new suspect classes can frustrate (or even terminate) public debate, legislative action, and development of "evolving social norms and innovative medical options." *Id.* Courts have "rarely deemed a group a quasi-suspect class," *Adams*, 57 F.4th at 803 n.5, and has not done so "in over four decades[.]" *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023), *cert. granted*, No. 23-477. Since transgender status is not a quasi-suspect class in the First Circuit and the Supreme Court has not spoken on the issue, Plaintiffs' transgender status does not trigger heightened review, even if RSA 193:41 contained classifications based on that status (which it does not). Rather, any such challenge would be subject to rational-basis review and would fail for the reasons already stated.

"The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955). Thus, "[a] statute is not invalid under the Constitution because it might have gone farther than it did," *Roschen v. Ward*, 279 U.S. 337, 339 (1929), because "reform may take one step at a time," *Williamson*, 348 U.S. at 489. "The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Id.*; *accord, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641, 656-57 (1966) (applying rational-basis review where Congress extended benefit to citizens educated in "American-flag schools" in Puerto Rico but did "not extend[] the relief … to those educated in non-American-flag schools"); *cf. Peightal v. Metro. Dade Cnty.*, 940 F.2d 1394, 1409 (11th Cir.

1991) ("The Equal Protection Clause does not require a state actor to grant preference to all ethnic groups solely because it grants preference to one or more groups.").

So, even assuming the New Hampshire General Court could have crafted a statute that permitted transgender girls to play on girls' sports teams while simultaneously ensuring "fairness, integrity, and safety in female competition[,]" that would not make the legislative choice constitutionally suspect.  Because "[t]he state was not bound to deal alike with all these classes, or to strike at all evils at the same time or in the same way," *Semler v. Ore. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935), it is not relevant to the constitutional analysis of RSA 193:41 that transgender girls might also seek the benefit of playing on teams reserved for females.  *See* RSA 193:41; *cf. Adams*, 57 F.4th at 801 ("[T]he Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex.").  While the state's decision to segregate sports teams by sex in the first instance warrants heightened scrutiny, *see, e.g., Virginia*, 518 U.S. at 532-33, the sex classification that informs how far New Hampshire's law "extend[s] … relief," *Katzenbach*, 384 U.S. at 656-57, does not.  And, again, that is what the Plaintiffs here are arguing.

### c.   Even If Heightened Scrutiny Applied, Which It Does Not, Birth Certificate Documentation Is a Substantially Related Means to Effectuating RSA 193:41's Important Governmental Objective

Even if heightened scrutiny applied, RSA 193:41 is constitutional.  A law survives intermediate scrutiny if it is "substantially related to achieving an important governmental objective."  *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). Protecting middle and high school female athletes' opportunity and welfare is an important governmental objective.  *See D.N. v. DeSantis*, No. 21-cv-61344, 2023 U.S. Dist. LEXIS 198678, *18-19 (S.D. Fla. Nov. 6, 2023) (quoting *O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449

U.S. 1301, 1302, 1307 (1980)).  Given the pernicious history of sex discrimination in education, "[i]t is ***beyond question*** that redressing the disparate athletic opportunities available to males and females is an important governmental interest."  *See D.N.*, 2023 U.S. Dist. LEXIS 198678, *18-19 (quoting *Kleczek on Behalf of Kleczek v. R.I. Interscholastic League*, Inc., 768 F. Supp. 951, 956 (D.R.I. 1991)) (emphasis added).  Plaintiffs do not dispute that maintenance of sex-specific boys and girls middle and high school sports teams is an important governmental objective.  Indeed, Plaintiffs allege that exclusion from their schools' girls' sports teams—"a pillar of public education"—would cause them irreparable harm.  ECF No. 7-1 at 19-20.  So, the parties appear to agree that ensuring opportunity and safety in public school athletics is an important governmental objective, though they disagree regarding the means to achieve that objective.

The means used to protect athletic opportunities for middle and high school girls, objective evidence of biological sex as recorded in birth certificates, is substantially related to New Hampshire's important governmental objective.  This is not a *post hoc* rationalization like that rejected by the Supreme Court.  *See United States v. Virginia (VMI)*, 518 U.S. 515, 535-36 (1996) ("[B]enign' justifications proffered in defense of categorical exclusions will not be accepted automatically; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded.").  The legislative record and news accounts are replete with documented stories regarding the risks faced by biological girls when they compete against biological boys in the age group subject to RSA 193:41.  These are not overly broad generalizations or stereotypes, they are legitimate public policy concerns.

This remains true notwithstanding the statements in the plaintiffs' complaint and declarations that they pose no competitive or safety threat to the other girls.[4]  Intermediate scrutiny does not ask whether the statutory means is the least restrictive available, so a statute need not be as precise as a surgical scalpel.  *See Califano v. Webster*, 430 U.S. 313, 318 (1977) (upholding higher Social Security benefits for females than for males due to historical earning discrimination against females, without proof that each female-beneficiary suffered discrimination).  Put differently, "the Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex."  *Adams*, 57 F.4th at 801.  In this case, RSA 193:41 uses the objective documentation reflected on birth certificates to protect athletic opportunity and safety for girls.  RSA 193:41, III.  So, even if this were an intermediate-scrutiny case, which it is not, the State Defendants have shown that this law passes constitutional muster.

### d.   Plaintiffs Cannot Challenge RSA 193:41 on Disparate Impact or Invidious Discrimination Grounds

RSA 193:41 is facially neutral and lacks discriminatory intent.  It is facially neutral because it does not explicitly distinguish people by protected characteristics.  *See Shaw v. Reno*, 509 U.S. 630, 642 (1993) ("Laws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition."); *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 678 (9th Cir. 1984) (explaining that a statute regarding Olympic procedure that does not refer to the competitors' sex is facially neutral).  The statute solely prohibits anyone with a birth certificate indicating that she or he is biologically male from competing in female athletics.  RSA 193:41, II(b) & III.  So, even if transgender status were a protected characteristic, RSA 193:41 is facially neutral.

---

[4]  Again, State Defendants will accept Plaintiffs' well-pleaded allegations of fact as true for the *sole* purpose of objecting to Plaintiffs' Motion for a Preliminary Injunction, and without waiving State Defendants' right to challenge Plaintiffs' factual allegations as this case proceeds.

Plaintiffs appear to contend that RSA 193:41 is nevertheless unconstitutional because it has a disproportionately adverse impact on transgender girls.  Disparate-impact claims are not cognizable under the Equal Protection Clause.  *Torres-Rivera v. Calderon-Serra*, 412 F.3d 205, 211 n.7 (1st Cir. 2005).  "Although evidence of adverse effect may be pertinent to claims of gender- or race-based discrimination under the Equal Protection Clause, a plaintiff must still show purposeful discrimination."  *Torres-Rivera v. Calderon-Serra*, 412 F.3d 205, 211 n.7 (1st Cir. 2005) (citing *Personnel Adm'r* v. *Feeney*, 442 U.S. 256, 274 (1979)).  There is no such evidence here.

Rather, a facially neutral statute runs afoul equal protection only where the statute is the ***result*** of "invidious discrimination." *Richland Bookmart v. Nichols*, 278 F.3d 570, 576 (6th Cir. 2002) (citing *Kucharek v. Hanaway*, 902 F.2d 513, 520 (7th Cir. 1990), in the context of statutory exemptions).  "The Supreme Court has determined that invidiousness is present when a legislature is motivated by a discriminatory or impermissible intent when creating the challenged classification." *Richland Bookmart v. Nichols*, 278 F.3d 570, 576 (6th Cir. 2002) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 276-80 (1979)).  "Invidiousness" is about discriminatory animus—it tends "to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating[.]" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (quoting Webster's Second Int'l Dictionary 1306 (1954)) (internal quotations and citations omitted).  RSA 193:41 is not the result of discriminatory animus.  Proponents describe it as an act to protect "fairness, integrity, and safety in female competition." 46 H. Rec. at 16.  Each of HB 1205's proponents before the House Education Committee and each of the Senators

13

who argued on the Senate floor for passage of the bill, stated time and again that the purpose of HB 1205 is to protect safety, promote fairness, and secure equal opportunity.[5]

### 2. Plaintiffs' Title IX Claim Is Not Likely to Succeed on the Merits

Plaintiffs do not challenge the constitutionality of Title IX or its regulations.[6]  Indeed, Plaintiffs ***advocate*** for sports teams separated by sex.  But their argument that Title IX's prohibition against discrimination "on the basis of sex" implies an expansive definition of "sex" has been rejected by many courts—including the United States Supreme Court.  *See Dept. of Ed., et al. v. Louisiana, et al.*, 603 U.S. _____ (2024) (*per curiam*) (where the Supreme Court *unanimously* agreed that the multiple injunctions should stay in place related to three provisions of the new Title IX rules, including "the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity."); *see also Tennessee*, 2024 WL 3453880, at *2 (denying stay because Title IX sex discrimination likely does not extend to gender-identity discrimination); *Louisiana v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *3 (5th Cir. July 17, 2024) (denying stay because injunction "does not prevent the DOE from enforcing Title IX or longstanding regulations to prevent sex discrimination."); *Arkansas v. U.S. Dep't of Educ.*, No. 4:24-CV-636 RWS, 2024 WL 3518588, at *15 (E.D. Mo. July 24, 2024) ("At the time Title IX was enacted in 1972, the term "sex" was understood to mean the biological distinctions between males and females."); *Texas v. United*

---

[5]  Please refer to the House Education Committee hearing on January 29, 2024, available at https://www.youtube.com/watch?v=lST_1AB0DBQ (last visited Aug. 24, 2024) (relevant testimony at 5:07:31 – 6:58:08), and the Senate pre-vote debate on May 16, 2024, available at https://www.youtube.com/watch?v=8ai8PSQakzM (last visited Aug. 24, 2024) (relevant debate at 1:14:45 – 2:37:20).

[6]  Title IX's athletics regulation provides: "No person shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics ... , and no [school] shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a) (emphasis added). Title IX also empowers schools to "operate or sponsor separate teams for members of each sex" in certain circumstances.  34 C.F.R. § 106.41(b).

*States*, No. 2:24-CV-86-Z, 2024 WL 3405342, at *6 (N.D. Tex. July 11, 2024) ("Title IX does not address gender identity."); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-CV-00461-O, 2024 WL 3381901, at *5 (N.D. Tex. July 11, 2024) (claiming "gender identity is one in the same as sex" goes "beyond Title IX's scope and even conflicts with its anti-discrimination mandate."); *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *9 (D. Kan. July 2, 2024) ("[I]t is clear from [Title IX's] statutory language that the term 'sex' refers to the traditional binary concept of biological sex."); *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, 2024 WL 3019146, at *9 (E.D. Ky. June 17, 2024) ("[T]he language Congress employed [in Title IX] presumes that males and females will be separated based on biological sex."); *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786, at *3 (W.D. La. June 13, 2024) ("The text of Title IX confirms that Title IX was intended to prevent biological women from being discriminated against in education in favor of biological men.").  Title IX's purpose and function is to correct historically pervasive discrimination against women and girls and increase their academic and extracurricular opportunities.  *See Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993) (noting that "it would require blinders to ignore that the motivation for the promulgation of the regulation" was to remedy prior marginalization of girls' athletic programs); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

### a.    Title IX's Definition of "Sex" Is Narrow

Title IX's view of "sex" is binary.  *See Adams*, 57 F.4th at 812 (collecting dictionary definitions).  While some may consider Title IX's 1972 definition too narrow and unenlightened in contemporary society, that is not reason enough to modify the definition in a way Congress did not contemplate at the time of enactment.  To do so would be inconsistent with the fundamental canons of statutory construction.

It is a "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning … at the time Congress enacted the statute." *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)) (internal quotations omitted).  At the time Congress passed Title IX, "sex" was viewed as binary and immutable—biologically male or female.  *See Adams*, 57 F.4th 791, 812 (collecting definitions).  "Sex" was unambiguous, *see id.* at 813, and "[t]here simply is no alternative definition of 'sex' for transgender persons as compared to nontransgender persons under Title IX."  *Id.* at 814.  This canon of statutory construction is non-normative—it does not judge whether Congress made the best practical or moral choice.  It merely acknowledges that "[w]ritten laws are meant to be understood and lived by.  If a fog of uncertainty surrounded them, if their meaning could shift with the latest judicial whim, the point of reducing them to writing would be lost." *Wisc. Cent. Ltd.*, 585 U.S. at 284.  The Court's analysis of "on the basis of sex" should end here and lead it to conclude that RSA 193:41 does not run afoul Title IX.

But even if the Court looks beyond the 1972 meaning of "sex," it must still interpret "sex" consistently with the statutory scheme.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 320 (2014).  In other words, the Court must "bear[] in mind the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Id*.  Title IX's text is replete with instances where "sex" is used in binary terms, unquestionably referring to the two biological classifications, demonstrating that is what Congress meant when it prohibited sex discrimination.  For example, the statute exempts from its coverage:

a. A public undergraduate institution with a historic "policy of admitting only students of *one sex*," 20 U.S.C. 1681(a)(5) (emphasis added);

b. Organizations like boy scouts or girl scouts whose memberships have "traditionally been limited to persons of *one sex*," *id.* 1681(a)(6) (emphasis added);

c. "[F]ather-son or mother-daughter activities," so long as opportunities provided for "*one sex*" are similar to those provided for "*the other sex*," *id.* 1681(a)(8) (emphases added); and

d. Scholarships associated with participation in a beauty pageant "limited to individuals of *one sex only*," *id.* 1681(a)(9) (emphasis added).

The statute also broadly provides that "nothing contained" in it "shall be construed to prohibit" covered entities "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. And Title IX's longstanding regulatory framework similarly adopts biology-based sex classifications and insulates from liability various forms of sex separation—including "separate teams for members of each sex." 34 C.F.R. § 106.41(b); *see also id.* § 106.32 (housing), § 106.33 (facilities).

Those provisions make sense only if "sex" refers to the male-female binary. And the statute's explicit allowances for varying types of sex classifications only make sense if those classifications can actually be enforced based on biological sex, rather than gender. Although some may view these provisions as antiquated, they nevertheless establish the contextual limits of the meaning of "sex" in Title IX. Plaintiffs urge the Court to read "sex" more broadly, but that would make the statutory scheme incoherent and internally inconsistent.

Statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and historic practices demonstrate that the ordinary public meaning of the term "sex" at the time

of Title IX's enactment could only have been, as Justice Gorsuch put it, "biological distinctions between male and female." *Bostock*, S. Ct. at 1739; *see* 20 U.S.C. §§ 1681(a), 1686; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth.").

        b.    ***Bostock* (and Its Title VII Analysis) Does Not Apply to Title IX**

Plaintiffs rely on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), for their contrary view of Title IX. But *Bostock* simply does not apply in this context. *Bostock*, however, is a Title VII case. As many courts have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not map onto other areas of discrimination. *See, e.g., Tennessee v. Cardona*, No. 24-5588, 2024 U.S. App. LEXIS 17600 (6th Cir. July 17, 2024) at *8 (collecting cases). Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX.

*Bostock* does not govern Title IX because *Bostock* "involved employment discrimination under Title VII," while Title IX "is about schools and children—and the school is not the workplace." *Adams*, 57 F.4th at 808; *see also Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167, 175 (2005) ("Title VII . . . is a vastly different statute from Title IX . . . ."). Additionally, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams*, 57 F.4th at 811. Thus, if *Bostock* applied, it "would swallow the carve-outs and render them meaningless." *Id.* at 814 n.7. *Eknes-Tucker v. Gov. of Alabama*, reaffirmed that "*Bostock* relied exclusively on the specific text of Title VII" and "bears minimal relevance" to cases involving "a different law . . . and a different factual context." 80 F.4th at 1228–29. So, *Bostock* does not undermine any such argument in this arena.

To bolster this point, one can simply look to Title VII and Title IX to see that the provisions use different language: discrimination "because of" sex in Title VII and discrimination "on the basis of" sex in Title IX.  *Compare* 42 U.S.C. § 2000e-2(a)(1) *with* 20 U.S.C. § 1681(a).  In addition, the two statutes serve different goals and have different defenses.  For these reasons, "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."  *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

Moreover, and perhaps most importantly, Congress enacted Title IX as an exercise of its Spending Clause power, U.S. Const. Art. I, § 8, cl. 1, which means that Congress must speak with a crystalline voice—such as regarding the definition of the term "sex" as described above— before it imposes new mandates on any state.  *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  The same is not true of Title VII.  *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-453 (1976).  In light of this, courts have been skeptical in attempts to use Title VII's expansive meaning of sex discrimination in other settings.  *See Cardona*, No. 24-5588, 2024 U.S. App. LEXIS 17600, at *9 (collecting cases).

**B.  Plaintiffs Have Not Demonstrated that They Will Suffer Irreparable Harm Absent an Injunction**

"A showing of irreparable harm requires an actual, viable, presently existing threat of serious harm that cannot adequately be remedied through money damages alone."  *PC Connection Inc. v. Sillich*, 673 F. Supp. 3d 131, 137 (D.N.H. 2023) (citations omitted). Numerous courts have held "that missing school sporting events is not an irreparable harm justifying a preliminary injunction."  *Chapman v. Pa. Interscholastic Ath. Ass'n*, No. 1:14-cv-00192, 2014 U.S. Dist. LEXIS 17702, at *5 (M.D. Pa. Feb. 12, 2014); *see also B.T. v. Smith-*

*Green Cmty. Sch. Corp.*, No. 1:23-CV-325-HAB, 2023 U.S. Dist. LEXIS 192281, at *14 (N.D. Ind. Oct. 26, 2023) ("Contrary to B.T.'s arguments, she has identified no case in which the opportunity to play high school sports was found to be the kind of irreparable harm that will support the entry of a preliminary injunction."); *Sharon City Sch. Dist. v. Pa. Interscholastic Ath. Ass'n*, Civil Action No. 9-213, 2009 U.S. Dist. LEXIS 13037, at *4 (W.D. Pa. Feb. 20, 2009) ("Nevertheless, it is well established that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm."); *Dziewa v. Pa. Interscholastic Ath. Ass'n*, No. 08-5792, 2009 U.S. Dist. LEXIS 3062, at *17-18 (E.D. Pa. Jan. 16, 2009) ("This Court, as well as all other federal courts, have previously and consistently held that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm."); *McKinney v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 771 (W.D. Ark. 2018) (participating in extracurricular activities is not a property interest and does not amount to irreparable harm); *St. Patrick High Sch. v. N.J. Interscholastic Ath. Ass'ns*, Civil Action No. 10-cv-948 (DMC), 2010 U.S. Dist. LEXIS 17993, at *15-16 (D.N.J. Mar. 1, 2010) ("Several courts in this Circuit, as well as 'other federal courts, have . . . held that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm.'") (internal citations omitted).  To the extent courts *have* contemplated that not being able to participate in athletics can constitute irreparable harm, "most courts seem to lean toward the harm being irreparable only when the person cannot participate in the sport at all."  *Gregor v. W. Va. Secondary Sch. Activities Comm'n, No. 2:20-cv-00654*, 2020 U.S. Dist. LEXIS 187428, at *8 (S.D.W. Va. Oct. 9, 2020) (citing cases).

Neither plaintiff has demonstrated that they will suffer irreparable harm absent an injunction.  Iris indicates that she "wants to play on the tennis team, a spring sport, and the track

and field teams, which has both winter and spring seasons."  ECF No. 7-3 ¶ 14; *see also id.* ¶ 15 ("Pembroke Academy's winter track season will begin on December 2, 2024, and the spring tennis and track seasons will begin on March 24, 2025.").  In other words, the earliest Iris might be subject to RSA 193:41 is more than three months from now, and it is by no means clear from the evidence submitted that she will seek to play any sport before March 2025.  "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent . . . ."  *New York v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (citations and quotation marks omitted).  Iris has not identified a risk of harm that is sufficiently actual or imminent to warrant this Court's intervention now.[7]

Nor is it at all clear that either plaintiff will be unable to participate at all in their chosen sports absent an injunction.  Parker has submitted no evidence demonstrating that the only opportunity to play soccer this fall is on Plymouth Regional High School's girls' varsity team. Parker has not, for example, demonstrated that there is no club option available to her.  *Accord Gregor*, 2020 U.S. Dist. LEXIS 199760, at *9 ("In my order denying Plaintiffs' request for a Temporary Restraining Order, I held that Plaintiff Student had not sufficiently alleged irreparable harm because of other options for playing soccer like joining the girls' team at Sissonville High or playing with a private club as she initially planned.").  Nor has Parker submitted evidence demonstrating that there is no option for her to play school soccer other than on the girls' team.  Plymouth Regional High School's sports website indicates that it *does* have a co-ed junior varsity unified soccer team with games scheduled for this fall against other New

---

[7] Notably, Iris has not sought a temporary restraining order, likely for this reason.

Hampshire high schools.[8]  There is nothing in language of RSA 193:41 that prohibits Parker from playing on that team.

Iris has likewise submitted no evidence demonstrating that she will be unable to participate in track or tennis at all, due to RSA 193:41.  Iris has not presented evidence demonstrating that there are no club options available for her in either sport or that she will be unable to play either sport at school.  Pembroke Academy's sports website indicates that both winter and spring track are co-ed sports.[9]  This undercuts any assertion that RSA 193:41 "prevents Iris from playing school sports at all."  *See* ECF No. 7-3 ¶ 17.

Plaintiffs nevertheless contend that they will suffer psychological, social, and educational harms as a result of RSA 193:41.  ECF No. 7-1 at 10.  But the evidence Plaintiffs offer in support of this contention stems from the proposition that Plaintiffs will face the choice of either trying out for the corresponding boys' team or not participating in the sport at all.  *Id.* at 19-20.  It is by no means clear that Plaintiffs would face irreparable harm as a matter of law if their only option were to play for the boys' team.  *See, e.g.*, *D.N.*, 2023 U.S. Dist. LEXIS 198678, at *38; *Gregor*, 2020 U.S. Dist. LEXIS 1997601 at *9.  As discussed, however, Plaintiffs have not demonstrated that this is their only option to participate in their chosen sports.  They have not demonstrated that there are no club or high school teams available to them, and their own high schools' sports websites indicate that there are co-ed options in at least two of the three sports they wish to play.  Plaintiffs have therefore failed to demonstrate that the factual premise to their assertion of psychological, social, and educational harm satisfies the second prong of the injunction analysis.

---

[8]  *See Coed Junior Varsity Unified Soccer*, Plymouth Regional High School, https://tinyurl.com/4kuxh8xs (last visited Aug. 24, 2024).

[9]  *See Coed Varsity Indoor Track*, Spartans Athletics, https://tinyurl.com/mtjv47sp (last visited Aug. 23, 2024); *Coed Varsity Outdoor Track*, Spartans Athletics, https://tinyurl.com/3cs7fpd7 (last visited Aug. 23, 2023).

C.      **Plaintiffs Have Not Demonstrated that the Balance of the Equities and the Public Interest Favor Granting Injunctive Relief**

The balance-of-the-equities and public-interest factors "merge when the government is the opposing party." *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (cleaned up).  These factors weigh strongly against the request for a preliminary injunction.  The plaintiffs have not demonstrated a likelihood of success on the merits.  And even if they had, this would not automatically entitle them to injunctive relief.  *See Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024) ("[T]he plaintiffs argue that, plaintiff will likely succeed on the merits of a constitutional claim, a court must grant a preliminary injunction. Not so. This equitable remedy is never automatic: Key to that discretion is whether an alleged injury jeopardizes the court's ability to see a case through.").  Nor, as discussed, has either plaintiff demonstrated an imminent threat of irreparable harm absent an injunction.

The interests of State Defendants and the public, in contrast, are significant.  RSA 193:41 is a duly enacted law passed by both chambers of the New Hampshire General Court and signed by the Governor.  "Any time a State is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (brackets and citation omitted); *see also Del. State Sportsmen's Ass'n*, 108 F.4th 194; *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (same); *Thompson v. Dewine*, 976 F.3d 610, 619 (6th Cir. 2020) (same); *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (same); *N.M. Dep't of Game & Fish v. United States DOI*, 854 F.3d 1236, 1254 (10th Cir. 2017) (same); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (same).  And, as discussed above, RSA 193:41 serves the well-established important governmental objective of redressing unequal athletic opportunities available to females and ensuring competitive fairness.  *See supra* Part III.A.1.c.

The plaintiffs have not demonstrated that their interests outweigh these recognized, important governmental objectives. They have therefore also failed to satisfy the balance-of-the-equities and public-interest prongs of the injunction analysis.

**D.     Should the Court Issue an Injunction, It Must Be Limited to Plaintiffs in this Case**

Plaintiffs only purport to seek preliminary injunctive relief with respect to themselves. This is clear from the face of their motion, in which each Plaintiff specifically asks this Court "to preliminarily enjoin" Defendants "from enforcing or threatening to enforce HB 1205" as to each Plaintiff and to "requir[e]" Defendants "to permit" each Plaintiff "to try out for and play on school sports teams designated for girls on the same terms and conditions as other girls." ECF No. 7-1 at 2 (Parker); *id.* at 2–3 (Iris). Accordingly, to the extent the Court is inclined to issue a preliminary injunction—and it should not for all the reasons already discussed—any injunction should be limited solely to Plaintiffs.

To the extent Plaintiffs argue in their reply or at oral argument that a broader injunction is warranted, the Court should reject the argument. Plaintiffs have not brought a putative class action on behalf of others similarly situated to them. Even if they had, this case is at an extremely early posture, the evidence presented is limited to Plaintiffs' own facts and circumstances, and there is no basis to assume that the requirements of Fed. R. Civ. P. 23 could be met in this case. And because Plaintiffs' evidence does not speak to the facts and circumstances of others potentially affected by the law, it necessarily fails to "establish that no set of circumstances exists under which [RSA 193:41] would be valid" such that Plaintiffs would be entitled to a facial remedy. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (citation and quotation marks omitted); *see also Doe v. Reed*, 561 U.S. 186, 194 (2010) (observing that

when a claim extend "beyond the particular circumstances of" the plaintiffs, "they must . . . satisfy [the] standards for a facial challenge to the extent of that reach").

Moreover, even when there is "a constitutional flaw in a statute," a court must "limit the solution to the problem." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 328 (2006).  Courts thus prefer "to enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Id.* at 328–29.  In other words, "an injunction must be narrowly tailored to remedy the specific harm shown." *Neb. Dep't Health & Human Servs. v. U.S. Dep't Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006).

If this Court concludes that the plaintiffs have demonstrated that a preliminary injunction is appropriate—and, again, it should not reach this conclusion—then the only harm Plaintiffs have demonstrated is limited to them.  Any preliminary injunction should be similarly circumscribed.[10]

## CONCLUSION

For all these reasons, this Court should deny Plaintiffs' request for a preliminary injunction.

<div style="margin-left:40%">

Respectfully submitted,

DEFENDANTS FRANK EDELBLUT, ANDREW CLINE, KATE CASSADY, ANN LANE, PHILIP NAZZARO, RAJESH NAIR, JAMES FRICCHIONE, and JAMES LABOE

By their attorneys,

JOHN M. FORMELLA
ATTORNEY GENERAL

</div>

---

[10] Nor is it clear that any injunction, if issued, should run against the State Defendants. The plaintiffs have not pointed to any act that any State Defendant has undertaken that is causing them harm. They simply name State Defendants based on a view that one or more of those defendants plays some role in enforcing RSA 193:41. As noted above, this legal question can be raised and resolved at a later date. For present purposes, however, Plaintiffs do not appear to dispute that an injunction running to school districts would redress the harm they allege.

Date:  August 24, 2024          */s/ Michael P. DeGrandis*
                                Michael P. DeGrandis, N.H. Bar  No. 277332
                                Attorney, Civil Bureau
                                Brandon F. Chase, N.H. Bar No. 270844
                                Assistant Attorney General, Civil Bureau
                                Office of the Attorney General
                                1 Granite Place South
                                Concord, NH 03301
                                (603) 271-3650
                                michael.p.degrandis@doj.nh.gov
                                brandon.f.chase@doj.nh.gov

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2024, a copy of the foregoing was served on all parties

of record through the Court's e-filing system.

                                 */s/ Michael P. DeGrandis*
                                Michael P. DeGrandis