# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

PARKER TIRRELL, et al.
  *Plaintiffs*,

v.                                              Case No. 24-cv-251-LM-TSM

FRANK EDELBLUT, et al.
  *Defendants.*

## PLAINTIFFS PARKER TIRRELL AND IRIS TURMELLE'S REPLY TO STATE DEFENDANTS' OBJECTION TO MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Parker Tirrell and Iris Turmelle bring this case to challenge a recently enacted New Hampshire law and its application to them that bans transgender girls from participating on girls' school sports teams (the "Sports Ban"). They submit this Reply to the State Defendants' Memorandum of Law in Objection to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 59-1 ("Defs.' Obj.").

**I.      Plaintiffs are likely to succeed on the merits of their equal protection claim.**

**A.      Defendants have failed to explain how categorically barring transgender girls from playing on girls' teams does not facially discriminate on the basis of transgender status.**

The Sports Ban facially classifies and discriminates on the basis of transgender status. The Sports Ban discriminates against Parker and Iris based on their status as transgender girls by providing that, for purposes of school sports, a student's sex is designated "at or near the time of the student's birth." N.H. Rev. Stat. Ann. ("RSA") § 193:41, III(a). The Sports Ban thus identifies the one unbridgeable difference between transgender and non-transgender girls and makes that the criterion for participation on school sports teams. *See* Decl. of Daniel Shumer, M.D. ¶ 20, ECF No. 7-6 ("A transgender girl is a girl whose birth sex is male."). The Sports Ban thus intentionally and categorically excludes all transgender girls from playing on girls' teams.

1

Courts have had repeatedly concluded that similar bans that exclude transgender students from sports based on their biological sex or sex designated at birth discriminate on the basis of transgender status. Further, courts have easily seen through the frequent assertion Defendants make here that "[t]ransgender status is not mentioned anywhere" in the statute. *See* Defs.' Obj. at 8, ECF No. 59-1. The Fourth Circuit examined a similar statute and reasoned that "[if the plaintiff] were a cisgender girl, she could play on her school's girls teams. Because she is a transgender girl, she may not. . . . The undisputed purpose—and the only effect—of that definition is to exclude transgender girls from the definition of 'female' and thus to exclude them from participation on girls sports teams. That is a facial classification based on gender identity." *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 555–56 (4th Cir. 2024).[1]

Defendants make no assertion that a criterion based on "biological sex" as designated at birth does not single out and target transgender people. They cannot do so. In an attempt to circumvent that obvious problem and the application of heightened scrutiny, Defendants offer two flawed points. First, Defendants contend that the only sex-based classification in RSA § 193:41 is the requirement of sex-separated sports teams, which Plaintiffs do not challenge.[2] But a statute can,

---

[1] *See also Hecox v. Little*, 79 F.4th 1009, 1042–43 (9th Cir. 2023) (That the statue "speaks in terms of 'biological sex,' rather than 'transgender status' or 'gender identity,' is not controlling" because "the Act can only be understood as a transgender-based classification. . . . [T]he Act distinguishes on its face between cisgender women and girls, who can compete on teams consistent with their gender identity, and transgender women and girls, who are categorically barred from doing so. . . . [They] are the only group banned from participating on athletic teams that are aligned with their gender identities."); *L.E. v. Lee*, 2024 U.S. Dist. LEXIS 57803, at *48–50 (M.D. Tenn. Mar. 29, 2024) (statutory criterion of "sex at the time of the student's birth" is "facial discrimination" and concluding that "[u]nder the challenged law and policy, every cisgender student is permitted to play on the team that aligns with their gender identity. . . . [T]ransgender students are not"); *see generally A.M. v. Indianapolis Pub. Sch.*, 617 F.Supp.3d 950 (S.D. Ind. 2002), *appeal dismissed*, 2023 U.S. App. LEXIS 1994 (7th Cir. Jan. 19, 2023) (holding that a virtually identical statute discriminated against transgender individuals despite not using the term "transgender"); *Doe v. Horne*, 683 F. Supp. 3d 950, 971–72 (D. Ariz. 2023) ("The Arizona legislature intentionally created a classification, specifically 'biological girls,' that necessarily excludes transgender girls, and expressly allowed only that exclusive classification to play girls sports to the exclusion of transgender girls.").

[2] Without any support, Defendants assert that the statutory criterion of "'sex' as designated by birth certificates" is not a classification itself, but merely the means of implementing the "sex-based" classification of sex-separated sports. *See* Defs.' Obj. at 5, ECF No. 59-1 ("Plaintiffs do not challenge the classification itself, but rather the legislature's

of course, classify on more than one ground. Defendants' argument ignores the statutory language and the weight of authority of other courts examining similar laws. *See* cases cited *supra* note 1. The relevant classification for purposes of this case is that a student's sex is "determined by the student's biological sex on the student's official birth certificate." RSA § 193:41, III.

Second, the two cases that Defendants rely on, which involve governmental definitions of race classes in affirmative action programs, *see* Defs.' Obj. at 5–7, ECF No. 59-1, are inapposite. Those cases do not address laws that facially and intentionally target a class of people to categorically bar them from opportunities.[3] Those cases are, therefore, far afield from this case.

### B.   Defendants misstate the basis for subjecting transgender status classifications to heightened scrutiny and inaccurately characterize the current state of the law.

Defendants assert that "[i]n any event, as numerous courts have found, transgender status is not a quasi-suspect class that would trigger heightened scrutiny." Defs.' Obj. at 8, ECF No. 59-1. This statement is wrong on two counts. First, apart from whether transgender people constitute a suspect or quasi-suspect class, many courts have held that heightened scrutiny applies to laws that facially discriminate based on transgender status because such laws discriminate based on sex. *See* Pls.' Mem. Supp. Prelim. Inj. 16–18, ECF No. 7-1 ("Pls.' Mem.") (citing cases). In addition,

---

choice of what to include within the classification."); *id.* at 7 (characterizing Plaintiffs' argument as "challenging the lawfulness of a classification's definitional contours rather than the lawfulness of the classification itself").

[3] *See Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) (in challenge to affirmative action statute, the plaintiffs did not show that the statute was designed to harm people of Spanish descent in small business owner benefits program, so plaintiffs' claim was evaluated using rational basis review and passed rational basis review); *Orion Ins. Grp. v. Wash. State Off. of Minority & Women's Bus. Enters.*, 2017 LEXIS 124300 (W.D. Wash. Aug. 7, 2017) (no assertion that affirmative action programs were designed to exclude mixed-race individuals from state and federal benefits. Further, the plaintiff did not offer evidence that the application of the program created any disparate impact on mixed-race persons. The plaintiff's claim was evaluated using rational basis review and passed rational basis review).

numerous courts have also held that laws targeting transgender people are subject to heightened scrutiny because transgender persons plainly meet the criteria of at least a quasi-suspect class.[4]

**C.      Defendants provide no basis to conclude that the Sports Ban survives heightened scrutiny.**

This Court concluded at the TRO stage that the Defendants failed to demonstrate that the Sports Ban as applied to Parker (and now Iris) is substantially related to important governmental objectives of ensuring fairness and safety in girls' school sports. Order at 9, ECF No. 50. Defendants offer nothing to change that assessment. They simply assert, with no factual support, that "objective evidence of biological sex as recorded in birth certificates," is substantially related to the stated goals. *See* Defs' Obj. at 11, ECF No. 59-1. Defendants do not and cannot dispute that Parker and Iris have no inherent strength or competitive advantages as compared to other girls. *See* Pls.' Mem. at 5, 18–19, ECF No. 7-1. By categorically banning all transgender girls from girls' sports, the Sports Ban improperly equates transgender status with athletic ability and is based on the type of generalizations and assumptions that cannot withstand heightened scrutiny.

**II.      <u>Plaintiffs are likely to succeed on the merits of their Title IX claim.</u>**

As numerous appellate courts have concluded, because anti-transgender discrimination is based on sex, the plain text of Title IX prohibits discrimination based on transgender status. *See*

---

[4] Although this Court does not need to reach the issue here, many courts have found that laws classifying based on transgender status are quasi-suspect because transgender people meet the well-established criteria, including being subjected to a history of systemic discrimination. *See Grimm v. City of Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020); *Hecox*, 79 F.4th at 1026; *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019); *Doe v. Snyder*¸ 28 F. 4th 103, 113 (9th Cir, 2022); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719–22 (D. Md. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288–89 (W.D. Pa. 2017); *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015). Defendants' discussion is replete with mischaracterizations of the various cases they cite. The Sixth and Eleventh Circuits, for example, have not "expressly refused" to find that transgender status is a quasi-suspect class status, Defs.' Obj. at 8, ECF No. 59-1, and in the cases cited, those courts found that the laws at issue did not classify based on transgender status, *see L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023) (finding that the ban on healthcare for transgender minors did not discriminate based on transgender status but was merely the regulation of medical care); *Eknes-Tucker v. Governor of State of Ala.*, 80 F.4th 1205 (11th Cir. 2023) (where there was no finding of a pretext for invidious discrimination based on transgender status, the statute was a regulation of medical care that did not trigger heightened scrutiny).

Pls.' Mem. at 13, ECF 7-1. The State cannot overcome Title IX's prohibition on discrimination based on transgender status, which is a form of sex discrimination. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 683 (2020).

In *Bostock*, the Supreme Court explained that its holding was compelled by two of "Congress's key drafting choices—to focus on discrimination against individuals and not merely between groups and to hold employers liable whenever sex is a but-for cause of the plaintiff's injuries." *Id.* at 680. These key drafting choices are as relevant here as they were in *Bostock*. First, Title IX, like Title VII, prohibits discrimination against individual "person[s]," not groups. 20 U.S.C. § 1681(a). Defendants are wrong that Plaintiffs cannot prove a Title IX claim because they do not challenge sex separation in sports at their schools; an individual can prove a Title IX violation if *that person* is discriminated against based on their sex. Here, Plaintiffs can do so by showing they are discriminated against based on their transgender status and, therefore, on the basis of their sex—regardless of the existence of separate teams for boys and girls.

Second, the difference between the statutory language "because of" in Title VII and "on the basis of" in Title IX, if any, is one that cuts in the Plaintiffs' favor here. Plaintiffs can show "but-for causation," as the Plaintiffs did in *Bostock,* because discrimination on the basis of transgender status always takes into account a person's sex. *Bostock*, 590 U.S. at 669. And to the extent Title IX adopts a different standard for causation, it is a less stringent one that recognizes a Title IX violation upon establishing that sex was a motivating factor. *See Doe v. Trs. of Dartmouth Coll.*, Civil No. 22-cv-018-LM, 2024 U.S. Dist. LEXIS 69677, at *26–27 (Aug. 22, 2024) (explaining that the alternative to Title VII's "but-for" causation is the "less stringent 'motivating factor' standard").

Defendants' reliance on recent Title IX rulings is unavailing. Defendants rely on federal courts that have issued preliminary injunctions, limited in scope to certain U.S. states, blocking a new Department of Education Final Rule that interprets Title IX as broadly prohibiting discrimination based on sexual orientation and gender identity. *See* 89 Fed. Reg. 33474, *et seq.* (Apr. 29, 2024) ("2024 Rule"). These decisions are not relevant here, and their analysis is not persuasive.

As an initial matter, no appellate courts have reached a final decision on the merits of the 2024 Rule's interpretation of Title IX.[5] In addition, the First Circuit has been unequivocal in interpreting Title IX consistently with Title VII. *See, e.g.*, *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896–98 (1st Cir. 1998) ("[T]he Title VII standard for proving discriminatory treatment should apply to claims of sex discrimination arising under Title IX."); *Wills v. Brown Univ.*, 184 F.3d 20, 25 n.3 (1st Cir. 1999) (aside from damages, "the two statutes are construed *in pari materia*").

Finally, contrary to Defendants' claim, there is no ambiguity in Title IX that would offend the Spending Clause. The Spending Clause does not require Congress to "prospectively resolve

---

[5] The State Defendants overstate the relevance of three recent appellate decisions, which merely declined to stay injunctions of the 2024 Rule. Contrary to the assertions in the State's Objection, the U.S. Supreme Court did not "reject" an expansive definition of "sex" in *Dept. of Ed., et al. v. Louisiana, et al.*, No. 24A70, 603 U.S. ____, 2024 U.S. LEXIS 2983 (Aug. 16, 2024) (per curiam). Neither the majority nor the dissent engages with this question at all, let alone weighs its merits, discussing only the issue of whether the part of the regulation defining sex discrimination is severable from other provisions of the 2024 Rule, with the majority concluding that it is not. The analysis of that question has no bearing on the issues before this court. The circuit court decisions from which that stay application originated are similarly inapplicable here. Like the Supreme Court's stay denial, *Louisiana v. U.S. Dep't of Educ.* addresses only the question of whether the district court's injunction was overbroad. No. 24-30399, 2024 U.S. App. LEXIS 17886 (5th Cir. July 17, 2024). The Sixth Circuit decision also focuses principally on the question of whether the district court's injunction of the 2024 Rule was overbroad, engaging with the question of Title IX's definition of sex discrimination only briefly by noting its "skeptic[ism] of attempts to export Title VII's expansive meaning of sex discrimination to other settings." *Tennessee v. Cardona*, No. 24-5588, 2024 U.S. App. LEXIS 17600, at *9 (6th Cir. July 17, 2024). An Eleventh Circuit decision enjoining the 2024 Rule also issued in a circuit, unlike the First Circuit, with precedent declining to interpret Title VII consistently with Title IX. *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444-GG, 2024 U.S. App. LEXIS 21358, at *12 (11th Cir. Aug. 22, 2024) (holding that *Bostock* does "not govern Title IX because it 'involved employment discrimination under Title VII,' while Title IX 'is about schools and children—and the school is not the workplace.'") (quoting *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022)).

every possible ambiguity concerning particular applications" of a statute.[6] *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). With regard to anti-discrimination legislation, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). Here, recipients of federal funds have notice that Title IX encompasses all forms of sex discrimination, including against transgender people. *See Bostock*, 590 U.S. at 677–78 ("[A]pplying protective laws to groups that were politically unpopular at the time of the law's passage . . . often may be seen as unexpected. But to refuse enforcement just because of that . . . would tilt the scales of justice in favor of the strong or popular and neglect the promise that all persons are entitled to the benefit of the law's terms."); *id.* at 669 ("Nor is there any such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.").

Moreover, the Spending Clause argument, even if it were otherwise correct, would merely affect the availability of retrospective relief—that is, "money damages." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). The Spending Clause does not affect whether the Plaintiffs are entitled to an injunction based on "the scope of the behavior that Title IX proscribes." *Id.* In short, the Spending Clause offers Defendants no refuge.

III.   **Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction.**

The denial of Plaintiffs' opportunity to participate equally in girls' sports alone establishes irreparable harm. Plaintiffs are irreparably injured by the "denial of equal treatment resulting from

---

[6] In fact, courts have identified in Title IX's clear text numerous forms of discrimination. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005) (holding that Title IX prohibits retaliation against student for reporting sexual harassment); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 653–54 (1999) (holding that peer-on-peer sexual harassment is prohibited sex-based discrimination under Title IX); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 76 (1992) (upholding damages remedy in sexual harassment claim under Title IX).

the imposition of a barrier"—the Sports Ban. *Hecox v. Little*, 479 F. Supp. 3d 930, 960 (D. Idaho 2020) *aff'd in relevant part*, Nos. 20-35813 & 20-35815, 2024 U.S. App. Lexis 13929 (9th Cir. Aug. 17, 2023). Like the law enjoined in West Virginia and other comparable laws enjoined in other states, the Sports Ban not only excludes Plaintiffs from girls' sports entirely, but it also excludes them because of who they are: transgender girls. *See B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 357 (S.D. W. Va. 2021) (finding irreparable harm because "not only would B.P.J. be excluded from girls' sports completely; she would be excluded because of who she is: a transgender girl") *preliminary injunction aff'd*, 550 F. Supp. 3d 347 (4th Cir. 2021).

In addition to the constitutional injury, Iris and Parker are harmed by the loss of the opportunity to play sports altogether. As even Defendants concede, irreparable harm is shown when "the person cannot participate in the sport at all." *Gregor v. W. Va. Secondary Sch. Activities Comm'n*, No. 2:20-cv-00654, 2020 U.S. Dist. LEXIS 187428, at *8 (S.D. W. Va. Oct. 9, 2020).

The ban also harms Iris and Parker by interfering with their medical care. The effectiveness of their medical treatment rests on them being able to live fully as girls; denying them the opportunity to play on a girls' team undermines this medical care and damages their mental health and well-being. *See* Manzelli Decl., ¶ 17, ECF No. 7-3; Tirrell Decl., ¶¶ 19–20, ECF No. 7-4; *see also* Shumer Decl., ¶ 25, ECF No. 7-6 (describing standard of care for medical treatment). Defendants do not attempt to contest this form of harm. Nor can they.

Finally, the denial of the opportunity to play sports affects Iris and Parker well beyond the playing field. School sports are crucial in helping students build self-confidence, experience a sense of accomplishment, and develop a positive self-image through teamwork and shared goals. For Iris and Parker, being barred from playing does more than simply exclude them from a team— it denies them a chance to develop essential social and emotional skills that shape their healthy

development at a particularly sensitive time in their lives. *See* Manzelli Decl., ¶ 14, ECF No. 7-3; Tirrell Decl., ¶ 17, ECF No. 7-4.

The harms these girls face are immediate. The start of a new school year brings the desire to make friends, forge new relationships, and make healthy choices. As Iris's mother testified, for Iris, sports is about making friends, establishing a "fun and positive peer group," and coping with the "stresses she experiences in life." Manzelli Decl., ¶ 14, ECF No. 7-3. All that can happen on the playing field, but it primarily happens in her day-to-day interactions with peers. For Parker, "sports gets [her] up in the morning and motivates her on days when she might not feel like going to school." Tirrell Decl., ¶ 14, ECF No. 7-4. The injury of being denied the chance to do that is experienced pervasively throughout her days, not just on the playing or practice field.

For all these reasons, Defendants' citation to cases noting that "ineligibility alone does not constitute irreparable harm" misses the point. This is far from a case involving ineligibility to play in a specific game, in a tournament, or even in any particular sport.[7] Here, these girls are barred from trying out, participating, or playing sports on equal terms with their female peers and its harmful impact on their mental health and social development. Even in *B.T. v. Smith-Green*

---

[7] All of the cases cited by Defendants are inapt. None involve a categorical exclusion from play of athletes because of who they are. Nor do they involve cases where exclusion from play undermines a student's medical care or immediately harms their self-esteem and mental health in ways that can never be undone. *Cf. St. Patrick High Sch. v. N.J. Interscholastic Athletic Ass'ns*, No. 10-cv-948, 2010 U.S. Dist. Lexis 17993, at *17 (D.N.J. Mar. 1, 2010) (no irreparable harm where high school basketball team that had an opportunity to participate in a full regular season, a county tournament, and out-of-state play, was excluded from state high school tournament); *Gregor v. W. Va. Secondary Schs. Activities Comm'n*, No. 2:20-cv-654, 2020 U.S. Dist. Lexis 187428, at *9 (S.D. W. Va. Oct. 9, 2020) (no irreparable harm where plaintiff permitted to play on girls' soccer team failed to allege sufficient injury from being denied a spot on boys' team, as allegations of lost college recruitment and skill development were found speculative and achievable on girls' team); *Dziema v. Pa. Interscholastic Athletic Ass'n*, No. 08-5792, 2009 U.S. Dist. Lexis 3062, at *19 (E.D. Pa. Jan. 16, 2009) (no irreparable harm based on alleged future college prospects where student wrestler was allowed to practice, work out, and compete in tournaments); *Sharon City Sch. Dist. v. Pa. Interscholastic Athletic Ass'n*, No. 9-213, 2009 U.S. Dist. Lexis 13037, at *6–7 (W.D. Pa. Feb. 20, 2009) (neither school nor student could show irreparable harm where student ejected from basketball game for misconduct was required to sit out next game); *Chapman v. Pa. Interscholastic Athletic Ass'n*, No. 1:14-cv-192, 2014 U.S. Dist. Lexis 17702, at *5–6 (M.D. Pa. Feb. 12, 2014) (no irreparable harm where home schooled student denied eligibility to play in one post-season basketball game).

*Community School Corp.*, one of the cases upon which Defendants rely, the court explained that, where a transgender girl is barred from playing girls' sports, the harm is not the "abstract benefit of sport participation," but instead the "significant psychological harms" that result. No. 1:23-CV-325-HAB, 2023 U.S. Dist. LEXIS 192281, at *14 (N.D. Ind. Oct. 26, 2023).

**IV.    The balance of equities supports the entry of a preliminary injunction.**

As set forth above, Plaintiffs have shown a likelihood of success on the merits and that they will experience irreparable harm if the Sports Ban is not enjoined. "It is 'always in the public interest to prevent the violation of a party's constitutional rights,'" *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)), and Defendants cannot suffer harm from an injunction that bars an unlawful practice, *see Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of. P.R.*, 437 F. Supp. 3d 119, 137 (D.P.R. 2020) (holding that the government "has no interest in enforcing an unconstitutional law").

Defendants do not dispute that Plaintiffs enjoy no physical advantage over their non-transgender peers, nor do they argue that Plaintiffs are physically different than their non-transgender peers in any way relevant to sport. Until the Sports Ban went into effect and for years, Parker, Iris, and other transgender girls have played sports in New Hampshire alongside their non-transgender peers. A preliminary injunction maintains the status quo ante and harms Defendants not at all.

**V.    Conclusion**

For these reasons and as explained in Plaintiffs' Memorandum of Law in support of their Motion for a Preliminary Injunction, Plaintiffs respectfully request that this court enter the preliminary injunction to enjoin the Sports Ban.

Respectfully submitted,

PARKER TIRRELL, by her parents and next friends SARA TIRRELL and ZACHARY TIRRELL,

and

IRIS TURMELLE, by her parents and next friends AMY MANZELLI and CHAD TURMELLE,

By and through their attorneys,

/s/ Chris Erchull

| | |
|---|---|
| Kevin J. DeJong (NH Bar No. 17633) | Chris Erchull (NH Bar No. 266733) |
| kdejong@goodwinlaw.com | cerchull@glad.org |
| GOODWIN PROCTER LLP | Bennett H. Klein* (MA Bar No. 550702) |
| 100 Northern Avenue | bklein@glad.org |
| Boston, MA 02210 | Jennifer Levi* (MA Bar No. 562298) |
| (617) 570-1156 | jlevi@glad.org |
| | GLBTQ LEGAL ADVOCATES & DEFENDERS |
| | 18 Tremont Street, Suite 950 |
| Louis L. Lobel* (MA Bar No. 693292) | Boston, MA 02108 |
| llobel@goodwinlaw.com | (617) 426-1350 |
| Elaine H. Blais* (MA Bar No. 656142) | |
| eblais@goodwinlaw.com | |
| GOODWIN PROCTER LLP | Gilles Bissonnette (NH Bar No. 265393) |
| 100 Northern Avenue | gilles@aclu-nh.org |
| Boston, MA 02210 | Henry Klementowicz (NH Bar No. 21177) |
| | henry@aclu-nh.org |
| | AMERICAN CIVIL LIBERTIES UNION OF |
| Samira Seraji* (CA Bar No. 338979) | NEW HAMPSHIRE FOUNDATION |
| sseraji@goodwinlaw.com | 18 Low Avenue |
| GOODWIN PROCTER LLP | Concord, NH 03301 |
| 601 S. Figueroa Street | (603) 224-5591 |
| Suite 4100 | |
| Los Angeles, CA 90017 | |
| | |
| Ben See* (NY Bar No. 6019202) | |
| bsee@goodwinlaw.com | |
| GOODWIN PROCTER LLP | |
| 620 Eighth Avenue | |
| New York, NY 10018 | |

Emmett Weiss* (MA Bar No. 713784)
eweiss@goodwinlaw.com
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036

*Admitted to appear *pro hac vice*.

August 26, 2024

**Certificate of Service**

    I, Chris Erchull, hereby certify that on today's date I served a copy of the forgoing on all counsel by filing the same on ECF.

/s/ Chris Erchull       
Chris Erchull
