**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 12-2-2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
PARKER TIRRELL, ET AL               *
                                    *   24-cv-251-LM-TSM
             v.                     *   August 27, 2024
                                    *   10:10 a.m.
FRANK EDELBLUT, ET AL               *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:

For the Plaintiffs:          Chris Erchull, Esq.
                             Bennett H. Klein, Esq.
                             Jennifer L. Levi, Esq.
                             GLBTQ Legal Advocates and Defenders

                             Henry Klementowicz, Esq.
                             Gilles R. Bissonnette, Esq.
                             ACLU of New Hampshire

                             Louis L. Lobel, Esq.
                             Kevin DeJong, Esq.
                             Goodwin Procter, LLP

For the Defendants:
(State of NH)                Michael P. DeGrandis, Esq.
                             NH Attorney General's Office (Civil)

                             Brandon Francis Chase, Esq.
                             NH Attorney General's Office (DOJ)

(Pemi-Baker Regional         Diane M. Gorrow, Esq.
School District)             Soule Leslie Kidder Sayward & Loughman

(Pembroke School             Michael Gregory Eaton, Esq.
District)                    Wadleigh, Starr & Peters, PLLC

Court Reporter:              Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             (603) 225-1453

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has before it for
 3    consideration today a motion hearing regarding preliminary
 4    injunction in Parker Tirrell and Iris Turmelle versus Frank
 5    Edelblut, et al.  It is 24-cv-251-LM.
 6              If counsel could please identify themselves for the
 7    record starting with the plaintiffs, please.
 8              MR. ERCHULL:  Chris Erchull for the plaintiffs.
 9              MS. LEVI:  Jennifer Levi for the plaintiffs.
10              MR. KLINE:  Bennett Kline for the plaintiffs.
11              MR. KLEMENTOWICZ:  Henry Klementowicz for the
12    plaintiffs.
13              MR. BISSONNETTE:  Gilles Bissonnette for the
14    plaintiffs.
15              MR.  DEJONG:  Kevin DeJong from Goodwin & Proctor
16    for the plaintiffs.
17              MR. LOBEL:  Louis Lobel for the plaintiffs.
18              MR. DEGRANDIS:  Good morning, your Honor.
19              Michael DeGrandis with the Attorney General's
20    Office for the state defendant.
21              MR. CHASE:  Good morning.
22              Brandon Chase with the Attorney General's Office
23    for the state defendant.
24              MS. GORROW:  Diane Gorrow for the Pemi-Baker
25    Regional School District defendant.
```

1          MR. EATON:  Good morning, your Honor.

2          Michael Eaton for the Pembroke School District

3    defendant.

4          THE COURT:  Okay.  All right.  Let me just get my

5    paperwork laid out here.

6          Okay.  Why don't you tell me how you envision

7    today's hearing proceeding.  Are we going to hear evidence?

8          MR. ERCHULL:  Your Honor, the parties have agreed

9    that we're not going to hear evidence today.

10          The defendants have agreed to accept for the

11    purposes of this hearing that all of the well-pleaded

12    allegations and supporting declarations are true for the

13    purposes of this hearing.

14          THE COURT:  Okay.  All right.  And this is a

15    preliminary injunction.

16          Give me a sense of what a trial would look like in

17    this matter.

18          MR. ERCHULL:  Your Honor, we would present evidence

19    supporting all of the claims that we've made in our complaint

20    and we would expect to hear from witnesses supporting them,

21    including an expert endocrinologist who would provide support

22    for --

23          THE COURT:  An expert, maybe treating physicians,

24    parents perhaps?

25          MR. ERCHULL:  That's correct, your Honor.

```
 1                    THE COURT:  Okay.

 2                    And from the state?

 3                    MR. DEGRANDIS:  And I would suspect on the other

 4      side that we would probably have -- countervailing opinions

 5      from experts would be the principal source of evidence.

 6                    THE COURT:  Okay.  And would that be a jury or a

 7      bench trial?

 8                    MR. ERCHULL:  A bench trial, your Honor.

 9                    THE COURT:  You both agree with that?

10                    MR. DEGRANDIS:  That would make sense.

11                    Yes, your Honor.

12                    THE COURT:  Okay.  And you're not asking -- you're

13      asking for attorneys' fees and nominal damages?

14                    MR. ERCHULL:  That's correct, your Honor.

15                    THE COURT:  Your relief is primarily injunctive?

16                    MR. ERCHULL:  Right.  Injunctive and declaratory.

17                    THE COURT:  Yes.  Okay.  All right.

18                    And I just want to talk about timing a little bit

19      because obviously the TRO is in effect as to Parker, and Iris

20      has issues with timing because her -- and you didn't request a

21      TRO for that reason with respect to Iris.  Her track would

22      start December 2nd I think.

23                    Is that right?

24                    MR. ERCHULL:  I would go a little further, your

25      Honor.  I mean, Iris starts school next Tuesday, and we
```

1    believe that she suffers a constitutional injury the second

2    she walks into the building.

3              THE COURT:  Okay.  All right.

4              This is an injunction, and so ultimately do you

5    have any cases that would support me granting an injunction

6    based on that harm?

7              MR. ERCHULL:  Yeah.  I have additional facts to

8    frame as supporting the injury that she will experience when

9    she goes to school and she's not able to participate in

10    conversations with her friends about what activities they're

11    going to be participating in throughout the school year.  That

12    she's not going to be able to forge new relationships and

13    bonds with other students the way that everyone else can

14    because the law tells her that she's not allowed to

15    participate in the same activities as other students.  That's

16    true from day one whether or not she intends to go out for

17    track on December 2nd.

18              THE COURT:  Okay.  All right.  I think I understand

19    your argument.  We can get there.

20              I could also simply expedite a trial.  Especially

21    where it's a bench trial.  So let me hear your thoughts on

22    that.

23              MR. DEGRANDIS:  I think there's a lot of merit to

24    the notion that perhaps we should proceed to trial quickly.

25    It doesn't seem like there would be a lot of evidence, but at

1  this time I don't know how much time it would take us to find

2  the experts that we would need and so I'm not really at

3  liberty to commit to a particular time here and now.  I know

4  that typically with expert disclosures you need something

5  along the lines of 60, 90 days to sort of pull those types of

6  things together.

7          THE COURT:  We would shorten all of those obviously

8  to deal with the nature of the case and the claims and to get

9  clarity sooner.  That would answer some of these

10  justiciability questions.  And I haven't heard that argument.

11  I haven't contemplated that particular argument.

12          My thought was December 2nd was the beginning of

13  track and that a trial before that date, especially if it's a

14  bench trial, I know I could schedule that the end of October

15  and November and put you on an expedited discovery schedule

16  and disclosure schedule.  We can deal with that at the end.

17  It's just -- it's a thought that I have with respect to the

18  timing and some of the issues with regard to the timing of

19  Iris's would-be exclusion from the track team.

20          MR. ERCHULL:  We're prepared to proceed with trial

21  on an expedited basis.

22          THE COURT:  Okay.  All right.

23          And I know you would want some time to contemplate

24  that.

25          MR. DEGRANDIS:  Yes.

 1              THE COURT:  And I would obviously give you that

 2    time.

 3              Okay.  Then let's begin.

 4              Attorney Erchull.

 5              Can I ask you, just to start, what do you make of

 6    the fact that the United States Supreme Court did not stay the

 7    injunction at least with regard to the Title IX <u>Bostock</u>

 8    portion of the injunction recently?

 9              MR. ERCHULL:  Thank you, your Honor.

10              I agree that the Supreme Court did decline to stay

11    the decision, but at the same time that decision is really

12    only -- that decision really only addressed the issue about

13    scope of relief and whether or not a stay was appropriate in

14    this case.  That was not a decision on the merits at all or

15    even on the likelihood of success of the merits, and I don't

16    think the Supreme Court -- I mean the written decision weighs

17    in not at all on those issues.

18              THE COURT:  So I should just completely ignore it

19    at this point?

20              MR. ERCHULL:  Well, I believe that your Honor is

21    being asked to look at the underlying decisions as well, and

22    they include analysis.  I'm prepared to explain why the

23    analysis in those cases is wrong.

24              THE COURT:  In which cases?

25              MR. ERCHULL:  In the underlying decisions that

```
 1   issued the preliminary injunction in the first instance that
 2   say that Title IX is different from Title VII in two respects.
 3              THE COURT:  Okay.  So that would be Judge Reeves'
 4   decision and Judge Sutton's more recent decision?
 5              MR. ERCHULL:  Right.
 6              THE COURT:  Okay.  All right.
 7              MR. ERCHULL:  Well, the arguments raised by the
 8   state defendants in response to reading those decisions.  So
 9   arguments presented --
10              THE COURT:  All right.  I'll let you get to that.
11   I obviously interrupted you before you got a word in.
12              So go ahead.
13              MR. ERCHULL:  Thank you, your Honor.
14              Chris Erchull for the plaintiffs, Iris Turmelle and
15   Parker Tirrell.
16              The law before you today was designed to prevent
17   transgender girls from playing sports with other girls.  The
18   state conceded as much in its objection to the plaintiffs'
19   motion.
20              Before getting into the legal claims, I want to
21   make a couple of key points about the challenged statute and
22   about the facts of this case.
23              The defining and unbridgeable difference between
24   transgender girls and non-transgender girls is the sex
25   designated at the time of birth.
```

1          The sole basis for determining access under this
2   ban is whether or not the girl was assigned the sex of female
3   at birth.
4          Girls who are not assigned female at birth are
5   excluded, and there is a perfect identity between the group of
6   transgender girls and the girls who are excluded under the
7   ban.
8          The word transgender does not need to appear in a
9   statute in order for it to be a facial classification.  There
10  are numerous examples, but some that come to mind include a
11  statute that defines marriage as between a man and a woman.
12  It does not mention gay people, it does not mention
13  homosexuality, it does not mention lesbians, yet it's still
14  classification based on sexual orientation.
15         When enlistment in the military is denied to people
16  who have been through gender transition, that creates this
17  transgender status classification even when the word
18  transgender does not appear on the face of the policy.
19         When the defining characteristic of a group is
20  woven into a statute or policy, that statute or policy creates
21  a facial classification based on that group.
22         Courts agree in the context of sports bans that
23  it's not necessary to use the word transgender to find a
24  facial classification.
25         There's no need to review all of the facts that

1  we've pleaded in our complaint and supporting declarations,

2  but I will go through just a few key facts that I want us all

3  to have in mind.

4          A transgender girl is a girl whose birth sex is not

5  female.

6          Transgender people uniquely experience a health

7  condition known as gender dysphoria.  Gender dysphoria is a

8  serious but highly treatable medical condition that is

9  characterized by clinically significant distress caused by a

10 mismatch between a person's gender identity and their birth

11 sex.

12         The scientifically developed and universally

13 recognized treatment protocol involves gender transition both

14 socially and with medication.

15         Parker and Iris both have gender dysphoria.

16 They've both known they were girls from a young age.  Both

17 have experienced clinically significant distress caused by the

18 mismatch between their bodies and their female gender

19 identities.  Both girls have transitioned socially, and they

20 live as girls in all aspects of their life.  Both have been

21 supported by the people around them.  Both have transitioned

22 with medication.

23         Neither Parker nor Iris has or will have

24 testosterone-driven puberty.  Neither girl has any biological

25 or physiological difference from any other girls that would

1    impact their performance in sports.

2            These are all really important facts and they're

3    all on the record, and none of these facts are contested here.

4            I will move on to talk about likelihood of success

5    on the merits, and I'm going to start with equal protection.

6            Sex-based classifications are subject to

7    intermediate scrutiny.  That means that there's a searching

8    inquiry into whether the government has provided an important

9    interest and an exceedingly persuasive justification for how

10   that interest is served by the ban.

11           The ban classifies here based on transgender

12   status.  Courts have long said, and the Supreme Court made it

13   very clear in Bostock, that transgender status is a sex-based

14   classification.

15           As the Bostock Court said:  It is impossible to

16   discriminate against a person for being transgender without

17   discriminating against that individual based on sex.

18           But I want to spell out a little more carefully why

19   Bostock applies, it's a Title VII case, but why it would apply

20   even in the equal protection context.

21           And to aid in that discussion I just want to call

22   attention to a recent Tenth Circuit decision from two months

23   ago.  It appears in our principal brief.  That decision is

24   Fowler versus Stitt.

25           Oklahoma passed a law.  It was a statute combined

1    with an executive order prohibiting all people from -- that

2    prohibited all people from changing the gender marker on their

3    birth certificate.  It was true for all people.

4            First, the Court went through an analysis to find

5    purposeful discrimination based on transgender status, but the

6    Court didn't stop there.

7            The Court looked at what <u>Bostock</u> had to say about

8    Title VII, about how Title VII applies to individuals, not

9    groups.  "An employer can violate Title VII even when it

10   treats men and women equally."  That's a quote from <u>Bostock</u>.

11           The Court went through a litany of equal protection

12   cases that stand for the same proposition, and then the panel

13   in <u>Fowler</u> went through a couple of key examples.  One of them

14   being <u>J.E.B. versus Alabama</u>.  That was the case that

15   established that the use of peremptory challenges to

16   discriminate based on gender is unconstitutional.

17           What the Court said is that, yes, you could have

18   counsel on either side who are both discriminating based on

19   sex to try to get a favorable jury and as a class that might

20   result in a balanced jury with an equal number of men and

21   women, but the fact is that every juror that comes up and is

22   being excluded based on that juror's gender is experiencing

23   unlawful discrimination that violates the tenants of equal

24   protection.  Equal protection is based on an individual's

25   status and not based on class.

1          The Tenth Circuit went on to conclude, "Because the

2    policy intends to discriminate based on transgender status, it

3    necessarily intends to discriminate based on sex, and the

4    discrimination on the basis of sex is present irrespective of

5    whether the targeted individual is male or female."

6          The states say that the plaintiffs don't challenge

7    sex separation as a general matter, and that's an accurate

8    characterization of our position but it misses the point.

9          Each individual transgender girl who comes up

10   against this sports ban as an individual is being denied

11   access to school sports for one reason, and it's because she

12   is transgender.  And because transgender status is a sex-based

13   classification, the sports ban is subject to heightened

14   scrutiny.

15         Therefore, the state carries a very heavy burden to

16   show that the sports ban as it's written is substantially

17   related to important state interests.

18         The plaintiffs agree that safety and fairness are

19   important.  The problem is that the way the state accomplishes

20   its goal, or it purports to accomplish its goal to ensure

21   fairness and safety and support, has no apparent relationship

22   with the means, which is to exclude all transgender girls from

23   participation.

24         It's a sweeping categorical ban.  It affects every

25   transgender girl from all girls' sports teams, and no other

1    factor is taken into consideration.

2            It's an uncontested fact in the record that no

3    automatic athletic advantage arises just because a student is

4    transgender.  The state has two alternatives to argue in order

5    to get around this equal protection problem.  One is that

6    there is no transgender status classification, and, two, that

7    transgender status is not a sex-based classification.  Both

8    are wrong.

9            First, as stated before, the sports ban facially

10   and intentionally defines a class of students based on the

11   fact that they are transgender, girls who are not designated

12   female at birth, and excludes all of them from all girls'

13   sports teams.  There is no question that this is a transgender

14   status classification.

15           The second point.  Several circuit court decisions

16   have held conclusively that classifications based on

17   transgender status are entitled to heightened scrutiny because

18   they are sex-based classifications.

19           Some Courts have even reached that point prior to

20   the Supreme Court's ruling in Bostock.  There's no reason that

21   this Court needs to go against the weight of authority or go

22   against the Supreme Court's holding in Bostock to reach the

23   point that the defendants want us to reach, which is that

24   rational basis review would apply.

25           The state argues that using birth certificates to

1    distinguish between who has access to different sports teams

2    is an objective test.  Basically what they're saying is that

3    it's a convenient and objective way to exclude based on a sex

4    characteristic.  It's a choice to go with that kind of more

5    convenient option than to employ a more tailored or

6    individualized assessment on what impact a particular

7    individual might have on the asserted state interests, but

8    convenience can't be a justification for sex discrimination

9    under the equal protection doctrine.

10          Just look at Craig versus Boren where the minimum

11   age to purchase alcohol was 21 for young men but 18 for young

12   women.  Statistics may very well support that the age

13   differential makes sense, but that does not absolve the state

14   from having to tailor its laws so that an individual isn't

15   being discriminated against based solely on their gender.

16   Objective and convenient rules leave a whole class of people

17   vulnerable to discrimination.

18          Being that heightened scrutiny must apply here, the

19   state has not and cannot show that categorically banning all

20   transgender girls from all girls' sports teams without any

21   consideration for the sport or the other physical attributes

22   of the student playing the sport is substantially related to

23   any state objective other than harming and excluding a

24   vulnerable, politically unpopular minority.  Transgender

25   girls.

1          I'm going to move on to talk about Title IX now.

2          THE COURT:  Can I ask you a question about equal

3     protection?

4          MR. ERCHULL:  Yes.  Of course.

5          THE COURT:  Am I analyzing the two-part test to

6     decide whether the means chosen by the law to achieve its aims

7     are substantially related to achieving those aims or whether

8     applying those means to Parker and Iris is substantially

9     related to achieving those aims?

10         MR. ERCHULL:  Thank you for the question, your

11    Honor.

12         I believe that you reach the same result in either

13    instance.  And the reason is because, as Parker and Iris

14    illustrate, the sweeping classification on the face of this

15    statute encompasses -- it doesn't take into consideration any

16    of the safety or fairness factors that the state purports to

17    want to advance.  And so Parker and Iris as applied make the

18    perfect examples of why on its face the classification is

19    categorical and sex-based and therefore can't survive

20    intermediate scrutiny.

21         THE COURT:  So you're making both a facial and

22    as-applied challenge?

23         MR. ERCHULL:  I am, your Honor.

24         THE COURT:  All right.

25         Go ahead.

1           MR. ERCHULL:  Under Title IX to prove a Title IX

2    claim each plaintiff must show that the sports ban would

3    exclude her from participation in, deny her the benefits of,

4    or subject her to discrimination; two, in an educational

5    program receiving federal financial assistance; three, on the

6    basis of sex or gender.

7           So as to the first two elements, I don't think

8    we're disputing here that they're being excluded from

9    participation in an educational benefit.  There's no dispute

10   that these are educational programs receiving federal

11   financial assistance.

12          So the only dispute is as to whether or not it's on

13   the basis of gender.

14          There is no need for this Court to engage in

15   finding a definition of sex in order to establish that these

16   elements have been met.  Bostock did not rely on any

17   definition of sex.  In fact, the Supreme Court said that

18   transgender status is a sex-based classification no matter how

19   you slice it.

20          The arguments that the state raises in support of

21   its position that Title IX is different all fail.  You know,

22   Bostock doesn't apply just because it's a different statute

23   that's being addressed.  That's one argument that they make.

24   Well, the First Circuit has long mandated that Courts look at

25   Title VII to know how to interpret Title IX, and there's no

1    reason that this analysis should be any different.

2            The defendants point to the difference between the

3    terms because of sex versus on the basis of sex.  The

4    defendants don't really offer any explanation for how this

5    slight difference might matter or how it might end in

6    different outcomes in this case.

7            It's true that some Courts have said that there's a

8    different causation standard under Title IX, but in those

9    cases the causation standard is actually more relaxed.  A

10   plaintiff needs to only show that sex was a motivating factor

11   in those cases, not a but-for factor, for the discrimination

12   at issue.

13           Here sex is both a but-for cause and a motivating

14   factor for the exclusion of transgender girls from school

15   sports.  So the difference between because of and on the basis

16   of has no bearing on the analysis here.

17           The state defendants also point to the spending

18   clause and how, yes, it's true that Title IX differs from

19   Title VII and that it was enacted under Congress's power under

20   the spending clause, but that does not bear on the outcome of

21   this case.

22           First, money damages are the source of the

23   difference between how Courts treat spending clause

24   legislation versus commerce clause legislation, and here we

25   are seeking declaration and injunctive relief.

1    Second, the issue -- where it arises in spending

2    clause litigation -- where the substantive distinction arises

3    is when the text of the law isn't clear.

4    And I'm going to quote from Bostock here and say,

5    "Applying protective laws to groups that were politically

6    unpopular at the time of the law's passage often might be seen

7    as unexpected, but to refuse enforcement just because of that

8    would tilt the scales of justice in favor of the strong or

9    popular and neglect the promise that all persons are entitled

10    to the benefit of the law's terms."

11    I think that there's no justification for seeing

12    the bar on sex discrimination under Title IX any differently

13    from the way it's laid out in Title VII, and the Supreme Court

14    has made it crystal clear what sex discrimination entails.

15    Discriminating against transgender people because they are

16    transgender is a form of sex discrimination.  That's true

17    whether we're talking about Title VII and it's true if we're

18    talking about Title IX.

19    THE COURT:  Now, how do you think the Court would

20    decide that today if you -- obviously Bostock is clear in the

21    Title VII context.

22    MR. ERCHULL:  Yeah.  I know the answer to that,

23    yes, I think I do, which is that -- you know, that decision

24    was a 6-3 decision, right?  Eight of the justices I believe

25    are still the same justices that are on the court -- or no.

1    Sorry.  Seven are.  Two have been replaced.

2          There's a possibility that the numbers might fall a

3    little bit differently, but, you know, the author of the

4    opinion was Justice Gorsuch, and I don't think there's any

5    reason that the Supreme Court would revisit that decision and

6    offer a different analysis under Title IX.

7          THE COURT:  Okay.  You don't think that they might

8    see a school as a different context and athletics as a

9    different context?

10          They specifically in Bostock say at the end we're

11    not dealing with these other cases, we're not dealing with

12    locker rooms and bathrooms.

13          And certainly Judge Reeves and Judge Sutton have

14    signaled that they see a stark difference between Title IX and

15    Title VII.  Title IX being designed to protect women, girls in

16    sports.

17          Now, I agree Bostock is very, very clear --

18          MR. ERCHULL:  Uh-huh.

19          THE COURT:  -- with respect to Title VII, and

20    Roberts also joined that opinion.

21          MR. ERCHULL:  That's true.

22          THE COURT:  And I will say Reeves is relying

23    heavily on the dissents, and maybe that was going to be part

24    of your explanation.  Reeves's decision cites the dissents in

25    Bostock, which is not something I would feel empowered to do

1    to give you a sense of where I would stand in terms of my

2    humility with respect to being a district court judge.  I'm

3    going to be beholden to a majority opinion.

4            But the question of Title IX is a different

5    context.  It's one that I'm definitely grappling with as I

6    study this issue.

7            MR. ERCHULL:  So, your Honor, I agree that the

8    context is much different in schools versus in the workplace.

9    I don't think that the workplace setting is what factored into

10   how Gorsuch wrote his opinion.  He was pretty clear that this

11   was a textual analysis, right?  And he even said in his

12   decision, "There's just not any such thing as a canon of donut

13   holes in which Congress's failure to speak directly to a

14   specific case that falls within a more general statutory rule

15   creates a tacit exception."

16           There was discussion in the Bostock decision about

17   how unexpected the result might be, how it certainly wasn't

18   expected by Congress at the time that Title VII was enacted,

19   but that doesn't play into how this Court should look at the

20   text of Title IX.

21           And if Congress wishes to pass a different law, of

22   course Congress has the power to do so, but Congress instead

23   uses the same essential language in saying that sex

24   discrimination is unlawful when they passed Title IX just like

25   what they did when they passed Title VII.

1                Also, I think that the principles underlying Title

2    IX about protecting students from denial of educational

3    opportunities based on gender apply with full force to our

4    plaintiffs that we have before this Court and with full force

5    to all transgender students in New Hampshire public schools

6    who simply want to have the same educational opportunities as

7    all other students.

8                I have two more points that I would like to get

9    through on Title IX.

10                First, the Department of Education's new final rule

11    interpreting Title IX to prohibit gender identity

12    discrimination.

13                The Court cases involving that rule are in a

14    totally different posture from this case.  Not one of those

15    cases involved a transgender plaintiff coming before the Court

16    with a Title IX claim.  That's what we have here today.  Those

17    claims are administrative procedure claims and their analysis

18    is not binding here, and for the reasons that I've raised

19    already I don't believe that the reasoning in those decisions

20    is persuasive at all.

21                This Court should follow <u>Bostock</u> because it is the

22    authoritative guide from the Supreme Court on how to analyze

23    sex discrimination when it comes to transgender status.

24                And this Court should follow the First Circuit

25    mandate to interpret the substantive provisions of Title IX

1   like Title VII.

2          THE COURT:  Now, I'm just going to read from the

3   Supreme Court's decision, and they say, and I'm quoting,

4   "Importantly, all members of the Court today accept that the

5   plaintiffs were entitled to preliminary injunctive relief as

6   to three provisions of the rule, including the central

7   provision that newly-defined sex discrimination to include

8   discrimination on the basis of sexual orientation and gender

9   identity."

10          MR. ERCHULL:  Yes, I read that language to say that

11   they accept for the purposes of the motion before it, which is

12   whether or not they should interfere with a Court's issuance

13   of an injunction.

14          And of course your Honor understands that stays are

15   rarely granted and that's a very extraordinary form of relief,

16   and, you know, preliminary injunctive relief is ordinary, but

17   stays on relief issued by Courts is even more extreme.

18          THE COURT:  Why couldn't they just carve out the

19   one that clearly implicates Bostock and say with respect to

20   that we are going to stay the injunction?

21          MR. ERCHULL:  Right.  So I will just say that the

22   Supreme Court also declined to stay the Fourth Circuit's

23   decision in B.P.J., and that decision ruled, you know,

24   analyzed Title IX in a very different lens and ended up ruling

25   that a sports ban violated the rights of transgender students

1    under Title IX.

2            And so I don't think we can glean too much about

3    whether or not the Supreme Court decides to issue a stay or

4    not, and I don't take the language that you quoted to mean

5    anything more about how the Court would look at the merits of

6    the claim, that <u>Bostock</u> is somehow different.

7            THE COURT:  What's the cite for the Court declining

8    to stay <u>B.P.J.</u>?

9            MR. ERCHULL:  Let me see if I can get that for you.

10           THE COURT:  Okay.  All right.

11           MR. ERCHULL:  Would you like me to stop and do it

12   now or would you like me to --

13           <u>B.P.J.</u> is the case that's the West Virginia sports

14   ban.

15           THE COURT:  Right.

16           MR. ERCHULL:  And that was decided by the Fourth

17   Circuit in April, I believe it was, or April or May.

18           That decision -- you know, there was a motion to

19   stay before the Fourth Circuit.  They declined it of course,

20   and then that went up to the Supreme Court and the Supreme

21   Court denied that motion to stay as well.

22           THE COURT:  Okay.

23           MR. ERCHULL:  Apologies for not being clear

24   about --

25           THE COURT:  I can find that, too.

```
 1              MR. ERCHULL:  Okay.

 2              THE COURT:  That's all right.

 3              MR. ERCHULL:  All right.

 4              One more quick point about Title IX is that Title

 5   IX protects individuals, not groups.  Just like equal

 6   protection.  Just like Title VII.  I think that's also really

 7   helpful for understanding how this Court should look at the

 8   claims before it.

 9              I do want to move on to talk about irreparable

10   harm.  As your Honor noted, I was talking about the

11   irreparable injury that's at issue here today in a broader way

12   than I discussed it in the past.

13              You know, number one, the opportunity to

14   participate in sports alone is enough to show irreparable

15   injury.  We don't need to go any further than that.  But as

16   you noted, Iris does not intend to play any sports until

17   December 2nd.

18              But, number two, because of who they are, because

19   they're transgender girls, they're being denied an essential

20   educational opportunity, and that's a constitutional injury

21   and that's also irreparable harm.

22              Number three.  The medical care that these young

23   girls receive to live fully as girls is an essential part of

24   it, and to deny them the right to live fully as girls is going

25   to damage their health and damage their well-being.
```

1          Number four.  The life skills that you learn on and

2  off the field when you play school sports includes things like

3  self-confidence, a sense of accomplishment, positive

4  self-image, other benefits involved with sharing goals with

5  the team, social and emotional development at a really

6  critical and sensitive time in their lives.

7          Number five.  I want to talk about the immediacy

8  with the new school year starting.

9          Iris is about to start her freshman year at a new

10  school.  When she walks in, this is an opportunity to make

11  friends, forge new relationships, well before the season

12  starts.

13          Iris's mother's declaration states that sports are

14  going to be an important way for Iris to find a fun and

15  positive peer group to cope with life stressors, and of course

16  this happens on the playing field.

17          The primary peer group benefits though, they start

18  from talking with your friends and they start on the first day

19  of school.  Kids will be talking with each other about the

20  classes that they're taking, they're going to be talking about

21  the clubs that they're going to be joining, and, yes, from day

22  one they will be talking about what sports teams they may or

23  may not want to try out for and play on during the course of

24  their high school careers.  That starts as soon as high school

25  starts.  This critical time as she's about to embark on her

1    freshman year.

2            For Parker we know that soccer is why she gets up

3    in the morning.  It motivates her to get ready for school when

4    she might not feel like going.  It's her passion.  Barring her

5    from playing sports would impact her throughout her days.  Not

6    just on the field.

7            This isn't a case about ineligibility for a few

8    games or, you know, for a particular sport.  These girls are

9    totally barred from trying out, practicing, or playing on

10   sports teams on equal terms with their peers, and it's going

11   to have a harmful impact on their mental health and on their

12   social development.

13           The balance of harms here easily tips in favor of

14   the plaintiffs because the state never has an interest in

15   enforcing an unconstitutional law and preliminary relief would

16   maintain the status quo by allowing transgender students to

17   continue having the same opportunities as other students in

18   continuing to allow the New Hampshire Interscholastic Athletic

19   Association to set eligibility criteria for transgender

20   students.

21           Finally, your Honor, we believe that it's clear

22   that the state has no justification for categorically barring

23   all transgender girls from all school sports regardless of

24   factors like age, competitive level, individual sport, or the

25   circumstances of an individual student, and so we're

1    requesting that you enjoin this law as applied to Parker and

2    as applied to Iris.

3         But we also believe that broader relief would be

4    justified if the Court were inclined to grant it given the

5    facts in this case and given the law.

6         With that, I'm happy to answer any other questions

7    you have.  Otherwise, I'll turn it over to the defendants.

8         THE COURT:  What's in the record with respect to

9    other sports opportunities?  I know the state is arguing there

10   are other opportunities.  What's your position on that and

11   what's in the record that they can't play on the school teams?

12        MR. ERCHULL:  Right.  If they can't play on the

13   main school soccer team, there might be other opportunities

14   that include club teams or other activities.

15        I don't think that there's any case law to support

16   the idea that an educational opportunity that is not the same,

17   that is not equal, can satisfy the strictures of Title IX or

18   equal protection.  I don't think that those opportunities are

19   the equivalent opportunities.

20        And I think -- specifically, I think Parker's case

21   helps to illustrate that.  The teammates that she has from her

22   freshmen year were her community and her friends, and they're

23   the same people that she's continuing to play with this year.

24   Taking that away from her is the injury, right, and so it's

25   not necessarily the fact that she has an option to play soccer

1    in some way that might not even be school affiliated.

2            And I would say that I don't think that the

3    defendants presented clear evidence of what teams Parker might

4    actually be eligible to join.  One of the options was a team

5    that was intended for students with disabilities.  So I'm not

6    sure that there are other options anyway.

7            And we have made clear in our pleadings that Parker

8    is not able to play on the boys' team, and the same is going

9    to be true for Iris, and so there's no other relief other than

10   being allowed to participate equally on the same terms as

11   other girls.

12           THE COURT:  And so there really isn't any other

13   opportunity in the record in front of me?

14           MR. ERCHULL:  There is no other opportunity.

15           Right, your Honor.

16           THE COURT:  All right.

17           And the harm, as you describe it, is this fitting

18   in, sort of conversational harm, but isn't the harm more about

19   the stigmatizing and shame-filled affect, that making her --

20   you know, excluding her, forbidding her from being part of a

21   team, isn't that more of an irreparable harm?

22           MR. ERCHULL:  Right.  Yeah.  You're absolutely

23   right, your Honor.

24           The stigma carries with it an affect on your

25   self-esteem, an affect on the way you perceive yourself, and

1    the knowledge with how others are perceiving you.

2          And, believe me, other students will understand

3    perfectly well why Parker and Iris aren't eligible to play on

4    school sports.  That will be hanging over them and it will

5    hurt their confidence, it will hurt their well-being, it will

6    make them suffer emotionally and psychologically, and it will

7    stay with them forever.

8          THE COURT:  All right.  Thank you.

9          MR. ERCHULL:  Thank you so much, your Honor.

10         MR. DEGRANDIS:  Good morning, your Honor.

11         THE COURT:  Good morning.

12         MR. DEGRANDIS:  I think it's important that we do

13   something at the outset, and that is really drill down and try

14   to distill what are the plaintiffs' legal theories, what are

15   the facts which they allege.  I think if we do that, we can

16   more readily see that the plaintiffs haven't really satisfied

17   their burden, and it is their burden to establish the four

18   factors necessary to earn a preliminary injunction.

19         The Equal Protection Clause treats all persons

20   similarly situated alike, and so I think with every equal

21   protection challenge the first step is determining who is

22   similarly situated with whom.

23         And this gives me an opportunity to again note that

24   the state defendants for the purposes, limited purposes of

25   just this hearing are accepting the well-pleaded facts of the

1    plaintiffs as being true.

2            And so when we examine those facts as alleged, we

3    have two transgender girls who are receiving puberty blockers

4    and are getting female hormone treatments.  So the similarly

5    situated group would be the other girls at their school.

6            And so the next step we have to analyze is if

7    they're similarly situated to them, what different treatment

8    are they complaining about here?  Of course that different

9    treatment is grounded in RSA 193:41, and the different

10   treatment is with respect to the one issue of participation in

11   athletics.

12           Now, the reason for that difference is grounded in

13   just a different birth certificate.  That's what creates this

14   difference.

15           The plaintiffs are not -- and I believe that

16   Attorney Erchull said as much here today.  The plaintiffs are

17   not saying that there's something fundamentally wrong with

18   having different teams, a boys' team and a girls' team.

19   Rather, what they're saying is they want to expand the

20   definition of who is able to be on the girls' team.

21           That's not how the legislature drew it up.  In this

22   particular instance the legislature identified a problem.  The

23   problem was fear of missed opportunities and perhaps injury

24   and other physical harm to biological girls on a team, and so

25   they restricted access to that team based upon birth

1   certificate.  And that standard applies to everyone,

2   including -- we're not just talking about transgender girls --

3   including boys as well.  They would not be able to opt in to a

4   girls' team.

5          This means that ultimately the plaintiffs' claim

6   here is underinclusivity.  What they would rather have is a

7   broader definition of girl to satisfy their desire to play on

8   these teams.  And that's fine, they can go ahead and argue

9   that, but that is a political choice.  I don't think that

10  that's something that the Court should review in this

11  particular instance.

12         But in the broader equal protection claim realm,

13  when the Court analyzes it in that rubric, it would be a

14  rational basis test the Court should apply.  Did the

15  legislature have a rational basis to believe that they needed

16  to protect girls' sports?  And, again, this is confined to

17  fifth grade through twelfth grade.  So we're talking about

18  girls here, confined to girls' sports, to those who can

19  demonstrate sex based upon their birth certificate.

20         And so the important point here that I think I

21  really need to emphasize is the plaintiffs are challenging the

22  contours, the parameters of that definition.  It's not about

23  transgender status.

24         Courts have held in numerous instances that just

25  because it is a sex-based classification that doesn't mean

1    that by limiting it without inclusion of those with

2    transgender status makes it based on a transgender status.  It

3    doesn't do that.  It still is a sex-based classification.

4           The Sixth and Eleventh Circuits have been clear

5    about this.  Districts courts have refused to consider it in

6    the Third, Seventh, and Tenth Circuits, and certainly the

7    First Circuit hasn't really dealt with this issue yet, either.

8           And I think part of the problem is that you end up

9    with this slippery slope.  Once we get to discussing

10   transgender status and whether the statute discriminates on

11   transgender status, we have to determine whether there's a

12   quasi-suspect class here in transgender status.  And the

13   Supreme Court has cautioned federal courts and said don't go

14   ahead and make these determinations.  These should be

15   extremely rare and require a lot of consideration.

16          We see right now that there is a split in the

17   circuit.  Some circuits have identified transgender status as

18   being a quasi-suspect class, but others have refused to do so.

19   And this is -- since this is something that neither the

20   Supreme Court nor the First Circuit have addressed, I don't

21   think this Court should address that at this time.

22          THE COURT:  I know Bostock is Title VII, but

23   Bostock says over and over again in plain -- its

24   interpretation of plain language, and Gorsuch is very clear.

25   I think he says it as many as ten times in his Bostock

1  decision that -- and I'll just read from this Bostock

2  decision:

3           "That's because it's impossible to discriminate

4  against a person for being homosexual or transgender without

5  discriminating against that individual based on sex."

6           And it goes on to say even though Title VII doesn't

7  have the words transgender in it specifically, it still is

8  protecting transgender people from discrimination.

9           So Gorsuch himself rejects that kind of analysis in

10  the Bostock opinion.

11           Again, I understand it's Title VII, but clearly

12  he's looking at the word sex, and I don't think that the

13  plaintiffs are saying you can't divide girls' and boys'

14  sports.  I don't think they're taking that tact.  I think

15  they're saying the way the line is drawn is discriminating

16  against transgender students.

17           Go ahead.

18           MR. DEGRANDIS:  Yes.  And so that quote that you

19  read from Justice Gorsuch -- were I quoting that, I would

20  throw in the brackets, in the employment context as it relates

21  to Title VII, and there's a big difference.

22           So the plaintiffs here today have also talked about

23  Bostock as if it's got some sort of impact on an equal

24  protection analysis, and it certainly does not.  I mean,

25  Bostock analyzed statutory rights and analyzed it only under

1   statutory rights and only as they relate to Title VII.

2              And so when Justice Gorsuch and the majority

3   opinion reviews what does sex mean, it is true that maybe

4   there is some ambiguity there in what Congress wrote, and the

5   Supreme Court tried to understand and articulate what is that

6   ambiguity and how does that work in the circumstances of this

7   case and how Title VII operates to protect people from

8   discrimination.

9              That's fundamentally different from Title IX.  We

10  can get to -- I realize we're talking about equal protection,

11  but it's fundamentally different from Title IX which isn't to

12  protect from -- I don't think it's principally Title IX to

13  protect from discrimination.  A principal point of it is to

14  remediate prior discrimination and to prevent future

15  discrimination from happening.  It's very different than in

16  the context of employment and also different in that we're

17  talking about the different language used.

18             But with respect to equal protection, the Equal

19  Protection Clause doesn't require perfect, pinpoint, laser

20  remedies for specific issues, specific problems that a

21  legislature identified, and that's why I don't think that the

22  analysis of sex in Bostock would apply to a situation where --

23  our statute is just defining sex as your birth certificate.

24  That's why I refer to it as an objective standard.  We're not

25  trying to define sex at all.  We're just saying what does your

 1    birth certificate say.  We've identified a problem, and we

 2    believe that this is the best means to resolving that problem.

 3         And so I appreciate that the plaintiffs feel that

 4    because of their unique circumstances like the puberty

 5    blockers, they've alleged that they won't go through male

 6    puberty, that they have female hormone therapy, that that puts

 7    them in a different situation than other transgender girls

 8    that might also be excluded from playing girls' sports.  I

 9    appreciate that that's unique to them, but the statute needn't

10    -- in order to be constitutional needn't address each and

11    every possible permutation to address the harm that it sees.

12         And, again, still the political environment is

13    open, there is an election coming up, and there's an

14    opportunity to either amend or repeal this statute if it

15    doesn't meet the citizens of New Hampshire's needs and what

16    they're looking for.

17         THE COURT:  Okay.  And where's the evidence in the

18    record that I rely on to counter the evidence that plaintiffs

19    have put forth that their birth certificate, their sex on

20    their birth certificates gives them any sort of a biological

21    advantage in sports?

22         MR. DEGRANDIS:  Just generally speaking, do you

23    mean people who aren't the plaintiffs?  Because for the sake

24    of this hearing we are not arguing that the plaintiffs, that

25    Iris and Parker, we're not arguing that they have any

1    biological advantage.  Not for the purposes of this hearing.

2    We're not addressing that at all.

3         THE COURT:  Okay.  And so there's no biological

4    advantage, no physiological advantage, and so then how does

5    the statute pass even rational review with respect to these

6    two specific plaintiffs as applied?

7         MR. DEGRANDIS:  Because there is no constitutional

8    requirement that a statute that is based rationally -- so we

9    see a problem and we're trying to address that problem.

10   That's essentially the rational basis.  The means we're using

11   is a reasonable means of getting there.

12        A statute needn't be so specific that we can

13   foresee every single nuance every single time if we have a

14   situation such as Parker and Iris.

15        Moreover, the statute also doesn't know -- it's a

16   weird way of saying it, but the legislature can't foresee

17   whether these plaintiffs, whether other transgender girls,

18   would then choose -- at some point through the course of

19   playing choose not to take puberty blockers or choose to cease

20   their female hormone therapy.  All of which they would be, you

21   know, well within their rights to do obviously, and it

22   wouldn't be appropriate to question that choice.

23        And so there's a lot here that a legislature has to

24   think about in piecing legislation together, and I think it's

25   important to keep that in mind.  That just because it may not

1   fit well with Iris and Parker here and now, this is an

2   important strategy the legislature has put together to resolve

3   a legitimate concern that the legislature has.

4           THE COURT:  Okay.  But ultimately I've got to give

5   scrutiny to the statute.  You have a burden under that, and

6   you have given zero evidence to meet any burden to show that

7   the law actually meets the government purpose as you describe

8   it.

9           MR. DEGRANDIS:  Well, under the rational basis test

10  --

11          THE COURT:  Or tell me what is your burden.

12          MR. DEGRANDIS:  That's exactly where I was going to

13  go.

14          Under the rational basis test I don't believe it is

15  our burden.  I think it's the plaintiffs' burden to

16  demonstrate that there is no rational reason why New Hampshire

17  should want to limit girls' sports to biological girls.  They

18  have not demonstrated that.

19          If we were to take a heightened scrutiny approach

20  though, I still think that this law passes constitutional

21  muster where we do have an important governmental objective,

22  and I think the plaintiffs agree that there's an important

23  governmental objective interest in ensuring fairness and

24  safety in girls' sports.  I think we're all on the same page

25  there.

1          So the question ends up coming down to what about

2    this means.  And here what we have to look at is we have to

3    look at the discriminatory purpose, and I think discriminatory

4    intent is an important aspect of this.  It's an important

5    aspect of every equal protection case because equal protection

6    isn't simply satisfying the needs should be equal.  It's

7    preventing discrimination, invidious discrimination.

8          And when we look at the legislative record -- and

9    this is where you will find that our burden -- it does shift

10   to us.  It shifts to the state defendants to demonstrate that

11   we have legitimate purpose, and this is a legitimate means of

12   getting to that purpose.

13         Everyone who testified in favor of the bill at the

14   House Education Committee hearing, everyone who rose in

15   support of the bill in the senate, has consistently indicated

16   that this was about fairness, that this is about safety.

17         No one had uttered any sort of word that would

18   suggest that there's any animus directed towards transgender

19   girls at all.

20         And I would direct the Court to two hyperlinks to

21   two YouTube videos.

22         The first is the House Education Committee.  That

23   was on January 29, 2024.

24         The second was the senate debate on the bill where

25   they shortly -- at the very end they vote on it.  That's May

1  16, 2024.

2          I put in the limiting hours so you didn't have to

3  watch the hours ahead and the hours behind of each.  There are

4  two that I would like to highlight here to highlight this

5  notion of purpose.

6          The bill's principal sponsor is Representative

7  Andrus.  At the House Education Committee hearing at 5 hours,

8  10 minutes, 45 seconds, she asks the rhetorical question:  Why

9  do we need HB 1205 to become law?  Our biological females in

10  New Hampshire need protection and safety in sports.

11          Again, this is not about discriminatory animus.

12  The legislature is identifying a problem, and they're doing

13  their best to solve that problem.

14          And the only other one that I want to quote here is

15  Senator Bradley.  Senator Bradley on May 16th beginning at one

16  hour, 55 minutes, and 12 seconds.  He said:  We tried to do

17  the best that we can to apportion rights and fairness to the

18  world as fair to everyone as we possibly can be, but life is

19  inherently not perfect.  There's no magic bullet that makes

20  fairness across the board for everybody.  Now, I stood on this

21  floor --

22          He then -- there's a little lapse, he discusses

23  himself and his own experience, and he says:  Now, I stood on

24  this floor in 2018 and voted to add gender identity into the

25  antidiscrimination statute, RSA 354.  That was the right vote.

1          At this time Senator Bradley then calls by name a

2    number of senators which he says:  This was a difficult

3    political decision for you, but you did the right thing.

4          He then explains, "It was for public accommodation

5    (referring to RSA 354), housing and employment, but when we

6    talk about fairness and rights, we can't cover every

7    circumstance.  And so in a very narrow way that I think to

8    most of us is very clear, biological boys have an advantage

9    over biological girls.  We'll never be able to legislate total

10   fairness, but what we can't do is create rights as for one at

11   the expense of another."

12         And you see this is what the legislature was

13   grappling with at the time.  That's why the state defendants

14   have satisfied their burdens to demonstrate that they're

15   looking for the tools, the legislature, the tools that they

16   need to ensure fairness and safety.

17         There's certainly no evidence of discriminatory

18   intent anywhere in the legislative record whatsoever, and

19   that's an essential element of an equal protection claim.

20   You've got to demonstrate that there was some sort of

21   discriminatory intent here, and there certainly was not.

22         THE COURT:  How many transgender youth are there in

23   New Hampshire?  I think one of the representatives argued or

24   pointed out that there were less than one percent.

25         MR. DEGRANDIS:  The number -- I think there were a

1    couple of numbers I saw.  The one that sticks in my head is .6

2    percent.

3              THE COURT:  Okay.  And then even less in terms of

4    athletic teams?

5              MR. DEGRANDIS:  I don't recall seeing that.  I

6    don't know the answer to that.

7              THE COURT:  Okay.  I think it was one of the

8    representatives who spoke out against the bill pointed out

9    that it was this minute, tiny population of kids, and that it

10   was ultimately stigmatizing a tiny number of children.

11             Are you saying that I just defer to the legislature

12   and I don't do any independent -- I don't hear any evidence, I

13   don't make an independent judgment or assessment of whether or

14   not the legislature is correct about the --

15             MR. DEGRANDIS:  No.  I'm not saying that at all.

16             Of course the Court's in a position to determine,

17   you know, whether the elements of a cause of action for an

18   equal protection violation are present.

19             My argument is that they are not.  That you can

20   take a look at it from either a rational basis test, which I

21   think is the appropriate way to do it, or even a heightened

22   scrutiny, intermediate scrutiny test, and see that in

23   analyzing the legislative record, in analyzing the statutory

24   words themselves, in looking at the mechanisms and how the

25   statute operates, piece it all together and recognize that,

1   yes, the Court can examine this and determine I don't see -- I
2   mean, you could decide it the other way, I would disagree, but
3   I don't see any discriminatory intent here.  There's no
4   discriminatory animus, animus directed toward transgender
5   status.  They're trying to solve a problem.
6           I think the Court should analyze that.  I just
7   think that that's the side the Court needs to come down on,
8   that they're trying to solve the problem, and this is a
9   legitimate way to try to solve the problem even if people,
10  reasonable people can disagree, is this the best way to do it.
11  Is the statute underinclusive, you know, is that the problem
12  here?  Well, okay, but then that's the political problem, and
13  that's something that needs to be resolved through the
14  political branches of government.
15          THE COURT:  Okay.  But still I've got two
16  plaintiffs and they're saying that as applied to us, this
17  scrutiny that I apply, that ultimately there is no rational
18  basis even for excluding us from girls' sports because for all
19  affected purposes they are biological girls.
20          And so how does the statute survive the as-applied
21  analysis under the Equal Protection Clause?
22          MR. DEGRANDIS:  Well, I think it survives the
23  as-applied analysis because the statute needn't -- again,
24  needn't be so focused.  It's underinclusive as to them, but
25  that challenge -- their challenge specifically addresses the

1    scope of the definition itself, or I should say the

2    requirement of a birth certificate that is incongruous to the

3    plaintiffs.

4         That is where I don't think it's appropriate for

5    the Court to step in in an as-applied challenge such as this

6    to award a preliminary injunction where you have a political

7    problem, one that should be addressed through the political

8    process, because the statute itself isn't unconstitutional and

9    the means that it uses to achieve its goals, you know, again

10   don't reflect discriminatory intent.  And so it would be

11   appropriate for the plaintiffs to be persuasive to lobby the

12   legislature to get this law changed.  That would make sense.

13   But I don't think it's appropriate for the Court to act in

14   such a way as to make that choice for the legislature.  That's

15   the difference with their as-applied challenge as we stand

16   here accepting the facts as they've alleged them as being

17   true.

18         THE COURT:  Okay.  Move on to Title IX and deal

19   with the Bostock -- your Bostock problem.  Because Bostock is

20   a Supreme Court decision and Bostock makes clear that a

21   statute that says because of sex means you can't discriminate

22   because of sex.  You can't discriminate against somebody

23   because they're transgender.  That is clear from Bostock.

24   It's a statutory analysis.  It's textual.

25         Here in Title IX we say on the basis of sex.  Tell

1  me how is that different?  How is Justice Gorsuch and the

2  others who joined him in that 6 to 3 decision, how do they get

3  past the fact that the statutory text is almost identical?

4           MR. DEGRANDIS:  Almost is not --

5           THE COURT:  Tell me how it's materially different,

6  start with that, because I really -- I want you to answer that

7  question.

8           MR. DEGRANDIS:  Okay.

9           THE COURT:  Because of.  On the basis of.

10          MR. DEGRANDIS:  Because of.  On the basis of.

11          So you're talking about a direct result because --

12  and so Title VII in protecting people from discrimination in

13  the course of employment the question before Bostock was in

14  the hiring and firing of people because of sex is prohibited.

15  If that's the case, what does because of sex -- so they are

16  being hired or fired on the basis of sex.  That is decidedly

17  different than the other -- than the phrase, I lost it for a

18  second there, on the basis of sex.  Of course.  That it's

19  entirely different from Title IX's on the basis of sex.  Where

20  in Title IX the dynamic is so fundamentally different to --

21  throughout the statute and throughout the regulations that

22  effectuate the statutory goals, we see the statutes

23  identifying what ends up being a binary choice between sexes.

24  It's either male or female.  And I appreciate that may seem

25  unenlightened in these days, but it is just true in 1972.

1          And so when they say on the basis of sex, they're

2     referring to a carve-out, a protection to make sure that women

3     will not be discriminated again in education.  That is a

4     different -- that is a protection that's different from a

5     prohibition against an employer that could otherwise fire

6     somebody or hire somebody because of sex.  I think the

7     protections are entirely different in the two statutes.

8          THE COURT:  Right.  The protections, the purposes

9     of the statute are different, but the statutory text because

10    of, on the basis of, you can't discriminate because of sex,

11    you can't discriminate on the basis of sex, how is Justice

12    Gorsuch going to differentiate that when the case comes up

13    under Title IX?

14         And I will point out Judge Reeves and I think

15    Justice Sutton in their decisions simply say that the language

16    is different, but there's no material distinction that's given

17    to those clauses.  So that would have to happen because you

18    haven't persuaded me that those two clauses are materially

19    different.  I get that the purpose of the statute is

20    different.

21         MR. DEGRANDIS:  And it may very well be, your

22    Honor, that that's -- the limited answer is that the language

23    is different because the statutory purposes are different, and

24    we have to look closer at those statutory purposes.

25         And we see that the Supreme Court though it was

1    clear, and you said a couple of times it was clear in <u>Bostock</u>,

2    with respect to Title VII what because of sex means, and that

3    sex means -- includes sexual orientation and gender and

4    everything else, but, again, that is limited to that statute.

5    And when we look at the canons of statutory construction, we

6    can't simply look over the statutory purpose of Title IX.

7             And we see that reflected in <u>Department of</u>

8    <u>Education versus Louisiana</u>.  The plaintiffs want this Court to

9    breeze over pretty quickly that the Court, both the majority

10   and the partial dissenting side, emphasized that everyone on

11   the Court was in agreement that the Department of Education's

12   definition of sex, so how the Department of Education was

13   interpreting Title IX sex, which would have included gender,

14   that the Court, every single one of them, said no, no, no, no,

15   no.  And in saying no -- it isn't just simply we're not

16   granting a stay.  Not at all.  It's what we're looking at

17   here.  You've got to demonstrate a likelihood of success on

18   the merits.

19            The Court is agreeing that there is a likelihood of

20   success on the merits that the Department of Education's

21   definition is statutorily flawed at least from an

22   Administrative Procedures Act perspective.  Now, what does

23   that mean with respect to the Administrative Procedures Act?

24   It means that this is a substantive rule.  It means that it is

25   changing the nature of regulated -- the nature of the

1  requirements of regulated parties.  That is a very serious

2  issue.

3        THE COURT:  I agree.  It gives me pause.  I agree

4  that that aspect of it gives me pause, but that went up on --

5  very quickly it went up on what's called the Court's shadow

6  docket.  It involved a stay, it involved the APA, and it

7  involved the government rewriting part of the statute in

8  issuing its regulations.

9        And ultimately the Court based on Bostock may come

10  down and ultimately confirm that that particular regulation

11  was correct.  That could happen ultimately, but I think the

12  Court -- it's not strong enough for me to say that the Court,

13  the Supreme Court, is really overruling Bostock in this

14  context as statutory interpretation.

15        I look at Bostock as a district court judge and I

16  read the language in the statute and I'm trying to interpret

17  the language of Title IX, and the language is almost

18  identical.  And the reasoning in Bostock over and over again

19  is essentially saying that a person's transgender status is

20  interwoven completely at one with their sex.  They are one and

21  the same.  They are tied up together.

22        And Justice Gorsuch gives a hypothetical and says

23  if the employer is inviting these incredibly qualified

24  employees to his house for dinner and invites you to bring

25  your spouse and employee one shows up with his wife and

employee two shows up with her wife, and he gives that

hypothetical and explains that ultimately it depends on the

sex of the employee as to whether or not they're going to keep

their job where the employer is going to say I'm not having

any homosexuals on my staff, and he gives that example.  How

is it different with regard to sports teams when the state has

enacted this law that bars transgender girls from playing on a

girls' sports team?

A girl shows up for tryouts, and whether she is

allowed to try out is going to depend on whether she's born as

a biological male or biological female.  So she will be

treated differently based on what her biological sex at birth

was even if it's designed just to target transgender girls.

So why isn't that the same analysis, the same

hypothetical as Justice Gorsuch gives in the Title VII context

and the circuit?  I'm a district court judge.  The First

Circuit has said over and over, look to Title VII, judges, as

you interpret Title IX.  And so how do I get past the language

in Bostock about because of sex includes, prohibits

discrimination against homosexuals and transgender people?

MR. DEGRANDIS:  Because to apply Bostock to Title

IX would eviscerate the whole point of Title IX.  Title IX

where it routinely talks about what is allowable as far as

separating the sexes is concerned.  That's why I raised

that -- you know, it may seem antiquated, but it really is a

1    binary choice there because of the problem that Title IX was

2    trying to solve.  And it was strictly about women, biological

3    women and their opportunities in education, and if you take

4    that away, it ends up eroding the whole purpose of ensuring

5    that women have that fair, equal opportunity.

6         It's not possible to take a Title VII

7    interpretation where you're dealing with the context of

8    employment versus -- I should say dealing with the subject

9    matter of employment where the question is, you know, how are

10   we going to interpret sex as Congress, you know, wrote this

11   statute, Title VII, which is an entirely different analysis

12   than trying to answer the question of how are we going to

13   interpret sex in Title IX where Title IX is about preserving

14   this binary separation.  Maybe it should be amended, but

15   that's not what we're dealing with here, and it doesn't appear

16   that the Court is willing to -- that the Supreme Court is

17   willing to extend it.

18        When we look to their decision in Department of

19   Education versus Louisiana, I mean they emphasized, and this

20   language is so important, "Newly defined sex discrimination to

21   include discrimination on the basis of sexual orientation and

22   gender identity."

23        They explain it's a newly defined -- it's a new

24   definition.  The Court isn't going to come back to this case

25   and then say, oh, now Bostock applies.

1            Now, it's entirely possible it might say, hey, we

2    like the reasoning in Bostock, and maybe the Court does decide

3    that we think that there should be some accounting for this,

4    but that wouldn't be consistent with their decision here.  I

5    can't predict what the Supreme Court will do in the future.

6    It is much more likely that they will stick with this.

7            Even the dissent in that case, the dissent in

8    Department of Education versus Louisiana was quite clear about

9    siding with the majority with respect to these new

10   definitions.  If they're defining it as new definitions, you

11   know, how can Bostock apply?  And Bostock may provide some

12   good informational value and perspective, but Bostock can't

13   apply to Title IX.  It just makes Title IX unworkable.

14           THE COURT:  Well, it certainly -- Bostock is a

15   different context.  It's Title VII.  Ultimately the Court

16   could reach the same result, but they don't have the power to

17   reach that result as part of these regulations under the APA.

18   It seems like at least it's a different -- it's a different

19   question, and we're talking about whether or not to stay an

20   injunction.  They're not actually dealing with the merits of

21   whether or not Bostock applies.

22           MR. DEGRANDIS:  I don't know -- I don't know that I

23   agree with that.

24           THE COURT:  Did they mention Bostock in --

25           MR. DEGRANDIS:  I don't recall them mentioning

 1    Bostock.  I can check.  I do have --

 2              THE COURT:  Yeah, I just -- where Bostock is so

 3    clear in terms of its statutory construction, and that's what

 4    we're talking about, I'm not comfortable using an implication

 5    from a case -- the per curium decision out of the Supreme

 6    Court that deals with an entirely different question.

 7              MR. DEGRANDIS:  But I would still think that they

 8    identify it.  They identify the Department of Education's

 9    proposed role as providing a new definition.  So, in other

10    words, new -- it doesn't exist in the --

11              THE COURT:  It is a new definition.

12              MR. DEGRANDIS:  Okay.

13              THE COURT:  Because Bostock was dealing with Title

14    VII.  So isn't it still a new definition?

15              And ultimately I agree it gives me pause, but I

16    think that's all it gives me at this point.  It's not enough

17    for me to look at Bostock and say Bostock just doesn't apply

18    in the Title IX context.  Especially where the circuit has

19    told me to apply Title VII law in a Title IX context.

20              But does it give me pause?  Yes.

21              You're saying it should give me more than pause?

22              MR. DEGRANDIS:  More than pause, yes.  Yes,

23    significantly more than pause.

24              I mean, I think -- you know, Department of

25    Education versus Louisiana settles the issue that -- the

1    definition that the plaintiffs would like this Court to apply

2    here.

3              So I believe what the plaintiffs are asking, and

4    stated a little bit better, is instead of using a birth

5    certificate to determine who may or may not play on a girls'

6    sports team, the Court should instead say either birth

7    certificate or transgender sex, you know, or be a transgender

8    girl, something to that effect.  So that would be changing the

9    definition in the statute.  It would be changing the function

10   of the statute.

11             And I think what we have here is that Title IX

12   doesn't support that because the Court is saying that would be

13   a new definition.  That is a new perspective that somehow

14   transgender fits within the notion of sex.  I think that's the

15   relationship that I'm trying to build here.

16             THE COURT:  All right.

17             MR. DEGRANDIS:  And then I would just say, I

18   believe I said it before, but just to make sure that I did,

19   <u>Bostock</u> also doesn't apply to equal protection claims because

20   it's not an equal protection case.  It's just strictly about

21   statutory rights.

22             As I mentioned before, I mean the statutory text of

23   Title IX is replete with binary terms, and it goes to great

24   lengths to list specific carve-outs of where it's not

25   considered to be discriminatory to separate boys and girls

 1    based upon biological sex.

 2            And I should also note, too, it's important -- the

 3    notion of the spending clause is important, and I think the

 4    plaintiffs may have misunderstood where we were going with the

 5    spending clause argument.

 6            When it comes to Title IX, it's important that

 7    Congress speak with crystalline clarity regarding the

 8    requirements on the states.  It's in order to get federal

 9    funds you have to do X, Y, and Z, and Congress can't be vague

10    in doing that.

11            The plaintiffs had mentioned something about

12    remedies and monetary remedies and so forth, and this has

13    nothing to do with injunctive relief or monetary relief.

14            The importance of the spending clause is the

15    distinction between Title -- is a very important distinction

16    between Title VII and Title IX.

17            Title VII doesn't transfer federal money to the

18    states.  Title IX does.

19            And so to the extent that Congress needs to explain

20    to -- that Congress must explain to states what they must do

21    or in some cases must not do in order to receive federal

22    funds, that's the spending clause argument that we're making

23    here, and it's a very important distinction between Title IX

24    and Title VII.

25            With respect to irreparable harm, I was a little

1  surprised to hear from the plaintiffs today that -- they were

2  mentioning, I think it was part of their irreparable harm

3  argument, that the concern for the girls is that they won't be

4  able to forge relationships, that they won't be able to talk

5  to their peers.  This isn't something that we've seen or heard

6  to this point.  It sounds more like a First Amendment

7  challenge of sorts.

8          There's no reason to attribute any inability to

9  talk to their friends or develop relationships to RSA 193:41,

10  and I'll say that a showing of irreparable harm requires

11  actual, viable, present, existing threat.

12          So, you know, this maybe they won't be able to

13  forge relationships thing, again I don't see how that's

14  possible.  I don't see how the statute in question would

15  impact that.

16          But also what we're hearing here is a much more

17  ephemeral, sort of etherial, you know, this may happen and it

18  may be difficult to develop relationships.

19          Numerous Courts have held that missing a sporting

20  event is not irreparable harm.  It's just not irreparable

21  harm.  It's absent in this case, too, because the plaintiffs

22  haven't demonstrated that they don't have other avenues other

23  than these specific sports teams.  There are co-ed sports.

24  They aren't being excluded categorically.  It's not that they

25  can't play any sports.  It's these specific sports that are

1    designated for girls by statute, and the statute says --

2              THE COURT:  Where does the record have evidence

3    that there are co-ed teams at the schools?

4              MR. DEGRANDIS:  I believe we have citations to -- a

5    footnote in our objection, footnote 8, footnote 9, co-ed

6    junior varsity unified soccer, at Plymouth co-ed varsity

7    indoor track.  These are available to them.

8              The important point here is that the plaintiffs

9    haven't met -- because this is their burden.  It's their

10   burden to demonstrate the irreparable harm.  They haven't

11   demonstrated at all, made no showing, that somehow this type

12   of social interaction, this type of athletic extracurricular

13   activity is somehow woefully deficient and just can't meet the

14   needs of these children, you know, when compared to the girls'

15   soccer team.

16             And they in a conclusory way suggest that it's

17   shameful to be on a co-ed team.  I don't understand that, it's

18   rather conclusory, and I would think that the plaintiffs need

19   to show much more than --

20             THE COURT:  What's the co-ed team?  Are you talking

21   about the unified program?

22             MR. DEGRANDIS:  Yes, and there may be others.

23             THE COURT:  But the unified program is for kids

24   with special needs and disabilities, right?

25             MR. DEGRANDIS:  Well, it says -- I don't know.

1                This says co-ed junior varsity unified soccer,

2      co-ed varsity indoor track, co-ed varsity outdoor track.

3                These are just a couple of examples of -- I don't

4      know the specifics.  I know that they are available.

5                And, you know, the plaintiffs -- again, it's their

6      burden.  So if plaintiffs are, like, no, none of these are

7      viable, well then they should make their argument these are

8      not viable alternatives, but we haven't heard that.  And if

9      there's a viable alternative, then we don't have irreparable

10     harm.

11               THE COURT:  Okay.  What about the medical evidence

12     and the declarations of the parents with respect to the kids

13     and their need to play sports and to play a sport consistent

14     with their gender?

15               MR. DEGRANDIS:  I don't doubt that for a second.  I

16     don't even need -- like, we are, you know, accepting the

17     plaintiffs' facts as alleged.  Intuitively that makes perfect

18     sense.

19               But, again, in order for it to be irreparable harm,

20     there can't be other readily available alternatives.  That's

21     what we're seeing here.

22               I mean, obviously the girls want to play on a

23     girls' team.  I understand that.  The statute doesn't allow

24     that because of their birth certificates, but there can still

25     be other ways to achieve the exact same benefits that they

1   would receive on the girls' teams for which they're not

2   allowed to participate on other teams that they aren't allowed

3   to participate, and I think that that's an important aspect of

4   this and it is the plaintiff's burden to demonstrate that, and

5   I don't think that they have.

6         THE COURT:  Okay, but they've got medical evidence

7   that this is important for them and for their development,

8   their mental health, to play on a sports team consistent with

9   their gender and that they would be harmed if they didn't and

10  harmed if they were excluded because of their gender identity.

11  That's in the record.  That's in I think Dr. Shumer --

12        MR. DEGRANDIS:  Yes, I think --

13        THE COURT:  His declaration.  And so that's

14  uncontested.

15        And so for you to just simply proclaim that they

16  could play on a co-ed team and it would be exactly, precisely

17  the same, ultimately I don't -- if you had a doctor that could

18  tell me that ultimately Dr. Shumer is wrong about this, these

19  kids would be fine in sort of a co-ed unified soccer team or

20  it would be the same for them --

21        MR. DEGRANDIS:  I'm not saying that.

22        So to correct you there, what I'm saying is that

23  the burden is on the plaintiffs to demonstrate that they have

24  irreparable harm.  And so they have to demonstrate that these

25  other options are insufficient.  It's not the state's burden

```
1   to say, you know, here are all your options and here's the
2   medical evidence as to why this is sufficient for you.  That
3   would be, you know, flipping the burdens here, and the burden
4   is on the plaintiff to demonstrate those things and the
5   plaintiff hasn't.
6            With a very quick cursory review, we notice that
7   there are other alternatives.  The plaintiffs should address
8   why those alternatives aren't suitable to them, and maybe Dr.
9   Shumer needs to address that, too, but my recollection of Dr.
10  Shumer's declaration -- he doesn't address why alternatives
11  aren't sufficient.
12           Because what would happen if they try out for the
13  team and don't make it?  I mean, that would also be harm to
14  them, and that could happen.
15           THE COURT:  Well, that has happened.  That has
16  happened.  I believe it happened to Iris.  She tried out for a
17  team.  She didn't make it.  That's different than being told
18  that you cannot play, you cannot try out for this team because
19  of your gender identity.
20           MR. DEGRANDIS:  It certainly is, but as far as -- I
21  think a lot of what Dr. Shumer addresses are the long-term
22  benefits of the -- I believe he discusses comradery, and, you
23  know, just actually participating on the team with people of
24  the same gender is really the point, the biggest benefit that
25  the plaintiffs would receive and why they need to be
```

1    specifically on these girls' teams.  But what about the

2    alternatives?  And the plaintiffs need to demonstrate that,

3    that the alternatives are not sufficient.

4            And that is related to, you know, just my point

5    that they're not totally barred from playing sports.  They are

6    barred from the sports that they want to play, and I

7    appreciate that that's difficult for them.  I appreciate that,

8    you know, this is a trying circumstance for them.  I don't

9    want to come across as being insensitive to that, but they

10    still in order to demonstrate irreparable harm have to

11    demonstrate that there is no other alternative.

12            We want to also address balancing the equities of

13    course, and I don't think that the plaintiffs have satisfied

14    their burden there either.  As the Court has indicated, the

15    balancing of the equities merges with public interest in this

16    environment where the state is a defendant, and here we have

17    allegations of harm, questioned whether they're irreparable,

18    but I think even if the Court were persuaded that the

19    plaintiffs are suffering irreparable harm, we do need to

20    appreciate that the state suffers irreparable harm as well.

21            The state has a duty to enforce its laws.  This law

22    was duly enacted.  It was duly enacted in trying to resolve a

23    problem.  It is trying to resolve a problem and it does so

24    without discriminatory intent, as we discussed earlier.

25            Enjoining the state would be a significant burden

1    on the people of New Hampshire who have chosen this public

2    policy route.  Whether this is, you know, the preferred public

3    policy route or not, this is the route that the state has

4    chosen.

5              The last point, I believe last point, that I would

6    like to make, if I could.

7              THE COURT:  The state is going to be irreparably

8    harmed?  So the state has been irreparably harmed then by my

9    TRO?

10             MR. DEGRANDIS:  That would be our argument.

11             THE COURT:  How is that?  Tell me how my TRO

12   irreparably harmed the state.  Where the coach, the other

13   teammates, the school supports these kids, tell me how that

14   caused the state to suffer irreparable harm.

15             And let me just tell you that the evidence in the

16   record is from both the doctors and the parents that -- the

17   healthcare providers have made clear to the parents that, and

18   this is Parker's parents but I think the same thing would be

19   true for Iris, that the medical course of care and healthy

20   development require that she live and participate in the world

21   as a girl, and playing on a boys' sports team would exacerbate

22   her gender dysphoria and harm her mental health.

23             And, again, this is somebody who was playing on

24   this sports team all along and would be moving up to

25   essentially play with the same girls that she was playing

1   with.

2           So by saying to her as the state, you may not

3   continue doing that, even though your coach is fine with it,

4   the school is fine with it, and even though you have no

5   biological or physiological advantage, we're going to prohibit

6   you from doing that, we're going to stop you from doing that.

7           MR. DEGRANDIS:  But --

8           THE COURT:  How does that not harm her based on the

9   evidence that I have in the record?

10          MR. DEGRANDIS:  Just to be clear, if I have left

11  you with the impression I'm saying she's not harmed, I meant

12  to say the exact opposite.  That's harm.

13          What I'm questioning is whether they met their

14  requirement, the plaintiffs did, to establish irreparable

15  harm.  It's certainly harm.  If she wants to do something and

16  a statute doesn't allow her to do it, of course that's harm,

17  but it's not irreparable harm.

18          That quote right there discusses the challenge, the

19  danger to the plaintiff should she be forced to play on a

20  boys' team.  Nobody is forcing her to do that.

21          There are other options, including co-ed teams, and

22  plenty of girls play on co-ed teams.  It's the point of co-ed

23  teams.  It's mixed.  So that is an option.

24          The plaintiffs are responsible for demonstrating

25  why that option isn't viable to them, and they haven't done

1    so.

2         And just with respect to the irreparable injury to

3    the state, I'll just quote the Supreme Court:

4         "Any time a state is enjoined from effectuating

5    statutes enacted by representatives of its people, it suffers

6    a form of irreparable injury."

7         That's the basis for my statement that the state is

8    irreparably harmed by not being able to enforce its laws.

9    That's the Supreme Court's perspective, and other courts

10   beneath the Supreme Court have echoed that in the past.  I

11   don't have a string cite for that, but I stand by the Supreme

12   Court to support my proposition there.

13        The last point I want to make is that this is a

14   narrow case.  There are two plaintiffs in this case.  This is

15   not a class action.  It seems that the plaintiffs would like a

16   broad preliminary injunction here just to broadly enjoin the

17   state from enforcing this particular statute.  We think that

18   would be a big mistake since the plaintiffs haven't offered

19   any evidence that there is a class action here.  They haven't

20   filed a class action.

21        And so to the extent that the Court is considering

22   or decides to grant the preliminary injunction, we would ask

23   the Court to make it narrow, make it restrictive to just these

24   two plaintiffs.

25        These two plaintiffs have provided very specific

1    evidence regarding why the statute shouldn't apply to them.

2    That's an as-applied challenge.  And if the Court is going to

3    grant preliminary injunction, it should just do so in that

4    as-applied context.  For all of the reasons I mentioned

5    before, I don't think the Court should do that, but if the

6    Court does go down that road, we would just ask to keep it

7    narrow.  That is -- the proper function of injunctive relief,

8    too, is to keep that remedy as narrow as possible, and so we

9    would appreciate it if --

10              THE COURT:  Let me ask you -- if I were to grant

11   the preliminary injunction as to Parker, what about Iris in

12   terms of the timing?  Because if I find there is irreparable

13   harm but ultimately I can have a trial before December 2nd,

14   then I think I take care of the issue with respect to Iris and

15   the justiciability of her harm.

16              Where do you stand on that?  I know you want me to

17   deny the preliminary injunction, but if I grant it as to

18   Parker and on that basis, then my question becomes what about

19   Iris and how do I handle that.

20              MR. DEGRANDIS:  I don't know how to answer that

21   question.  I'm trying to get beyond my own argument which is,

22   you know, we have an irreparable harm problem here just

23   generally speaking, and so I don't think Iris has demonstrated

24   --

25              THE COURT:  Right.  Assume I don't buy that.  I'm

1    concerned about the irreparable harm to the mental health of a

2    child who is told they cannot -- essentially they cannot be

3    who they think they are, so assume I don't buy that, but I am

4    concerned about the December 2nd date and irreparable harm and

5    I think that the harm has to be eminent, has to be

6    irreparable, if the Court waits until the end of trial to

7    resolve the harm.

8            So if a case can be adjudicated on the merits

9    before the harm complained of will occur, there's no

10   sufficient justification for the preliminary injunctive

11   relief.

12           So ultimately if I could have a trial before that

13   December 2nd date, then that would get me past that issue.

14           MR. DEGRANDIS:  That reasoning makes perfect sense

15   to me.

16           I don't know where the state is on -- you know, the

17   bureaucracy above me is pretty substantial.  So I don't know

18   exactly where the state is as far as a perspective on how

19   quickly we can move, how quickly we would want to move.

20   Obviously we'll do whatever the Court orders us to do, but

21   just sort of the inner workings and how we figure that out and

22   figure out our own position, that's not something I'm prepared

23   to directly address.

24           I'm sorry.  I don't mean to be evasive.  I just

25   don't know exactly where we would be in order to comment

```
 1   intelligently.

 2              Does that make sense?

 3              THE COURT:  Okay.  All right.

 4              And you wouldn't concede just to a status quo with

 5   respect to Iris?  Presumably you would appeal a preliminary

 6   injunction as to Parker.

 7              MR. DEGRANDIS:  I would need to talk to my client

 8   and to others that are part of --

 9              THE COURT:  To your higher-ups, right.

10              MR. DEGRANDIS:  Just the privileged nature of the

11   strategy, I wouldn't want to commit to something that I can't

12   make good on.

13              THE COURT:  All right.  Okay.

14              Thank you.

15              MR. DEGRANDIS:  Thank you, your Honor.

16              THE COURT:  Attorney Erchull, anything further?

17              MR. ERCHULL:  One moment, please, your Honor.

18              THE COURT:  And while they're meeting, let me ask

19   the school district.

20              There was an issue that I think you raised in your

21   reply, and the problem -- I think mentioned even the

22   possibility of a cross-complaint with respect to school

23   districts' liability under the statute.

24              How is that?  Where are we on that issue?

25              MR. EATON:  In terms of a cross-petition, I mean,
```

1    I'm not sure.  I don't know whether or not we would take that

2    route.

3              What I meant to suggest in my response and in

4    attaching the Commissioner's letter was just to convey the

5    tough situation that we're in.

6              Obviously we have liability on the state statute

7    side, we have potential liability on the Title IX equal

8    protection side, and then we have a Department of Education

9    who oversees school districts, school employees, and all that

10   sort of thing, and, you know, essentially an instruction in

11   that letter to continue applying the law despite the TRO that

12   this Court issued.

13             So, you know, while we certainly don't take any

14   position on the merits of the case, I wanted to make that

15   clear.

16             We do hope for relief that can be applied or an

17   order that could be applied in the future.  Because obviously

18   these two plaintiffs are not the only transgender girls in the

19   school and in New Hampshire, and I think we're going to be

20   faced with similar and potentially different situations

21   involving transgender girls in the future.

22             So our hope is that whether the Court adopts the

23   facial challenge that the plaintiffs have raised or a broader

24   injunction, or of course denies the injunction, our hope is we

25   can have some guidance moving forward.

1          THE COURT:  Do you have any position on that

2     question raised by the school districts?

3          MR. DEGRANDIS:  I don't know that I understand the

4     question exactly.  I mean, I appreciate the school districts

5     are in an unenviable position in that they are the ones who

6     could potentially face liability for violating the statute.

7          The only point that we made relative, we, the state

8     defendants, made relative to this, is that the Department of

9     Education may not be a proper defendant here since the

10    Department of Education doesn't enforce the law itself and

11    isn't threatening to do anything to the school districts to

12    enforce the law.

13         I think the way 193:41 should be read is that it

14    requires the Department of Education to effectuate the

15    purposes of the statute.  In other words, you know, to the

16    extent that regulations need to be promulgated to effectuate,

17    then go ahead and do that, and, by the way, don't promulgate

18    any regulations that would interfere with the statutory

19    intent.

20         But I don't think that we have a specific position,

21    unless I don't understand the question, regarding just that

22    sort of dynamic for the school districts.

23         THE COURT:  Okay.

24         Do you have anything further, Attorney Erchull?

25         MR. ERCHULL:  Thank you, your Honor.  I'll be as

 1   brief as possible here.  I just want to make a few quick

 2   points.

 3          One is that transgender status meets the criteria

 4   for classification as a quasi-suspect class on its own, but

 5   there is no need for this Court to address that issue right

 6   now because in fact, despite what the state was saying about

 7   the shortage of circuit court cases, there are numerous

 8   circuit court decisions that say transgender status

 9   discrimination is sex discrimination for the purposes of equal

10   protection and therefore entitled to heightened scrutiny.

11          And that's on page 17 of our memorandum of law

12   citing to the Fourth Circuit, Seventh Circuit, Ninth Circuit,

13   Tenth Circuit.  There's not any shortage of case law.

14          And then of course your Honor's familiar with the

15   Judge Saris decision here within the First Circuit.  That's

16   persuasive on that point as well.

17          We agree with everything that your Honor said about

18   the decisions on the administrative rule.

19          I do want to give you the cite to the West Virginia

20   versus B.P.J. motion to stay, that is 22 Atlantic 800 from

21   April 6, 2023, and there was a dissent from Alito and Thomas

22   -- from Justice Alito and Thomas in that.

23          I do also just want to bring up that, you know, I

24   am concerned about the state's willingness to move to trial

25   quickly being a problem if there isn't a preliminary relief

1   that applies to Parker, and of course I'm concerned about the

2   same --

3                THE COURT:  To Iris you mean?

4                MR. ERCHULL:  Iris.  I'm sorry.  Yes.

5                And I'm concerned about the same issues that

6   counsel for Pembroke raised about school districts not having

7   sufficient guidance, and I'm also concerned about how that's

8   going to affect students, including the plaintiffs, as they go

9   into the school year as it's beginning because it's hanging

10  over them that this law is in effect.

11               And as far as the point about proper defendants, I

12  just want to say it's very clear on the face of the statute

13  that the Board of Education is directed to make a policy as of

14  now that implements and operationalizes what the sports ban

15  does.

16               And then I also just want to quickly reference, so

17  your Honor is aware, that attached to Pembroke counsel's reply

18  there is a letter from the Commissioner of Education who's

19  named in this case, and of course the Pembroke reply kind of

20  characterizes it as a letter that's, you know, instructing

21  school districts about how they should be reacting to the law.

22               And for those reasons we think it's pretty

23  abundantly clear that the state defendants are appropriately

24  named in this case.

25               THE COURT:  Thank you.

1          MR. ERCHULL:  Thank you.

2          THE COURT:  All right.  Now, I issued a TRO in this

3  case on August 19th, and I stated that that order would expire

4  on today's date unless extended.

5          I find good cause to extend the TRO for an

6  additional 14 days because the grounds for originally issuing

7  it continue to exist.

8          Therefore, it is extended until 11:59 p.m. on

9  September 10 of this year.

10          Court is adjourned.

11          Thank you, counsel.

12          (Conclusion of hearing at 11:53 p.m.)

1                          C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate transcription of

6     the within proceedings to the best of my knowledge, skill,

7     ability and belief.

8

9

10    Submitted:   9-3-24       /s/    Susan M. Bateman
                                SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25