UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Parker Tirrell, et al.</u>

     v.                         Case No. 24-cv-251-LM-TSM
                                     Opinion No. 2024 DNH 073 P

<u>Frank Edelblut, et al.</u>

# O R D E R

Two minor plaintiffs, by and through their respective parents and next friends, bring this action against the Commissioner of the New Hampshire Department of Education, members of the New Hampshire State Board of Education, the Pemi-Baker Regional School District and members of its School Board, and the Pembroke School District and members of its School Board.[1] Plaintiffs allege that defendants' enforcement of a recently enacted New Hampshire law prohibiting transgender girls (i.e., people who were born biologically male but who identify as female) from participating in girls' sports violates their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. Presently before the court is plaintiffs' motion for a preliminary injunction. <u>See</u> doc. no. 7. The State defendants object. <u>See</u> doc. no. 59. Neither the Pemi-Baker defendants nor the Pembroke defendants take a position on plaintiffs' motion. <u>See</u>

---

[1] This order will refer to the Commissioner and the members of the New Hampshire State Board of Education collectively as "the State defendants." It will refer to the Pemi-Baker Regional School District and members of its School Board collectively as "the Pemi-Baker defendants." It will refer to the Pembroke School District and members of its School Board collectively as "the Pembroke defendants."

doc. no. 50 at 8 n.5; doc. no. 56. The court held a hearing on plaintiffs' motion on August 27, 2024. For the following reasons, plaintiffs' motion for a preliminary injunction (doc. no. 7) is granted.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movant must demonstrate that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in her favor; and (4) an injunction is in the public interest. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). Of these, likelihood of success on the merits and irreparable injury are the most important factors. González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009). When, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and the public interest factors merge. Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).

## FINDINGS OF FACT[2]

I.   Background on Gender Identity and Gender Dysphoria

The phrase "gender identity" is an accepted medical term for a person's innate sense of gender. Everyone has a gender identity, and it may or may not align

---

[2] Except where otherwise indicated, these findings of fact are based upon the plaintiffs' representations in their memorandum and their uncontested evidentiary submissions attached to their motion for a preliminary injunction. See doc. nos. 7-1, 7-3 through 7-6. None of the defendants contest the plaintiffs' factual assertions for purposes of the preliminary injunction motion.

with their biological sex or anatomy. A transgender girl is a person who was born with a male anatomy but whose gender identity is female.

Transgender people experience a medical condition known as gender dysphoria. Gender dysphoria is a medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). Gender dysphoria results from a lack of alignment between one's birth sex and gender identity. It is highly treatable, but if left untreated, gender dysphoria may result in anxiety or depression, eating disorders, substance abuse, and even suicide. The prevailing standards of care for the treatment of gender dysphoria are developed by the World Professional Association for Transgender Health ("WPATH") in collaboration with the Endocrine Society.[3] Under these prevailing standards, treatment for gender dysphoria generally involves some combination of (1) a social transition in which the person adopts a new name, pronouns, appearance, and clothing, and (2) medical or surgical interventions that allow the patient to live more consistently with their gender identity. Social acceptance of one's gender identity is critical to the successful treatment of gender dysphoria.

---

[3] WPATH is an international, multidisciplinary professional association that promotes evidence-based care for transgender individuals. The Endocrine Society is a global membership organization that represents professionals in the fields of adult and pediatric endocrinology. The standards of care for gender dysphoria developed by these associations have been endorsed by the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association.

When a transgender girl and her parents seek treatment for gender dysphoria prior to or shortly after the onset of puberty, providers may prescribe puberty-blocking medication to prevent the development of physical characteristics that conflict with the child's gender identity. When this occurs, the transgender girl will not experience male puberty and will not experience physical changes caused by testosterone, such as male muscular development, facial hair, or an Adam's apple. The provider may thereafter prescribe hormones to induce female puberty. If this course of treatment is followed, the transgender girl typically has the same levels of estrogen and testosterone as other girls and significantly lower testosterone than pubescent boys.

Before puberty, there are no significant differences in athletic performance between boys and girls. After puberty, boys on average perform better than girls in most sports. Disparities in testosterone production drive this divergence—not sex chromosomes or sexual anatomy. After puberty, boys produce much more testosterone than girls, which results in increased muscle mass and strength. A transgender girl who does not experience male puberty and who receives hormone therapy to induce female puberty will not have an athletic advantage over other girls as a result of being born with a male anatomy.

II.   <u>Parker Tirrell</u>

Plaintiff Parker Tirrell is a fifteen-year-old transgender girl who has just begun her sophomore year at Plymouth Regional High School. She knew she was a girl at an early age, and preferred dressing as a girl when at home, engaging in

stereotypically female childhood activities, and socializing with other girls. At age twelve, Parker, who had not yet begun living as a girl in all aspects of her life, began experiencing mental distress. She and her parents sought mental health treatment. During the summer between her seventh- and eighth-grade years, Parker was evaluated at a health clinic by a team of providers that specialize in diagnosing and treating gender dysphoria in children and adolescents. Ultimately, Parker was diagnosed with gender dysphoria.

Parker's treatment for gender dysphoria first involved socially transitioning and living as a girl. At the start of her eighth-grade year, Parker began using female pronouns, wearing dresses and skirts to school, and living as a girl in all aspects of her life. This included participating in girls' sports and using girls' facilities at school. School administrators and coaches supported Parker's transition. Parker began taking medications to block male puberty in May 2023, toward the end of her eighth-grade year. She began female hormone therapy in December 2023 while in ninth grade. Her treatment has caused her to develop physiological changes associated with female puberty. She will not undergo male puberty. According to the uncontested factual record in this case, there is no medical justification to preclude Parker from participating in girls' sports.

Sports have always been a big part of Parker's life. She has played in elementary, middle, and high school and in town recreational leagues. Sports are the primary way Parker makes friends and connects with others. While she has participated in a variety of school sports, soccer is her passion. In eighth grade, she

played on the girls' soccer and track teams at Plymouth Elementary School.[4] In

ninth grade, she played on the girls' soccer team at Plymouth Regional High School.

Although the team experienced a challenging season and did not win a single game,

playing on her high school soccer team brought Parker joy and exhilaration. Her

soccer team was and continues to be her primary social outlet, both on and off the

field. Most of her friends are her teammates, and they have given Parker an

important source of acceptance, belonging, and emotional support. Parker also

participates in the team's off-field activities, such as going skating together and

attending weekly spaghetti dinners on nights before games. Both on and off the

field, Parker's soccer team has helped her develop confidence, make friends, and feel

accepted.

Playing on a boys' team is not a realistic option for Parker. Parker's providers

have prescribed treatment requiring her to live and participate in the world as a

girl. Playing on a boys' soccer team would likely have adverse impacts on Parker's

mental health and would exacerbate symptoms of gender dysphoria. According to

Parker's mother, Parker would be devastated if she is not allowed to play on her

soccer team solely because she is transgender.

III.   <u>Iris Turmelle</u>

Iris Turmelle is a fourteen-year-old transgender girl entering her freshman

year at Pembroke Academy, a public high school in Pembroke, New Hampshire. She

has always known that she is a girl. As a toddler, she asked Santa to make her into

---

[4] Plymouth Elementary is a K-8 school.

a girl for Christmas. She would not play with stereotypically male toys and instead gravitated toward feminine toys and playing dress-up in capes and gowns. One morning in the first grade, she came downstairs wrapped in a blanket and told her parents she wanted to wear it as a dress to school instead of her boy clothes. From that day on, Iris wore girls' clothes to school. In the summer of 2017 before her second-grade year, she began using her name Iris. She has lived as a girl from that point forward, participating in gender-separated activities at school as a girl and using girls' facilities.

Iris's parents took her to an endocrinologist that same summer. The endocrinologist diagnosed Iris with gender dysphoria. In 2019, Iris's parents brought her to a clinic specializing in the diagnosis and treatment of gender dysphoria in children and adolescents. After an evaluation, her gender dysphoria diagnosis was confirmed. Iris began receiving puberty-blocking medication in July 2021 when she was eleven years old. She began receiving hormone therapy to induce female puberty in May 2023 at age thirteen. Iris's treatment has caused her to develop physiological changes associated with female puberty. As with Parker, it is uncontested that there is no medical justification to bar Iris from playing girls' sports.

Iris has tried a variety of sports. As a young child, she participated in community youth soccer and Tae Kwon Do. She participated in intramural tennis in the seventh grade, but it was not offered in her eighth-grade year. She also tried out for her middle school softball team but did not make the team. As a freshman at Pembroke Academy, Iris plans to try out for track during the winter season, and for

tennis and track during the spring season.[5] After experiencing bullying in middle school, Iris and her parents hope that high school sports provide her with an opportunity to make new friends and feel accepted. In addition, Iris and her parents see sports as a way for her to stay physically active and as a healthy way to cope with life's stressors.

As with Parker, playing on a boys' sports team is not a realistic option for Iris. Her providers have made clear that Iris needs to live and participate in the world as a girl. Playing on a boys' team would be humiliating, damaging to her mental health, and would exacerbate her symptoms of gender dysphoria.

## OVERVIEW OF HB 1205

On July 19, 2024, New Hampshire enacted House Bill 1205 [hereinafter "HB 1205" or "the Act"]. 2024 N.H. Laws Ch. 228; see RSA 193:41-:42. It is entitled "an act relative to women's school sports." 2024 N.H. Laws ch. 228. HB 1205 applies to grades 5 through 12, RSA 193:41, I, and requires any "interscholastic sport activity or club athletic team sponsored by a public school or a private school whose students or teams compete against a public school" to be "expressly designated as . . . (1) Males, men, or boys; (2) Females, women, or girls; or (3) Coed or mixed." RSA 193:41, II(a). These team designations must be "based on the biological sex at birth of intended participants." Id. "Athletic teams or sports designated for females, women, or girls, shall not be open to students of the male sex." RSA 193:41, II(b).

---

[5] The winter track season begins on December 2, 2024. The spring track and tennis seasons begin on March 25, 2025.

However, HB 1205 places no restrictions on who may play on teams designated for males, men, or boys.

The Act states that "the sex of a student for the purpose of determining eligibility to participate in an interscholastic sport activity or club athletic team shall be determined by the student's biological sex on the student's official birth certificate or certificate issued upon adoption." RSA 193:41, III. However, such a certificate "is considered to have correctly stated the student's biological sex only if the certificate was: (a) [i]ssued at or near the time of the student's birth; or (b) [m]odified to correct any type of scrivener or clerical error in the student's biological sex." Id. If the certificate "does not appear to be the student's original birth certificate or does not indicate the student's sex upon birth, then the student must provide other evidence indicating the student's sex at time of birth." RSA 193:41, IV. HB 1205 does not specify who determines whether the student's birth certificate "appear[s] to be the . . . original," how that determination is to be made, or what constitutes sufficient "other evidence" of the student's birth sex. Id. It does make clear, however, that "[t]he student or the student's parent or guardian must pay any costs associated with providing the evidence required." Id.

The Act requires "[t]he state board of education, each local school board, and each governing body of a public charter school [to] adopt and enforce policies to ensure compliance with" the Act.[6] RSA 193:41, V. HB 1205 creates several private

---

[6] The State defendants make a halfhearted assertion (in a footnote) that they may not be proper defendants in this action. The court declines to consider this argument because it is insufficiently developed. See United States v. Zannino, 895

rights of action. First, "[a]ny student who is deprived of an athletic opportunity or suffers any direct or indirect harm as result of a school knowingly violating RSA 193:41" has a private right of action against that school. RSA 193:42, I. Second, "[a]ny student who is subject to retaliation or other adverse action by a school or athletic association or organization as a result of reporting a violation of RSA 193:41" has a private right of action against the school, association, or organization. RSA 193:42, II. Finally, "[a]ny school that suffers any direct or indirect harm as a result of a violation of RSA 193:41" may bring a private cause of action "against the government entity, licensing or accrediting organization, or athletic association or organization" whose violation caused the school's harm. RSA 193:42, III. In any of the foregoing causes of action, the successful plaintiff "shall be entitled to monetary damages, including for any psychological, emotional, and physical harm suffered, reasonable attorneys' fees and costs, and any other appropriate relief," including injunctive relief. RSA 193:42, IV, see RSA 193:42, I-III.

HB 1205 took effect on August 18, 2024, which was one day before the first day of practice for Parker's high school soccer team.

## PROCEDURAL HISTORY

Parker and Iris, each through their respective parents and next friends, filed this action on August 16, 2024. The complaint brings four counts, two of which relate to Parker, and two of which relate to Iris:

---

F.2d 1, 17 (1st Cir. 1990). However, the State defendants' assertion rings hollow in light of HB 1205's requirement that the state board of education "adopt and enforce policies to ensure compliance with" the Act. RSA 193:41, V.

- In Count I, Parker alleges that the State defendants' and the Pemi-Baker defendants' enforcement of HB 1205 violates her rights under the Equal Protection Clause.

- In Count II, Parker alleges that the State defendants' and the Pemi-Baker defendants' enforcement of HB 1205 violates her rights under Title IX.

- In Count III, Iris alleges that the State defendants' and the Pembroke defendants' enforcement of HB 1205 violates her rights under the Equal Protection Clause.

- In Count IV, Iris alleges that the State defendants' and the Pembroke defendants' enforcement of HB 1205 violates her rights under Title IX.

Plaintiffs sue under 42 U.S.C. § 1983 and under Title IX's implied right of action. See Cannon v. Univ. of Chicago, 441 U.S. 677, 717 (1979). They seek declaratory and injunctive relief. Specifically, they seek a declaration "that the enforcement by Defendants of HB 1205 violates Plaintiffs' rights under the Equal Protection Clause . . . and Title IX." Doc. no. 4 at 26. They seek a preliminary and permanent injunction enjoining defendants "from enforcing or threatening to enforce HB 1205 as to" each plaintiff, and "requiring said Defendants . . . to permit" the plaintiffs "to try out for and play on the school sports teams designated for girls on the same terms and conditions as other girls." Id. at 26-27. The complaint does not seek a declaration that HB 1205 is facially unconstitutional or unlawful. Nor does it seek relief enjoining the enforcement of HB 1205 in all respects—the injunctive relief sought is limited to the plaintiffs. Plaintiffs do not seek damages (other than nominal damages) but do seek an award of reasonable attorneys' fees. All individually named defendants are sued only in their official capacities.

On the same day plaintiffs filed their complaint, Parker filed a motion for a temporary restraining order ("TRO") (doc. no. 6) and both plaintiffs filed the motion for a preliminary injunction that is presently before this court. The TRO motion related only to Parker, while the preliminary injunction motion relates to both plaintiffs.[7] After a hearing on August 19, 2024, the court orally granted Parker's motion for a TRO and subsequently issued a written order setting forth findings of fact and rulings of law. See doc. nos. 35, 50. The court found that Parker had demonstrated that she was likely to succeed on the merits of both her equal protection claim and her Title IX claim, and that she would suffer irreparable and substantial harm in the absence of immediate relief.[8]

## RULINGS OF LAW

The court must now resolve plaintiffs' motion for a preliminary injunction. As noted, to obtain a preliminary injunction, the plaintiffs must demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of relief, that the balance of equities are in their favor, and that injunctive relief is consistent with the public interest. Arborjet, 794 F.3d at 171. The court will consider each factor in turn.

---

[7] Because Iris does not plan to try out for school sports until December, she did not request a TRO.

[8] The TRO was originally set to expire on August 27, the date of the hearing on plaintiffs' preliminary injunction motion. At the hearing, the court extended the TRO until 11:59 p.m. on September 10, 2024.

I.      Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection
        Claims

The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "requires that 'all persons similarly situated be treated alike.'" Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 10 (1st Cir. 2013) (ellipsis omitted) (quoting City of Cleburn v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). To prove an equal protection violation, a plaintiff must demonstrate that she was treated differently than other persons similarly situated based on an impermissible consideration such as race or gender. Alston v. Spiegel, 988 F.3d 564, 574-75 (1st Cir. 2021).

The court's first task in considering an equal protection challenge is to discern the applicable standard of review. Laws that "identify a class of people with certain characteristics and treat them differently than others" may trigger a more stringent judicial inquiry—depending upon the class of people identified. Mazzarino v. Mass. State Lottery Comm'n, 616 F. Supp. 3d 118, 128 (D. Mass. 2022). When a law "classifies by race, alienage, or national origin," the court applies strict scrutiny and asks whether the law is narrowly tailored to serve a compelling state interest. Cleburne, 473 U.S. at 440; see Massachusetts v. U.S. Dep't of Health & Hum. Servs., 682 F.3d 1, 8-9 (1st Cir. 2012). Laws that classify based on sex or gender trigger what is known as intermediate or heightened scrutiny. Massachusetts, 682 F.3d at 9. Under heightened scrutiny, the State must show that the law is "substantially related to achieving an important governmental objective." Id. "The

burden of justification" under heightened scrutiny "is demanding and it rests
entirely on the State." United States v. Virginia (VMI), 518 U.S. 515, 533 (1996).
Absent a classification triggering strict or heightened scrutiny, the court will deploy
rational basis review, which is usually deferential to the state. See Massachusetts,
682 F.3d at 9.

      A.    HB 1205 Classifies By Transgender Status Because It Bars
               Transgender Girls—and Only Transgender Girls—from Playing On
               Teams Consistent With Their Gender Identity

HB 1205 requires interscholastic sports teams for grades 5 through 12 that
play against teams sponsored by public schools to be expressly classified as male,
female, or coed. See RSA 193:41, II(a). That is, of course, a sex- or gender-based
classification. However, plaintiffs do not challenge the statute's requirement for
gender-designated sports teams—indeed, plaintiffs seek to play on teams reserved
for girls. Plaintiffs instead argue that the Act classifies by transgender status
because it requires a student's eligibility to play on a girls' team to be determined by
the student's "biological sex at birth," and bars "students of the male sex," i.e.,
students who were born male, from playing on girls' teams. RSA 193:41, II. Because
the statute, on its face, bars all transgender girls from playing on girls' teams,
plaintiffs contend that HB 1205 classifies by transgender status.[9] And because it is

---

[9] The State defendants assert that, because plaintiffs do not challenge the
propriety of designating interscholastic sports teams by gender and merely seek to
be included among the class of people eligible to play on girls' teams, plaintiffs'
equal protection claims do not trigger heightened review. The court disagrees with
the State defendants' characterization of plaintiffs' argument. Plaintiffs do seek to
be included among the class of people eligible to play on teams designated for girls,

impossible to classify by transgender status without classifying by sex or gender, plaintiffs argue that heightened scrutiny applies.

The Fourth Circuit considered whether a materially identical West Virginia statute classified based on transgender status earlier this year. See B.P.J ex rel. Jackson v. W.V. State Bd. of Educ., 98 F.4th 542 (4th Cir. 2024). As with HB 1205, the West Virginia law at issue in B.P.J. required interscholastic sports teams to be "expressly designated" as "[m]ales, men or boys"; "[f]emales, women, or girls," or "[c]oed or mixed," and required these designations to be "based on biological sex." W. Va. Code § 18-2-25d(c)(1). As with HB 1205, the law required a student's biological sex to be determined "solely on the individual's reproductive biology and genetics at birth." Id. § 18-2-25d(b)(1). The law further provided that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex" in most circumstances.[10] Id. § 18-2-25d(c)(2).

The Fourth Circuit had little trouble concluding that § 18-2-25d classified based on transgender status:

> If [the plaintiff] were a cisgender girl, she could play on her school's girls teams. Because she is a transgender girl, she may not. The Act declares a person's sex is defined only by their reproductive biology and genetics at birth. The

---

but they contend that HB 1205's definition of persons eligible to play on such teams facially discriminates against transgender girls. "[E]ven when lines may—or must—be drawn, the Constitution limits how and where they may fall." B.P.J ex rel. Jackson v. W.V. State Bd. of Educ., 98 F.4th 542, 555 (4th Cir. 2024).

[10] The West Virginia law did allow for students born biologically male to play on teams designated for girls "where selection for such teams is [not] based on competitive skill or the activity involved is [not] a contact sport." W. Va. Code § 18-2-25d(c)(2). Unlike the West Virginia law, HB 1205 categorically bars transgender girls from playing on any interscholastic sports team designated for girls.

> undisputed purpose—and the only effect—of that definition is to exclude transgender girls from the definition of 'female' and thus to exclude them from participation on girls sports teams. That is a facial classification based on gender identity.

B.P.J., 98 F.4th at 555-56 (quotation and citation omitted). The Fourth Circuit is not alone. Several courts have determined that laws prohibiting persons born biologically male from participating in girls' or women's sports classify based on transgender status. See Hecox v. Little, 104 F.4th 1061, 1071-72, 1077-78 (9th Cir. 2024); Doe v. Horne, 683 F. Supp. 3d 950, 955-56, 971-72 (D. Ariz. 2023), aff'd, --- F. 4th ----, 2024 WL 4113838 (9th Cir. Sept. 9, 2024); L.E. ex rel. Esquivel v. Lee, --- F. Supp. 3d ----, 2024 WL 1349031, at *3, *15-16 (M.D. Tenn. Mar. 29, 2024); Roe v. Utah High Sch. Activities Ass'n, No. 220903262, 2022 WL 3907182, at *4-5 (Utah Dist. Ct. Aug. 19, 2022) (considering equal protection challenge under Utah Constitution); cf. A.M. ex rel. E.M. v. Indianapolis Pub. Schs., 617 F. Supp. 3d 950, 960, 965-66 (S.D. Ind. 2022) (finding that a materially identical law discriminated on the basis of transgender status for purposes of Title IX claim).

This issue "is not even a close call." A.M., 617 F. Supp. 3d at 965. HB 1205, on its face, discriminates against transgender girls. The Act classifies students for eligibility to participate in girls' sports based on "biological sex at birth." RSA 193:41, II(a). Students who were born "of the male sex" are prohibited from playing on girls' teams. RSA 193:41, II(b). "The . . . legislature intentionally created a classification . . . that necessarily excludes transgender girls, and expressly allowed only that exclusive classification to play girls sports to the exclusion of transgender girls." Horne, 683 F. Supp. 3d at 971-72. Indeed, transgender girls are the only

group whom the Act bars from playing on the team associated with their gender identity. HB 1205's "disparate treatment of transgender girls because they are transgender is clear on the face of the statute," id. at 971, and this "singling out of transgender females is unequivocally discrimination," A.M., 617 F. Supp. 3d at 966.

The State defendants contend that HB 1205 does not contain a facial classification based on transgender status because the law uses biological sex to determine eligibility for participation in girls' sports, not transgender status, and because "[t]ransgender status is not mentioned anywhere in" the Act. Doc. no. 59-1 at 8. Courts have easily seen through this argument. See Hecox, 104 F.4th at 1078 ("[T]he Act's use of 'biological sex' functions as a form of proxy discrimination. The definition of 'biological sex' in the Act is written with seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." (quotations, citation, and brackets omitted)); Horne, 683 F. Supp. 3d at 971 (ruling that similar sports ban was "facially discriminatory even if the statute does not expressly employ the term 'transgender.'"); L.E., 2024 WL 1349031, at *15 ("The . . . classification based on 'sex at the time of the student's birth' target[s] transgender student-athletes even though the definition does not use the word 'transgender' specifically."). For the reasons already discussed, the plain text of the Act targets transgender girls even though it does not use the word "transgender." See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

Even if HB 1205 could somehow be viewed as facially neutral, one need only consider the legislative history of HB 1205 to discern that it was intentionally written to bar transgender girls from girls' sports. See Bos. Parent Coal. for Acad. Excellence v. Sch. Comm. of Bos., 996 F.3d 37 (1st Cir. 2021) (explaining that laws that are not discriminatory on their face may trigger strict or heightened scrutiny if motivated by "a discriminatory purpose" as evidenced by, among other things, the law's "legislative or administrative historical background" (quotation omitted)); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 (1977) (explaining that "legislative . . . history may be highly relevant" to whether a law's passage was motivated by an intent to target a particular class, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."). One legislator speaking in support of the Act indicated that it was written to prevent "transgender females competing against biological females." N.H.H.R. House Calendar Vol. 46, No. 11, at 16 (Mar. 15, 2024).[11] Another said she was supporting HB 1205 in part because of an experience where "my daughter came to me after cross country practice and said mom, there's a transgender on my team." N.H.H.R. House Journal Vol. 46, No. 9, at 34 (Mar. 21, 2024).[12] Yet another legislator indicated that the intent of the Act was to prohibit

---

[11] Available at:
https://www.gencourt.state.nh.us/house/calendars_journals/viewer.aspx?fileName=Calendars\2024\No11%20March%2015%202024.PDF

[12] Available at:
https://www.gencourt.state.nh.us/house/calendars_journals/viewer.aspx?fileName=Journals\2024\HJ%2009%20March%2021,%202024.PDF

"biological men who identify as girls [from] participat[ing] in women and girls' sports." <u>Id.</u> at 35. In short, the legislative history of HB 1205 confirms what is apparent on its face: the Act intentionally targets transgender girls and subjects them to differing treatment solely because they are transgender.

B.    <u>HB 1205 Triggers Heightened Scrutiny Because It Is Impossible To Discriminate Based on Transgender Status Without Discriminating Based on Sex</u>

Having concluded that HB 1205 classifies based on transgender status, the question becomes what level of scrutiny applies in light of that classification. Plaintiffs contend that heightened scrutiny applies because discrimination based on transgender status necessarily entails sex discrimination. The State defendants argue that the Act triggers only rational basis review because transgender people do not constitute a "quasi-suspect" class.

In <u>Bostock v. Clayton County</u>, 590 U.S. 644 (2020) the Supreme Court analyzed the relationship between discrimination based on homosexuality or transgender status and discrimination based on sex. There, individuals who had been fired because they were gay or transgender sued their employers under Title VII of the Civil Rights Act of 1964. <u>Bostock</u>, 590 U.S. at 653-54. Title VII forbids employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The plaintiffs alleged that firing an employee because of the employee's homosexuality or transgender status violated Title VII's ban on discriminating against an employee because of sex.

Writing for a six-justice majority, Justice Gorsuch exhaustively analyzed the relationship between sex discrimination and discrimination based on homosexuality or transgender status. The employers argued that the term "sex" in the statute meant "status as either male or female as determined by reproductive biology." 590 U.S. at 655 (brackets omitted). The Court assumed arguendo that the employers were correct "because nothing in our approach . . . turns on" that definition. Id. at 655. "The question isn't just what 'sex' meant" when Congress enacted Title VII, "but what Title VII says about it." Id. at 656. Instead, the more important question to consider was causation—what does it mean to take a certain action against an individual "because of" that individual's sex? See id.

The Court reasoned that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." Id. at 660. "[H]omosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense . . . , but because to discriminate on these grounds requires an employer to treat individual employees differently because of their sex." Id. at 660-61.

Justice Gorsuch offered several hypotheticals throughout the opinion to illustrate this point. Suppose an employer has two employees, both of whom are materially identical in their qualifications, and both of whom are attracted to men. They differ only in their sex: one is a man, and one is a woman. "If the employer fires the male employee for no reason other than the fact that he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his

female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge." Id. at 660. Or suppose an employer has two employees, both of whom are once again equally qualified, and both of whom identify as women. They differ only in their sex assigned at birth: one was born with the sexual anatomy of a male, and the other a female. If the employer fires the transgender woman for being transgender, but retains the cisgender woman, "the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the employee's sex plays an unmistakable and impermissible role in the discharge decision." Id. at 660. "[I]f changing the employee's sex would have yielded a different choice by the employer," the employer has discriminated "because of . . . sex." Id. at 659-60; 42 U.S.C. § 2000e-2(a)(1).

This conclusion—that discrimination based on transgender status or homosexuality, by definition, entails discrimination based on sex—holds true even if the employer only intends to discriminate against gay or transgender people. "Just as sex is necessarily a but-for cause when an employer discriminates against homosexual or transgender employees, an employer who discriminates on these grounds inescapably intends to rely on sex in its decisionmaking." Bostock, 590 U.S. at 661 (emphasis omitted). Even though the employer's "ultimate goal might be to discriminate on the basis of sexual orientation" or transgender status, to achieve that discriminatory goal the employer must base its conduct "in part on that

individual's sex." Id. at 662. The employer intends to treat an employee differently than they otherwise would in part because of the employee's biological sex.

While Bostock concerned Title VII, its analysis of the logical relationship between sex discrimination and transgender discrimination extends to other contexts. The First Circuit has "recognized that the analytical framework for proving discriminatory treatment under Title VII is equally applicable to constitutional . . . claims." Lipsett v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988) (quotation, brackets, and ellipsis omitted). Several courts have held, guided by Bostock's reasoning, that discrimination based on transgender status necessarily constitutes discrimination based on sex for purposes of the Equal Protection Clause. See, e.g., Fowler v. Stitt, 104 F.4th 770, 793 (10th Cir. 2024); Kadel v. Folwell, 100 F.4th 122, 153-54 (4th Cir. 2024); Hecox, 104 F.4th at 1079-80; Bos. All. of Gay, Lesbian, Bisexual, & Transgender Youth v. U.S. Dep't of Health & Hum. Servs., 557 F. Supp. 3d 224, 244 (D. Mass. 2021); LeTray v. City of Watertown, --- F.Supp. 3d ---, 2024 WL 1107903, at *7 (N.D.N.Y. Feb. 22, 2024); see also Brandt ex rel. Brandt v. Rutledge, 47 F.4th 661, 669-70 (8th Cir. 2022) (reasoning that a law prohibiting "gender transition procedures" discriminates on the basis of sex because the patient's "sex at birth determines whether or not the [patient] can receive certain types of medical care"); Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1051 (7th Cir. 2017) (policy requiring students to use bathroom reflecting their biological sex at birth discriminated on the basis of transgender status and was "inherently based upon a sex-classification"; "the School

District's policy cannot be stated without referencing sex"), abrogated on other grounds by Ill. Republican Party v. Pritzker, 973 F.3d 760 (7th Cir. 2020).

In Kadel for example, the Fourth Circuit applied Bostock to hold that health insurance plans which prohibit certain medical procedures when undertaken to treat gender dysphoria discriminated on the basis of transgender status and therefore sex. See 100 F.4th at 133, 153-54. The Fourth Circuit posed a Bostock-esque hypothetical: "Try figuring out whether the [insurance plan] will cover a certain patient's vaginoplasty. By virtue of the fact that they are seeking a vaginoplasty, we know that they were born without a vagina. But we do not know what sex they were assigned at birth. Without that information, we cannot say whether the Plan or Program will cover the surgery." Id. at 153.

Some courts, however, have declined to apply Bostock in the equal protection context. See L.W. ex rel. Williams v. Skrmetti, 83 F.4th 460, 484-85 (6th Cir. 2023), cert. granted sub nom. United States v. Skrmetti, 144 S. Ct. 2679 (June 24, 2024); Eknes-Tucker v. Governor of Alabama, 80 F.4th 1205, 1228-29 (11th Cir. 2023). In L.W., for example, the Sixth Circuit concluded that Bostock's analysis was inapplicable to equal protection challenges given that the Fourteenth Amendment and Title VII use different language, and because different defenses to liability are available under Title VII. See L.W., 83 F.4th at 484-85. Similarly, in Eknes-Tucker the Eleventh Circuit declined to apply Bostock's analysis to equal protection claims because "[t]he Equal Protection Clause contains none of the text that the Court interpreted in Bostock." Eknes-Tucker, 80 F.4th at 1229.

The Tenth Circuit considered these potential distinctions in <u>Fowler v. Stitt</u>. The Tenth Circuit agreed that <u>Bostock</u> characterized "[t]he only question before us" as "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" <u>Bostock</u>, 590 U.S. at 681; <u>see</u> <u>Fowler</u>, 104 F.4th at 789-90. "Although that was the only question the Supreme Court decided, the Court did not indicate that its logic concerning the intertwined nature of transgender status and sex was confined to Title VII." <u>Fowler</u>, 104 F.4th at 790. Indeed, "the Supreme Court did not once state that its analysis concerning the relationship between transgender status and sex was specific to Title VII cases—and it could have [easily] done so." <u>Id.</u> Instead, when faced with the employer's argument that the Court's reasoning "will sweep beyond Title VII to other federal state laws that prohibit sex discrimination," <u>Bostock</u>, 590 U.S. at 681, the Supreme Court only "stated that other laws were not before it, so it would not 'prejudge.'" <u>Fowler</u>, 104 F.4th at 790 (quoting <u>Bostock</u>, 590 U.S. at 681).

As for the difference in language and available defenses between the Equal Protection Clause and Title VII, the Tenth Circuit readily agreed "that Title VII and the Equal Protection Clause are not interchangeable." <u>Id.</u> The Equal Protection Clause, for example applies whenever similarly situated persons are afforded different treatment, "and 'implies different degrees of judicial scrutiny'" depending on the basis for the differing treatment. <u>Id.</u> (quoting <u>Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.</u>, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring)). Title VII, by contrast, only applies to "certain classifications, and it

does not incorporate tiers of scrutiny." Id. But the Tenth Circuit saw "nothing about these differences that would prevent Bostock's commonsense reasoning—based on the inextricable relationship between transgender status and sex—from applying to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." Id.

The Tenth Circuit's analysis—which appears to reflect the majority rule—is persuasive. Bostock analyzed the logical relationship between discrimination based on transgender status and discrimination based on sex. The Court concluded that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." 590 U.S. at 669. While this analysis was framed within the context of determining what it means to discriminate "because of . . . sex" as that phrase appears in Title VII, the conclusion that transgender status and sex are inextricably intertwined is not limited to Title VII. To discriminate against someone because they are transgender entails discrimination based on sex in the equal protection context as much as it does in the Title VII context. "[A]dopting Bostock's commonsense explanation for how to detect a sex-based classification does not require [the court] to import Title VII's 'test for liability,'" it simply tells us how to detect a sex-based classification in the first place. Fowler, 104 F.4th at 790-91. "While further analysis may preclude recovery under the appropriate level of scrutiny, the corollary between sex and transgender status remains the same." Id. at 790.

To illustrate how HB 1205's transgender-based classification discriminates on the basis of sex, consider the following. Two girls show up for girls' high school

soccer tryouts. They play the same position (which is a position of great need for the team), and both are highly skilled players. One girl is transgender; she was born, in the parlance of HB 1205, "of the male sex." RSA 193:41, II(b). The other girl is cisgender; she was born biologically female. HB 1205 prohibits one girl from even trying out, and allows the other to play on the team without restriction (so long as she can suitably prove her biological sex at birth, <u>see</u> Pt. I.D, <u>infra</u>). In order to know which girl is barred from trying out, one needs to know her biological sex at the time of birth. HB 1205 intentionally targets the girl born biologically male for different treatment because of her biological sex at birth. The transgender-based classification apparent on the face of HB 1205 necessarily entails sex discrimination. It therefore triggers heightened scrutiny under the Equal Protection Clause.

> C.    <u>HB 1205 Triggers Heightened Scrutiny Because It Classifies Based on Gender Stereotypes</u>

In addition to the reasoning set forth in <u>Bostock</u>, HB 1205's discrimination against transgender girls triggers heightened scrutiny because it "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes." <u>Grimm v. Gloucester Cnty. Sch. Bd.</u>, 972 F.3d 586, 608 (4th Cir. 2020). In <u>Price Waterhouse v. Hopkins</u>, a plurality of the Supreme Court recognized that sex-based discrimination occurs when a person is singled out for disparate treatment based on a belief that the person does not conform to stereotypes associated with their sex. <u>See</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 250 (1989) ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman

26

cannot be aggressive, or that she must not be, has acted on the basis of gender.");

see also L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)

(explaining that a prohibition on sex-based discrimination "strike[s] at the entire

spectrum of disparate treatment of men and women resulting from sex stereotypes"

(quotation omitted)). Several courts of appeals, and even more district courts, have

held "that sex discrimination includes discrimination against transgender persons

because of their failure to comply with stereotypical gender norms." Glenn v.

Brumby, 663 F.3d 1312, 1317 (11th Cir. 2011); 2011) (collecting district court cases);

Grimm, 972 F.3d at 608-09 (collecting district court cases); Whitaker; 858 F.3d at

1051; Smith v. City of Salem, 378 F.3d 566, 573-75, 577 (6th Cir. 2004); Schwenck v.

Hartford, 204 F.3d 1187, 1198-1203 (9th Cir. 2003) cf. Rosa v. Park W. Bank & Tr.

Co., 214 F.3d 213, 214-16 (1st Cir. 2000) (holding that a "biological male" plaintiff

stated a claim for sex-based discrimination by alleging he was treated differently

because he was dressed in "traditionally feminine attire").

The Supreme Court has long held that sex- or gender-based classifications

must be given heightened scrutiny because they may reflect "stereotyped

distinctions between the sexes" that "frequently bear[ ] no relation to ability to

perform or contribute in society." Frontiero v. Richardson, 411 U.S. 677, 685-86

(1973) (plurality opinion). Thus, in Frontiero, the Supreme Court struck down a

statute that required a female servicemember to prove that her husband was in fact

financially dependent on her in order to claim him as a dependent, but allowed male

servicemembers to claim their wives as dependents without regard to their wives'

actual financial dependence. See id. at 688-91. In so holding, the Court rejected the

27

government's justification for the law that, "as an empirical matter, wives in our society frequently are dependent on their husbands, while husbands rarely are dependent on their wives." Id. at 688-89.

Since Frontiero (or even Reed v. Reed, 404 U.S. 71 (1971)), the Supreme Court has continued to emphasize that the State bears a substantial burden in justifying sex- or gender-based classifications in large part because such classifications may reflect pernicious stereotypes. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 135 (1994); see, e.g., Craig v. Boren, 429 U.S. 190, 198-99 (1976) (discussing the Court's "decisions that have invalidated statutes employing gender as an inaccurate proxy for other, more germane bases of classifications" based on "archaic and overbroad generalizations" about men and women "[i]n light of the weak congruence between gender and the characteristic or trait that gender purported to represent"); Orr v. Orr, 440 U.S. 268, 283 (1979) ("Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the 'proper place' of women and their need for special protection."); Miss. Univ. for Women v. Hogan, 458 U.S. 718, 725-26 (1982) (explaining that the purpose of giving heightened scrutiny to sex- or gender-based classifications "is to assure that the validity of such a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women"); J.E.B., 511 U.S. at 138 ("We shall not accept as a defense to gender-based peremptory challenges the very stereotype the law condemns." (quotation omitted)); VMI, 518 U.S. at 533 (explaining that the justification for a

sex- or gender-base classification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females").

Here, as already discussed, HB 1205 discriminates against transgender girls because they are transgender. It forbids transgender girls from playing girls' sports because they were born "of the male sex." RSA 193:41, III. The statute treats transgender girls differently because they "fail to conform to the sex-based stereotypes associated with their assigned sex at birth"; namely, that girls are always born as girls, and boys are always born as boys. Whitaker, 858 F.3d at 1051; see also Glenn, 663 F.3d at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. '[T]he very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior.'" (quoting Ilona M. Turner, Sex Stereotyping Per Se: Transgender Employees & Title VII, 95 Cal. L. Rev. 561, 563 (2007)). HB 1205 denies transgender girls the opportunity to play girls' school sports based on their failure to conform to stereotypes about the physical attributes or sexual anatomy that a girl must possess. In so doing, HB 1205 discriminates against transgender girls based on sex or gender stereotypes, and triggers heightened scrutiny for this reason as well.

The State defendants contend that classifications based on transgender status do not trigger heightened scrutiny because transgender people do not constitute a quasi-suspect class. Many courts have persuasively reached the opposite conclusion: that transgender individuals do, in fact, constitute a quasi-suspect class, such that transgender-based discrimination triggers heightened

scrutiny regardless of the inextricably intertwined nature of transgender-based discrimination and sex discrimination. See, e.g., Grimm, 972 F.3d at 610-13 (4th Cir. 2020) (holding that transgender people constitute a quasi-suspect class because: transgender people suffer "from high rates of employment discrimination, economic instability, and homelessness"; they experience harassment, physical assault, and violent crimes at rates disproportionately higher than the general public; they are still targeted for differential treatment by "current measures and policies" such as by laws that bar people from changing their gender marker on their birth certificates; being transgender "bears no . . . relation" to one's ability to perform in or contribute to society; "transgender people constitute a discrete group with immutable characteristics"; and "transgender people constitute a minority lacking political power"); see also Bos. All., 557 F. Supp. 3d at 244 (explaining that, while the First Circuit has held that homosexual persons are not a suspect or quasi-suspect class, it has not decided whether transgender persons are a suspect or quasi-suspect class). This court need not reach the issue. Regardless of whether transgender people independently constitute a quasi-suspect class, HB 1205's discrimination against transgender girls constitutes discrimination based on sex under Bostock's analysis and because it classifies students based on sex stereotypes.

D.   HB 1205 Triggers Heightened Scrutiny for the Additional Reason That It Requires Girls—but Not Boys—To Verify Their Biological Sex at the Time of Birth

Although the parties do not devote argument to the issue, the court notes that HB 1205 contains an additional classification triggering heightened scrutiny.

While the Act requires that interscholastic sports teams be expressly designated as male, female, or coed, it places no restrictions on who may play on boys' teams. It states that "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex," RSA 193:41, II(b), but no corresponding limitation is placed on boys' teams. To play on a girls' team, the girl must present her "official birth certificate or certificate issued upon adoption." RSA 193:41, III. Boys are not subject to this requirement. If the girl does not present her certificate, or if her birth certificate "does not appear to be the student's original birth certificate or does not indicate the student's sex upon birth," then she must prove her biological sex at birth using "other evidence." RSA 193:41, IV. Boys are not subject to this requirement. The Act does not specify who decides whether the girl's birth certificate "appear[s] to be the . . . original." Nor does it specify how this unknown decisionmaker should go about deciding whether the certificate "appear[s] to be the . . . original." Nor does it specify what "other evidence" the girl or her family should use to prove that she was born a girl or how this unspecified decisionmaker should judge such "other evidence."

By subjecting girls but not boys to this sex-verification process, HB 1205 classifies by gender and triggers heightened scrutiny. In Hecox, the Ninth Circuit considered a similar law passed in Idaho which banned "students of the male sex" from playing on girls' teams but did not place any limitations on who could play for boys' teams. 104 F.4th at 1080. While the law in Hecox did not require all students who wanted to play on a girls' team to prove their biological sex at the time of birth, it did allow anyone—including coaches, parents, and even other student-athletes—

to "dispute" a student's sex, which would then require the subject of the dispute to "verify [their] biological sex" pursuant to a health examination showing "the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone." Idaho Code § 33-6203(3). The Ninth Circuit found that the Idaho law "classifies on the basis of sex by subjecting only participants in women's and girls' sports, whether cisgender or transgender, to the risk and humiliation of having their sex 'disputed' and then suffering intrusive medical testing as a prerequisite for participation on school sports teams." Hecox, 104 F.4th at 1080.

The same holds true here. Under HB 1205, all New Hampshire girls who wish to play middle school or high school interscholastic sports have to prove their biological sex at the time of birth. Boys do not. If the unspecified decisionmaker to whom a New Hampshire girl presents her birth certificate decides—based on unknown criteria—that her certificate does not "appear to be the original," she must somehow prove her birth sex to this decisionmaker using "other evidence." While HB 1205 does not specify what "other evidence" would be sufficient, it takes no leap of logic to conclude that it would likely be similar invasive, expensive, and humiliating medical testing as was at issue in Hecox. "[W]here women's and girls' sports are subject to separate requirements for educational opportunities that are 'unequal in tangible and intangible' ways from those for men, those requirements are tested under heightened scrutiny." Hecox, 104 F.4th at 1080 (quoting VMI, 518 U.S. at 547).

E.  The State Defendants Have Not Shown That HB 1205 Satisfies Heightened Scrutiny

To satisfy heightened scrutiny, the challenged law "must be substantially related to achieving an important governmental objective." Massachusetts, 682 F.3d at 9. The justification for the challenged law must be "exceedingly persuasive." VMI, 518 U.S. at 533 (quotation omitted). The burden of demonstrating a satisfactory justification "is demanding and rests entirely on the State." Id. Moreover, the proffered justifications must represent the law's "actual . . . purposes," and cannot be "hypothesized or invented post hoc in response to litigation." Id. at 533, 535 (italicization omitted).

The State defendants contend that ensuring safety in middle and high school girls' sports is an important state objective. They further contend that protecting cisgender girls' "opportunity" to play interscholastic athletics is an important state objective. The State defendants assert—without citation or record support—that "[t]he legislative record and news accounts are replete with documented stories regarding the risks faced by biological girls when they compete against biological boys in the age group subject to" HB 1205. Doc. no. 59-1 at 11. They further assert—without explanation—that HB 1205's use "of biological sex as recorded in birth certificates" is substantially related to achieving these goals. Id.

For several reasons, the State defendants have not come close to satisfying heightened scrutiny. First, the State has submitted no evidence that transgender girls' participation in girls' sports in New Hampshire has created a safety problem or has jeopardized the integrity of girls' athletic competitions. While the State

defendants assert that "[t]he legislative record and news accounts are replete with" this evidence, they have not cited to a single instance, in New Hampshire or elsewhere, in which a transgender girl's participation in girls' sports created a safety or fairness issue. Even where a governmental interest is "compelling in the abstract," heightened scrutiny "is not satisfied by the assertion of abstract interests" or "an unsubstantiated and hypothetical danger." Rideout v. Gardner, 838 F.3d 65, 72, 76 (1st Cir. 2016) (quotation omitted); see, e.g., Hecox, 104 F.4th at 1085 (concluding that a similar sports ban did not satisfy intermediate scrutiny where "there was very little anecdotal evidence at the time of the Act's passage that transgender women had displaced or were displacing cisgender women in sports"). If anything, the plaintiffs' own circumstances suggest that transgender girls' participation in girls' sports in New Hampshire has not presented a fairness or safety issue: Parker's soccer team had a winless season last year, and Iris did not make the cut for middle school softball. "Heightened scrutiny requires more than a hypothesized problem." Horne, 683 F. Supp. 3d at 974.

Second, the State has submitted no evidence that transgender girls have an inherent advantage over cisgender girls in athletic competitions merely from having been born male. Before puberty, there are no meaningful differences in average athletic ability between boys and girls. Testosterone is what drives the divergence in average athletic skill between boys and girls after puberty. The uncontested record in this case shows that, when a transgender girl does not experience male puberty, she will have no inherent biological or physiological advantage over cisgender girls in athletics. Yet HB 1205 bars all transgender girls in grades 5

through 12 from girls' sports, regardless of whether they have started puberty and regardless of whether they have undergone treatment to block male puberty or induce female puberty.[13] Under heightened scrutiny, a court must "reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." Sessions v. Morales-Santana, 582 U.S. 47, 63 n.13 (2017).

Third, application of HB 1205 to Parker and Iris is not substantially related to achieving fairness or safety in girls' sports. See Bucklew v. Precythe, 587 U.S. 119, 138 (2019) (explaining that bringing an as-applied constitutional challenge "affects the extent to which the invalidity of the challenged law must be demonstrated"); see also, e.g., Lehr v. Robertson, 463 U.S. 248, 267 (1983) (holding that statutes giving unwed fathers fewer parental rights than unwed mothers "may not constitutionally be applied in that class of cases where the mother and father are in fact similarly situated with regard to their relationship with the child" but could be applied in those cases where "the father had 'not come forward to participate in the rearing of his child'" (quoting Caban v. Mohammed, 441 U.S. 380, 392 (1979))). Neither Parker nor Iris have undergone male puberty. Neither of them will undergo male puberty. Both have received hormone therapy to induce female puberty, and both have developed physiological changes associated with female puberty. It is uncontested that there is no medical justification to preclude Parker and Iris from playing girls' sports. As such, HB 1205 is unconstitutional as applied

---

[13] The court expresses no opinion on whether a more narrowly tailored law would satisfy heightened scrutiny.

to Parker and Iris because barring them from playing girls' sports does nothing to enhance fairness or safety in girls' sports. See B.P.J., 98 F.4th at 558-59 (reversing grant of summary judgment to defendants in similar case where the plaintiff "presented evidence that transgender girls with her background and characteristics possess no inherent, biologically-based competitive advantages over cisgender girls when participating in sports" (emphasis omitted)).

For these reasons, the State defendants have failed to demonstrate at the preliminary injunction stage that HB 1205 is substantially related to achieving an important governmental interest. Plaintiffs are therefore likely to succeed on the merits of their equal protection claims.

II.    Plaintiffs Are Likely to Succeed On the Merits of Their Title IX Claims

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To prove their Title IX claims, plaintiffs must show that, as applied to them, HB 1205 would (1) exclude them from participation in, deny them the benefits of, or subject them to discrimination in (2) an educational program receiving Federal financial assistance (3) on the basis of sex or gender. Doe v. Harv. Univ., 410 F. Supp. 3d 332, 334 (D. Mass. 2019). The State defendants do not dispute plaintiffs' showings on the first two prongs. They dispute only whether HB 1205 would bar plaintiffs from participating in girls' interscholastic sports on the basis of sex.

The court has already found that HB 1205 discriminates on the basis of transgender status and that Bostock explains why such discrimination necessarily entails discrimination on the basis of sex. Nevertheless, the State defendants assert that Bostock's analysis does not apply to Title IX claims. Their arguments are not persuasive.

First, the State defendants assert that the Supreme Court has already held that Bostock is inapplicable to Title IX. Not so. While the Supreme Court recently upheld (in a per curiam opinion on an emergency application for relief) the Fifth and Sixth Circuits' refusals to stay preliminary injunctions against the Department of Education's new administrative rule interpreting Title IX to bar discrimination on the basis of transgender status, it expressed no opinion as to whether the rule correctly interpreted Title IX. See Dep't of Ed. v. Louisiana, 144 S. Ct. 2507, 2509-10 (2024). True, the per curiam opinion stated that the Court unanimously "accept[ed]" that preliminary injunctive relief was proper as to the provisions of the rule found unlawful by the district courts, including the provision barring transgender-based discrimination. Id. But the primary issue in front of the Supreme Court was whether "those provisions should be severed and . . . the other provisions of the new rule should . . . be permitted to take effect" during the pendency of the Department's appeals of the preliminary injunctions. Id. at 2510. Ultimately, the Court found "[i]n this emergency posture" that the Department had not shown "a likelihood of success on its severability argument [or] that the equities favor a stay," and thus that there was no "sufficient basis to disturb the lower courts' interim conclusions that the . . . provisions found likely to be unlawful are intertwined with

and affect other provisions of the rule." Id. Read in context, the Court's "accept[ance]" of the propriety of preliminary relief can only be understood as accepting for argument's sake that some measure of preliminary relief was proper in order to set the stage for the actual dispute in front of the Court: whether some portion of the preliminary injunction should be stayed pending appeal.

Second, the State defendants assert that Bostock's analysis does not apply to Title IX because, "[a]t the time Congress passed Title IX, 'sex' was viewed as binary and immutable—biologically male or female." Doc. no. 59-1 at 16. But Bostock itself accepted for the sake of argument that Title VII's definition of "sex" was identical to the definition urged by the State defendants in this case "because nothing in our approach to [this] case[ ] turns on" that definition. Bostock, 590 U.S. at 655. The result in Bostock did not turn on the definition of sex, "but what Title VII says about it." Id. at 656. Bostock held that, because Title VII prohibits employers from discriminating "because of" sex, it necessarily prohibits employers from discriminating because of transgender status, even if "sex" refers solely to the biological characteristics that make someone male or female. Thus, even assuming the State defendants are correct that "sex" in Title IX should be construed in the manner they urge, that is not a basis to disregard Bostock's analysis.

The State defendants contend that Bostock's analysis of Title VII does not apply to Title IX because Title VII addresses employment discrimination whereas Title IX concerns schools and education, and because different defenses are available under the two statutes. It is of course true that Title IX and Title VII are not identical. But that has not stopped the First Circuit from interpreting Title IX's

strictures consistently with Title VII in numerous contexts. See Lipsett, 864 F.2d at 897 (holding "that the Title VII standard for proving discriminatory treatment should apply to claims of sex discrimination under Title IX" in the employment discrimination context); Wills v. Brown Univ., 184 F.3d 20, 25 n.3 (1st Cir. 1999) (explaining that Title IX and Title VII are generally interpreted consistently with one another); Ing v. Tufts Univ., 81 F.4th 77, 82 (1st Cir. 2023) ("[T]he standards governing claims arising under Title VII and Title IX are the same."). While the First Circuit has not yet had occasion to consider the issue, many courts have applied Bostock's analysis to Title IX claims. See A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville, 75 F.4th 760, 769 (7th Cir. 2023); Doe v. Snyder, 28 F.4th 103, 114 (9th Cir. 2022); Grimm, 972 F.3d at 616-17. The different goals and available defenses under Titles VII and IX do not "prevent Bostock's commonsense reasoning—based on the inextricable relationship between transgender status and sex—from applying to the initial inquiry of whether there has been discrimination on the basis of sex." Fowler, 104 F.4th at 790. Nor does the occurrence of transgender-based discrimination in a school instead of the workplace sever the inextricable relationship between transgender status and sex.

Undeterred, the State defendants contend that Bostock is inapplicable to Title IX because Title VII prohibits discrimination "because of" sex, whereas Title IX prohibits discrimination "on the basis of" sex. The court fails to see any meaningful difference between these two phrases and the State has not articulated any. Indeed, "Bostock used those phrases interchangeably throughout the decision." Snyder, 28 F.4th at 114. To the extent there is a meaningful difference between these phrases, it

would benefit plaintiffs, as <u>Bostock</u> applied Title VII's but-for causation standard, <u>see</u> <u>Bostock, 590 U.S. at 656-57</u>, whereas it is an open question in the First Circuit whether Title IX requires the plaintiff's sex to be a but-for cause or merely a "motivating factor," <u>see</u> <u>Doe v. Trs. of Dartmouth Coll., --- F. Supp. 3d ---, 2024 WL 1658894, at *9 (D.N.H. Apr. 17, 2024)</u>.

The State defendants next argue that <u>Bostock</u> does not control because Title IX expressly allows for differing treatment on the basis of sex in some instances. They contend that, if <u>Bostock</u> applied, these carveouts would be rendered meaningless. It is true that Title IX allows schools to maintain "separate living facilities for the different sexes," <u>20 U.S.C. § 1686</u>, and that its implementing regulations allow for separate housing, bathrooms, and athletic teams on the basis of sex, <u>34 C.F.R. §§ 106.32-.33</u>, .41. But applying <u>Bostock</u>'s recognition of the inextricable relationship between sex and transgender status to Title IX would not prevent schools from maintaining different housing, bathrooms, or athletic teams for men and women. <u>See</u> <u>A.C., 75 F.4th at 769-70</u> (finding Title IX's carveouts for differing treatment based on sex in some circumstances to be "of little relevance" to whether Title IX prohibits transgender-based discrimination). Indeed, the plaintiffs in this very case wish to play on sports teams reserved for girls. The fact that Title IX expressly allows for sex-separated athletic teams does not mean that a law barring all transgender girls from playing on girls' teams comports with Title IX.[14]

------

[14] This conclusion is buttressed by the fact that Title IX (like Title VII) protects individual "person[s]" from being discriminated against on the basis of sex, <u>20 U.S.C. § 1681(a)</u>, such that a violation occurs when an individual is singled out

See Grimm, 972 F.3d at 618 & n.16 (explaining that Title IX's allowance for sex-separated living facilities does not mean "that schools may act in an arbitrary or discriminatory manner when dividing students into those sex-separated facilities"); Parents for Privacy v. Barr, 949 F.3d 1210, 1227 (9th Cir. 2020) ("[J]ust because Title IX authorizes sex-segregated facilities does not mean . . . that they must be segregated based only on biological sex and cannot accommodate gender identity.").

Finally, the State defendants highlight that Title IX was enacted pursuant to the Spending Clause, whereas Title VII was not. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). The Supreme Court has "regularly applied this contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages." Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212, 219 (2022) (brackets and quotation omitted; emphasis added). Thus, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Ed., 526 U.S. 629, 640 (1999). Here, the plaintiffs do not seek money damages; as such, the concerns animating the Supreme Court's Spending Clause jurisprudence are not implicated.

---

for disparate treatment based on her sex even if a school treats boys and girls equally overall, see Bostock, 590 U.S. at 659.

But even if it were otherwise, "the principal place to look" for whether a particular piece of Spending Clause legislation "'furnishes clear notice regarding the liability at issue' . . . is the text of the [law] itself." Mr. I ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 14 (1st Cir. 2007) (quoting Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy, 548 U.S. 291, 296 (2006)). Title IX unequivocally and explicitly proscribes discrimination "on the basis of sex," 20 U.S.C. § 1681(a), and the Supreme Court has explained why, as a textual and logical matter, a prohibition on sex discrimination necessarily encompasses a prohibition on transgender-based discrimination, see Bostock, 590 U.S. at 659-62.

Like Title VII, Title IX "is a major piece of federal civil rights legislation" that "is written in starkly broad terms." Id. at 680. Like Title VII, Title IX's broad language "has repeatedly produced unexpected applications, at least in the view of those on the receiving end of them" Id.; see, e.g., Jackson v. Birmingham Bd. of Ed., 544 U.S. 167, 183 (2005) (interpreting Title IX to provide retaliation damages action; rejecting Spending Clause challenge because retaliating against an individual for reporting sex discrimination "violates the clear terms of the statute" (quotation omitted)); Davis, 526 U.S. at 648 (interpreting Title IX to hold recipients liable in damages "for their deliberate indifference to known acts of peer sexual harassment"; rejecting Spending Clause challenge). Indeed, the Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." Jackson, 544 U.S. at 183. For a piece of Spending Clause legislation to give sufficient notice of the acts for which a recipient of federal funding may be held liable, Congress need not "specifically

identif[y] and proscribe[ ] in advance" every act for which liability may attach.

Bennett v. Ky. Dep't of Ed., 470 U.S. 656, 666 (1985). Because a bar on transgender-based discrimination is a "necessary consequence" of Congress's decision to prohibit sex-based discrimination in Title IX, Bostock, 590 U.S. at 683, the court rejects the State defendants' Spending Clause argument.

For all of these reasons, plaintiffs are likely to succeed on the merits of their Title IX claims.

III.   Plaintiffs Are Likely to Suffer Irreparable Harm In the Absence of a Preliminary Injunction

A plaintiff demonstrates a sufficient likelihood of irreparable harm to support a preliminary injunction where she shows that, in the absence of preliminary relief, she is likely to suffer a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). Plaintiffs have easily satisfied that standard.

HB 1205 would bar Parker from playing on her high school soccer team—her primary source of social and emotional support and acceptance—solely because she is a transgender girl. It would also bar Iris from trying out for girls' sports, which she and her parents hope will allow her to make friends and feel accepted after being bullied in middle school. By treating Parker and Iris in this way, HB 1205 would be "very publicly branding [them] with a scarlet 'T.'" Grimm, 972 F.3d at 618 (quoting Doe ex rel. Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 530 (3d Cir. 2018)). "Plaintiffs will . . . suffer the shame and humiliation of being unable to

participate in a school activity simply because they are transgender—a personal characteristic over which they have no control."[15] Horne, 683 F. Supp. 3d at 975.

Not only would such public stigmatization harm these young plaintiffs, it would run directly counter to their medical providers' recommendations that they seek social acceptance of their gender identities in order to alleviate the misalignment between their birth sexes and their innate senses of gender. See A.M., 617 F. Supp. 3d at 967 (finding irreparable harm in similar case where plaintiffs' participation in softball "helped to lessen the distressing symptoms of [plaintiff's] gender dysphoria and allowed her to experience her life more fully as a girl" (quotation omitted)); Horne, 683 F. Supp. 3d at 975 ("Plaintiffs' mental health is dependent on living as girls in all aspects of their lives."). For the same reasons, the fact that HB 1205 would permit plaintiffs to play on boys' teams does nothing to alleviate plaintiffs' harms. Playing on a boys' team would be humiliating and degrading to the plaintiffs, and would almost certainly exacerbate symptoms of gender dysphoria. Although the factual record in this suit currently indicates that gender dysphoria is highly treatable, severe consequences may result in the absence of treatment, including substance use disorder, eating disorders, mental health disorders, and even suicide.

---

[15] For this reason, the court rejects the State defendants' argument that plaintiffs' alleged harm is insufficient because it is possible they could play intramural, coed, or community-based sports. Regardless of the availability of other athletic opportunities, in the absence of a preliminary injunction plaintiffs would be publicly singled out for discriminatory treatment based on an immutable characteristic. The stigma and humiliation that comes from such treatment of a child at the hands of the State is substantial and irreparable, regardless of whether Parker could play for a travel soccer team or Iris could take private tennis lessons.

The State defendants contend that Iris has not identified a sufficient harm to justify a preliminary injunction because she does not plan to try out for school sports until December 2024. However, a harm is sufficiently imminent to justify a preliminary injunction where the court's ability to prevent or remedy the harm will be frustrated if the court waits until the conclusion of trial to act. See Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 74 (1st Cir. 2004); Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs, 470 F. Supp. 2d 30, 64 (D.N.H. 2007); Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 235 (2d Cir. 1999). At the hearing on plaintiffs' preliminary injunction motion, the court offered the parties the possibility of an expedited trial in this matter in order to address the State defendants' concern about the lack of immediacy surrounding Iris's alleged harm. While the plaintiffs stated that they would assent to an expedited trial, the State did not do so. Therefore, trial in this matter would almost certainly occur well after December 2024, and the court must act before then in order to prevent Iris's alleged harm.

For these reasons, plaintiffs have demonstrated a likelihood of irreparable harm in the absence of preliminary relief.

IV.   The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction

As noted, when the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. Does 1-6, 16 F.4th at 37. Here, as just discussed, plaintiffs would suffer substantial and irreparable harm in the absence of preliminary relief. By contrast, the State defendants stand to suffer little harm if a preliminary injunction is granted. Prior to

HB 1205's enactment, Parker had been participating in girls' sports at Plymouth Elementary School and Plymouth Regional High School, and Iris had participated in tennis and tried out for her middle school softball team. There is no indication in the record that plaintiffs' participation in school sports has caused the State or anyone else the slightest modicum of harm. A preliminary injunction would merely maintain the status quo in existence prior to HB 1205's enactment. Moreover, the court has determined that plaintiffs are likely to succeed in arguing that HB 1205 is unconstitutional. The State "has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R., 437 F. Supp. 3d 119, 137 (D.P.R. 2020). Thus, the balance of equities and the public interest favor a preliminary injunction.

V.      Plaintiffs Are Not Required to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." A district court has "substantial discretion to dictate the terms of an injunction bond." HCC Specialty Underwriters, Inc. v. Woodbury, 289 F. Supp. 3d 303, 330 (D.N.H. 2018) (quoting Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991)). A court may dispense with a bond where one is not requested by the non-movant. See Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs., --- F. Supp. 3d ----, 2024

46

WL 3650089, at *26 (D.N.H. Aug. 5, 2024). Because none of the defendants has requested that the court order plaintiffs to post a bond, the court finds that no bond is required.

VI.   The Scope of the Injunction Will Be Limited To What Plaintiffs Have Requested

In both the complaint and their motion for a preliminary injunction, plaintiffs have asked only that the court enjoin HB 1205 as applied to them. They have not asked the court to enjoin HB 1205 in its entirety. The court will limit the scope of the preliminary injunction to what has been requested by the plaintiffs. See Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (noting that, as a general matter, "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs"). The court expresses no opinion on whether a broader injunction would be appropriate on this record.

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction (doc. no. 7) is granted. Accordingly, defendants are enjoined as follows pending further order of the court:

1.   Defendants Frank Edelblut, in his official capacity as Commissioner of the New Hampshire Department of Education; Andrew Cline, Kate Cassady, Ann Lane, Philip Nazzaro, Rajesh Nair, James Fricchione, and James Laboe, in their official capacities as members of the New Hampshire State Board of Education; the Pemi-Baker Regional School District; and Lisa Ash, Bernice Sullivan, Sheila Donahue, Tony Torino, Carolyn Varin, Peter Jackson, Phil

McCormack, Greg Aprilliano, Bonnie Acton, Barbara Noyes, Paul Ciotti, and Paul Pizzano, in their official capacities as members of the Pemi-Baker Regional School Board; and their employees, agents, appointees, or successors are enjoined from enforcing or threatening to enforce HB 1205 as to Parker Tirrell, and are required to permit Parker Tirrell to try out for, practice with, compete with, and play on school sports teams designated for girls on the same terms and conditions as other girls.

2.    Defendants Frank Edelblut, in his official capacity as Commissioner of the New Hampshire Department of Education; Andrew Cline, Kate Cassady, Ann Lane, Philip Nazzaro, Rajesh Nair, James Fricchione, and James Laboe, in their official capacities as members of the New Hampshire State Board of Education; the Pembroke School District; and Andrew Camidge, Gene Gauss, Kerri Dean, and Melanie Camelo, in their official capacities as members of the Pembroke School Board; and their employees, agents, appointees, or successors are enjoined from enforcing or threatening to enforce HB 1205 as to Iris Turmelle, and are required to permit Iris Turmelle to try out for, practice with, compete with, and play on school sports teams designated for girls on the same terms and conditions as other girls.

SO ORDERED.

Landya McCafferty
United States District Judge

September 10, 2024
cc:    Counsel of Record

48