## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| Parker Tirrell, by her parents and next friends Sara Tirrell and Zachary Tirrell, and <br><br> Iris Turmelle, by her parents and next friends Amy Manzelli and Chad Turmelle, <br><br>      Plaintiffs, <br><br> v. <br><br> Frank Edelblut, in his official capacity as Commissioner of the New Hampshire Department Of Education, *et al.*, <br><br>      Defendants. | Case No. 1:24cv00251-LM-TSM |

## FEDERAL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

After months of litigation in a challenge to a state law, Plaintiffs now attempt to drag the Federal Government into a lawsuit well under way not because of any imminent injury, but because of a generalized grievance with policies set by the President of the United States. Plaintiffs fail to allege the Federal Defendants[1] have taken a single action to implement those Executive Orders against Plaintiffs, Plaintiffs' schools, or even in the state of New Hampshire. What's worse, Plaintiffs' attempts to rope the Federal Defendants into this case are based on flawed understanding of Equal Protection law, separations of powers, and Title IX, 20 U.S.C. § 1681.

---

[1] As in the Motion, "Federal Defendants" means Defendants Donald J Trump, in his official capacity as President of the United States, United States Department of Justice, Pamela J. Bondi, in her official capacity as Attorney General of the United States, United States Department of Education, and Denise L. Carter, in her official capacity as Acting Secretary of Education. "Agency Defendants" means all Federal Defendants except the President.

This Court accordingly should dismiss the Federal Defendants from the Second Amended Complaint ("Amended Complaint), ECF No. 95, because Plaintiffs lack constitutional standing, and their stated speculative risk of future injury is not close to imminent and may never become ripe.  Beyond lacking standing, Plaintiffs cannot overcome sovereign immunity and properly invoke this Court's subject-matter jurisdiction because they did not (and cannot) invoke the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.*, or any other viable authority to sue here.

Because this Court lacks subject-matter jurisdiction, it should dismiss the Federal Defendants without reaching whether the Amended Complaint's three counts against the Federal Defendants state plausible claims on which relief should be granted.  *See Morales Feliciano v. Rullan*, 303 F.3d 1, 6 (1st Cir. 2002).  But even if this Court had subject-matter jurisdiction, the Court should still dismiss the claims because they fail to state claims as a matter of law under Rule 12(b)(6).

## I.    BACKGROUND

Plaintiffs are two high school students who initiated this lawsuit to challenge New Hampshire HB 1205, a state law that regulates boys' participation in girls' school sports.  *See* Amended Compl. at p. 3.  Later, this Court preliminarily enjoined the original state and local Defendants from "enforcing or threatening to enforce HB 1205" as to two individual Plaintiffs.  Order [on Prelim Inj.] at 47-48, ECF No. 70.

In January 2025, the President issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (January 30, 2025) ("Gender Order").  On February 5, 2025, the President issued Executive Order 14201, *Keeping Men out of Women's Sports*, 90 Fed. Reg. 9279 (February 11,

2025) ("Sports Order"). Just a few days later, on February 12, 2024, Plaintiffs filed the Amended Complaint attempting to challenge the Executive Orders and add the Federal Defendants.

The Sports Order sets forth the President's policy of "oppos[ing] male competitive participation in women's sports" because of safety, fairness, and ensuring "women and girls the equal opportunity to participate and excel in competitive sports." Sports Order § 1.

The Amended Complaint alleges three claims against the Federal Defendants: Count V alleging the Executive Orders violate the Fifth Amendment's equal protection component, Amended Compl. ¶¶ 135-41; Count VI alleging the Executive Orders violate Title IX, 20 U.S.C. § 1681, *id.* ¶¶ 142-50; and Count VII alleging the Executive Orders violate the Constitution's separation of powers and Congress's legislative power, *id.* ¶¶ 151-58. Only the equal protection Count V makes any mention of a violation of Plaintiffs' rights; Counts VI and VII allege that the Executive Orders are ultra vires and facially conflict with Title IX and the separation of powers.

The Amended Complaint seeks a declaration that the Executive Orders are "unconstitutional and unlawful" and an injunction enjoining the Federal Defendants "from enforcing or threatening to enforce the" Executive Orders, "or otherwise withholding federal funding from Plaintiffs' schools, or other recipients of federal funding, based on their position that transgender girls and women are prohibited on playing on sports teams designated for girls and women." Amended Compl. at p. 34.

In the allegations incorporated into the Counts, the only alleged harm to Plaintiffs is that the Sports Order's "prioritizing Title IX enforcement action" "puts [Plaintiffs'] ability to continue playing on girls' sports teams at risk." Amended Compl. ¶¶ 88 & 106.

## II.    LEGAL STANDARD: MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(1) authorizes motions to dismiss for this Court's "lack of subject matter jurisdiction," which includes the constitutional requirement that plaintiffs have "standing," *Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012), and overcome sovereign immunity, *FDIC v. Meyer,* 510 U.S. 471, 475 (1994).   Plaintiffs bear the burden of plausibly alleging jurisdiction.  *See Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir. 1998); *Mahon v. United States*, 742 F.3d 11, 14 (1st Cir. 2014).

Rule 12(b)(6) authorizes dismissal for "failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court must discard "bald assertions, subjective characterizations and legal conclusions." *DM Research, Inc. v. Coll. Of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (citation and quotation marks omitted).  After this discarding, dismissal is proper when "the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018) (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).  For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Pitta v. Medeiros*, 90 F.4th 11, 17 (1st Cir. 2024).

## III.    ARGUMENT

### A. THE COURT LACKS SUBJECT MATTER JURISDICTION.

### 1.  Plaintiffs Lack Constitutional Standing.

Plaintiffs fail to establish they have constitutional standing to invoke this court's subject matter jurisdiction.  As explained below, Plaintiffs' asserted claims of speculative future injuries

that may never occur fail the Constitution's standing and ripeness requirements. This Court should accordingly dismiss Plaintiffs' claims for lack of jurisdiction under Rule 12(b)(1).

### a. *Standing Requires Much More Than Plaintiffs' Speculative Hypothetical Future Injuries.*

The Constitution limits the judiciary's power to hearing only actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). A "case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing ensures that a plaintiff possesses a particular "personal stake" in the controversy, that courts decide a plaintiff's "legal rights in specific cases" rather than issue advisory legal opinions on issues sought by people who "'roam the country in search of governmental wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982) ("The federal courts were simply not constituted as ombudsmen of the general welfare.")). Standing and the case or controversy limitation on courts' subject-matter jurisdiction ensures that the judiciary stays within the Constitution's separation of powers. *All. for Hippocratic Med.*, 602 U.S. at 378-79 ("Standing is built on a single basic idea—the idea of separation of powers.").

"Standing also tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." 602 U.S. at 379 (citation omitted); *see also Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) ("Much as [the] standing doctrine seeks to keep federal courts out of disputes involving conjectural or hypothetical injuries, the Supreme Court has reinforced that [the] ripeness doctrine seeks to prevent the

adjudication of claims relating to contingent future events that may not occur as anticipated, or indeed may not occur at all.").

To have standing, the plaintiff must plausibly allege an injury in fact that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). "A threatened harm that is too attenuated or too speculative does not provide standing." *Roe v. Healey*, 78 F.4th 11, 20 (1st Cir. 2023) (citing *Clapper*, 568 U.S. at 410).

Here, Plaintiffs' purported injury is that the Sports Order's direction "to target investigations and rescind federal funding," Amended Compl. ¶ 139, puts the Plaintiffs "ability to continue playing on girls' sports teams at risk," *id.* ¶¶ 88 & 106. This speculative future injury fails both standing's imminent and particularized injury requirements.

Imminency requires that a "threatened injury must be *certainly impending* to constitute injury in fact"; allegations "of *possible* future injury" are not sufficiently imminent. *Clapper*, 568 U.S. at 409; *see also All. for Hippocratic Med.*, 602 U.S. at 381 (finding injury must be "imminent, not speculative—meaning that the injury must . . . be likely to occur soon"); *Katz v. Pershing, LLC*, 672 Fed.3d 64, 80 (1st Cir. 2012) (finding mere "increased risk" of injury insufficient).

Plaintiffs' claimed future injury points to potential funding recissions, but the multiple steps necessary to terminating funding, and the variables during those steps, make this far too speculative. Terminating funding under Title IX is a multi-step process. *See generally* 20 U.S.C. § 1682. A funding agency cannot terminate funding unless it first notifies the funding recipient of its "failure to comply" with Title IX, and also "determine[s] that compliance cannot be secured by voluntary means." *Id.* The statute also separately requires an "express finding on the record, after

opportunity for hearing, of a failure to comply." *Id.* And even after that administrative finding after a hearing, the agency must file a full written report with Congress explaining the grounds for the termination and wait 30 days after that report to terminate the funding. *Id.*

Plaintiffs here do not (and cannot) plausibly allege that the Agency Defendants have even started this multi-step process for any educational program in New Hampshire, much less the two particular schools that Plaintiffs attend. They do not (and cannot) point to even an initiated investigation in New Hampshire. They instead point only to Title IX investigations (not funding terminations) of three educational programs located in other states. Amend. Compl. ¶ 65. While the Agency Defendants retain discretion to investigate potential Title IX violations in New Hampshire, this Court should also consider the likelihood that the Agency Defendants would in the future expend their limited recourses to initiate a Title IX investigation concerning males participating in females' sports in New Hampshire, when New Hampshire already has state law HB 1205 regulating the same issue, which this Court has preliminarily enjoined.

Given this Title IX multi-step process for rescission of funds, and the considerable discretion involved in these steps before any Federal Defendant action could even remotely affect Plaintiffs, their claimed injury is far too speculative. *Lujan*, 504 U.S. at 562; *Trump v. New York*, 592 U.S. 125, 131 (2020) (finding lack of standing when case was "riddled with contingencies and speculation that impede judicial review . . . [a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] is no more than conjecture at th[e] time" (citation and quotation marks omitted)); *Clapper*, 568 U.S. at 410-11 (finding "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending"). Moreover, the discretion variables do not

completely lie with the Federal Defendants. An educational program has discretion to voluntarily comply with Title IX or choose itself to forego federal funding.

The speculative nature of Plaintiffs' claimed future injury also makes it not sufficiently "particularized." An injury is particularized when it affects "'the plaintiff in a personal and individual way'" and is not a "generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560 n.1). The United States Department of Education provides federal funding to educational programs across the country. Plaintiffs have not sufficiently pled why their two schools differ from these countless other schools across the country. Plaintiffs do not plausibly allege a future injury particularized to themselves, but rather "merely a generalized grievance." *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012); *accord Lujan*, 504 U.S. at 560 n.1.

Overall, Plaintiffs lack standing because their allegations leave this Court with "no idea whether or when" the Federal Defendants may take a step toward implementing the Executive Orders in New Hampshire. *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). Their claims thus are too "conjectural" or "hypothetical," *Lujan*, 504 U.S. at 560-61, and this Court accordingly should dismiss them for lack of standing and subject-matter jurisdiction.

### b. Plaintiffs' Speculative Hypothetical Future Injuries are Not Ripe.

Beyond standing, Plaintiffs' claims are not even close to ripe. Similar to standing, the related constitutional doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *National Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807 (2003) (citation omitted); *see also Rhode Island Assn. of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999) (explaining "standing" focuses on *who* may bring suit, while "ripeness" looks to *when* suit may be brought); *McInnis-Misenor v.*

*Maine Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003) (acknowledging "[i]n general, standing and ripeness inquiries overlap" (citations omitted)).

Ripeness exists when a complaint shows "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of the judicial relief sought." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citations and quotation marks omitted). The ripeness analysis concerns two factors: fitness and hardship. *Texas*, 523 U.S. at 301; *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013) (Ripeness considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." (citation omitted)). Plaintiffs' Amended Complaint fails to establish both fitness and hardship.

A claim lacks "fitness" when it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas*, 523 U.S. at 300); *accord Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). The Federal Defendants have taken no action in New Hampshire to enforce the Executive Orders or start the multi-step process of terminating funding under Title IX. Plaintiffs' claims accordingly are not ripe because they are "contingent future events" that "may not occur at all." *Id.*; *see also Ernst & Young*, 45 F.3d at 537 ("Federal courts cannot—and should not—spend their scarce resources in what amounts to shadow boxing. Thus, if a plaintiff's claim, though predominantly legal in character, depends upon future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe.").

For similar reasons, Plaintiffs' claims also fail the ripeness "hardship" requirement. In evaluating hardship, "the court should consider whether the challenged action creates a direct and immediate dilemma for the parties." *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc.*

*No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011) (citations and internal quotation marks omitted); *accord Ernst & Young*, 45 F.3d at 535. As above, the Federal Defendants have taken no action yet, so no "direct and immediate dilemma" exists here. Moreover, the Supreme Court has repeatedly held that challenges to intra-governmental directives, like the Executive Orders here, do not create the required hardship because a directive, by itself, "does not affect [anyone's] primary conduct." *National Park*, 538 U.S. at 810; *see also Texas,* 523 U.S. at 302*; Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58-61 (1993).

This Court accordingly should dismiss Plaintiffs' claims for lack of ripeness and subject matter jurisdiction.

### 2. Plaintiffs Cannot Overcome Sovereign Immunity.

Sovereign immunity also bars Plaintiffs' claims. This Court should dismiss Plaintiffs' claims for lack of jurisdiction because Plaintiffs have identified no statute (or other authority) authorizing the claims against the Federal Defendants. A federal court lacks subject-matter jurisdiction over claims against the United States or its officers unless the government waives its sovereign immunity and consents to suit. *FDIC v. Meyer,* 510 U.S. 471, 475 (1994); *accord United States v. Miller*, 145 S. Ct. 839, 849 (2025). Plaintiffs bear "the burden of proving sovereign immunity has been waived." *Mahon v. United States*, 742 F.3d 11, 14 (1st Cir. 2014). Here, Plaintiffs request declaratory and injunctive relief against the Federal Defendants seeking to prevent enforcement of the Executive Orders. Amend. Compl. at p. 34. As explained below, Plaintiffs cannot override sovereign immunity to obtain that relief against the Federal Defendants though any statute or other general authority they attempt to invoke. This Court accordingly should dismiss their claims for lack of jurisdiction under Rule 12(b)(1).

### a. Plaintiffs Cannot Obtain Relief Directly Against the President.

Plaintiffs cannot obtain relief directly against the President for issuing the Executive Orders.  Courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 (D.C. Cir. Feb. 15, 2025) ("[T]he President enjoys absolute immunity from injunctive actions." (citing *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992))).  As the Supreme Court explained in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), under "the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."  *Id.* at 165-66.  The Supreme Court's refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."  *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." (citations omitted)).  Plaintiffs accordingly cannot obtain the relief they seek directly against the President.

### b. Plaintiffs Cannot Invoke the Administrative Procedure Act.

Plaintiffs have not invoked the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*, as a basis for waiver of sovereign immunity for their claims.  Nor could they because the APA's waiver applies only to final agency action and no such final action exists here.

The APA provides a limited waiver of sovereign immunity for actions in federal district court by "person[s] suffering legal wrong because of agency action."  5 U.S.C. § 702; *id.* § 706(2)(A)-(C) (permitting courts to "set aside agency action . . . otherwise not in accordance

with law; contrary to constitutional right . . . [or] in excess of statutory jurisdiction"). But this limited waiver applies only to "final agency action," 5 U.S.C. § 704, which "marks the consummation of the agency's decisionmaking process" and "from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 156 (1997).

The President's Executive Orders themselves are not "final agency action" because the "President is not an agency within the meaning" of the APA and therefore cannot take "agency action." *See Franklin*, 505 U.S. at 796 (plurality opinion). Plaintiffs have not plead that the other Federal Defendants beyond the President have taken any actions that determined any rights or obligations or otherwise caused legal consequences in New Hampshire. As explained above, Plaintiffs' purported injury is not based on any actual action taken by the Agency Defendants (much less "final agency action"), but on Plaintiffs' speculative fear that the Agency Defendants might take some action in the future to revoke the funding at Plaintiffs' schools. *See, e.g.*, Amend. Compl. ¶¶ 87-88, 105-06. Given this lack of final agency action, Plaintiffs cannot invoke the APA to overcome sovereign immunity.

### c. Plaintiffs' Other Bases Fail to Overcome Sovereign Immunity.

The Amended Complaint's other references to statutes and vague general authorities also fail to provide authority to overcome sovereign immunity. As for other statutes, in attempting to add the Federal Defendants, the Amended Complaint added references in the "JURISDICTION" section to the Little Tucker Act, 28 U.S.C. § 1346, and the Mandamus Act, 28 U.S.C. § 1361. Amended Compl. ¶ 2.; *see also* ECF No. 94-1 (redline). These statutes, however, provide Plaintiffs no help. The Little Tucker Act only authorizes non-tort claims for money damages "not exceeding $10,000 in amount," 28 U.S.C. § 1346(a)(2), and does not authorize the equitable or declaratory relief Plaintiffs seek here, *e.g.*, *Berman v. United States*, 264 F.3d 16, 20–21 (1st Cir. 2001).

So too for the Mandamus Act.  Mandamus is an extraordinary remedy applying only in exceptional circumstances.  *See In re City of Fall River*, 470 F.3d 30, 32 (1st Cir. 2006); *Kerr v. United States Dist. Court for N. Dist. Cal.,* 426 U.S. 394, 403 (1976).  Moreover, mandamus applies only to clearly ministerial, nondiscretionary actions that an official is required to perform, where the plaintiff has a clear right and no other remedy.  *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *Kris v. Dusseault Fam. Revocable Tr.*, No. 18-CV-566-LM, 2021 WL 1162931, at *3 (D.N.H. Feb. 19, 2021) (Plaintiff "must plead facts showing that a federal agency or federal officer failed to perform a clearly prescribed, nondiscretionary, ministerial duty, and that no adequate remedy is available short of compelling the officer or agency to perform the duty."), *report and recommendation adopted sub nom. Kris v. Dusseault Fam. Revocable Tr. of 2017*, No. 18-CV-566-LM, 2021 WL 1162902 (D.N.H. Mar. 25, 2021).  Here, the Agency Defendants' decision to provide federal funds to schools (or enforce Title IX in court) is discretionary, and not merely a ministerial task.  Even if not discretionary, there is nothing to compel because Agency Defendants have not withheld any funds to schools in New Hampshire.  And Plaintiffs, two high school students, have not established a clear right to have the Agency Defendants fund their schools.  Plaintiffs thus cannot satisfy the requirements for an extraordinary mandamus remedy.[2]

Finally, beyond these statutes, Plaintiffs attempt to invoke general equity powers with the term "ultra vires."  Plaintiffs cannot rely on a general equitable cause of action to enjoin the Federal Defendants because Plaintiffs have not even identified a specific government action that exceeds

---

[2]  The Amended Complaint's reference to the Declaratory Judgment Act, 28 U.S.C. § 2201, also does not establish a waiver of sovereign immunity.  *See Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir. 1996) (noting that § 2201 does not constitute a waiver of sovereign immunity because the Act "neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief" (citations omitted)).

statutory authority. Courts have sparingly recognized an implied equitable authority to enjoin the actions of federal officials that exceed their statutory authority. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). But the ultra vires doctrine is "extremely limited" in "scope." *Griffith v. Fed. Labor Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Ultra vires relief must run against a particular governmental action that "violates some specific command of a statute" or other source of binding law. *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022). Here, Plaintiffs do not challenge any particular government action apart from the Executive Orders. *Cf.* Amend. Compl. ¶¶ 135-58. And Plaintiffs cite no authority that would prevent a presidential order from directing subordinates—as here—to act in accordance with law. *See* Gender Order § 8(b) ("This order shall be implemented consistent with applicable law."); Sports Order § 5(b) ("This order shall be implemented consistent with applicable law."). Plaintiffs' arguments concern hypothetical downstream actions that may or may not result from the Executive Orders that would violate those directives; but ultra vires relief is about stopping actual concrete action, not preventing hypothetical future harm based on guesses and approximations.

Accordingly, Plaintiffs have not shown the availability of relief against the Federal Defendants, and this Court should dismiss their claims.

### B. PLAINTIFFS' THREE COUNTS FAIL TO STATE CLAIMS.

Because this Court lacks subject-matter jurisdiction, this Court should dismiss the Federal Defendants without reaching whether the Amended Complaint's three counts against the Federal Defendants state plausible claims on which relief should be granted. *See Morales Feliciano v. Rullan*, 303 F.3d 1, 6 (1st Cir. 2002). But even if this Court had subject-matter jurisdiction, the Court should still dismiss the claims because they fail to state claims as a matter of law under Rule 12(b)(6).

All three Counts center on whether the Sports Order impermissibly excludes people based on "transgender status."  It does not.  As explained below, this Court should dismiss Plaintiffs' equal protection claim because the Sports Order does not impermissibly discriminate based on sex, and the Order's lack of additional protection for "transgender status" is rationally related to ensuring "women and girls the equal opportunity to participate and excel in competitive sports." Sports Order § 1.  Similarly, this Court should dismiss Plaintiffs' Title IX claim and related separation of powers claim because Title IX's protections do not extend to "transgender status."

### 1.   The Equal Protection Claim Fails

In Count V, Plaintiffs assert a Fifth Amendment equal protection claim alleging that the Sports Order impermissibly discriminates "on the basis of sex," Amended Compl. ¶ 137, and then adds that the Sports Order impermissibly discriminates based on "transgender status," *id.* ¶¶ 138-41.  This Court should dismiss this claim because the Sports Order does not impermissibly discriminate based on sex, and the Order's lack of additional protection for "transgender status" is rationally related to ensuring "women and girls the equal opportunity to participate and excel in competitive sports."  Sports Order § 1.

The Sports Order does not impermissibly classify based on sex.  "The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also, e.g.*, *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 63 (2001) (The Equal Protection

15

Clause "is essentially a direction that all persons similarly situated should be treated alike." (citation omitted).[3]

The Sports Order simply reaffirms that males and females are not similarly situated when it comes to sports. The Supreme Court recognizes that "differences between men and women" are "enduring" and thus sex is not an inherently "proscribed classification." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The biological differences between the sexes make them dissimilarly situated in sports, with males having a distinct physical advantage. *See, e.g.*, *id.* at 550 n.19 (admitting women to a previously all-male military academy "would undoubtedly require" that institution "to adjust aspects of the physical training programs"); *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) ("Men and women simply are not physiologically the same for the purposes of physical fitness programs."); *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819-20 (11th Cir. 2022) (en banc) (Lagoa, J., concurring) (discussing scientific literature regarding biological

---

[3] The Federal Defendants contend that *Bostock v. Clayton County*, 590 U.S. 644 (2020), does not extend beyond Title VII and particularly has no relevance to the Constitution's equal protection guarantee, which has critically different language and context. *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1229 (11th Cir. 2023) ("Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instant case."). As Justice Gorsuch, the author of *Bostock*, has explained, reading *Bostock* to control the meaning of a constitutional provision is "implausible." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring); *accord L.W. v. Skrmetti*, 83 F.4th 460, 484 (6th Cir.), *cert. granted*, 144 S. Ct. 2679 (2024); *Brandt v. Rutledge*, No. 21-2875, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J. dissenting).

Regardless, even if *Bostock* were relevant, it would not change the result here. *Bostock* makes clear that it requires a similarly situated analysis: "[D]iscrimination" means "treating [an] individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. In other words, *Bostock* stressed that to determine whether a policy "discriminate[s]," a court must use a comparator—*i.e.*, compare the plaintiff to "others who are similarly situated." *Id.* In *Bostock*, male and female employees were similarly situated because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660. Unlike in *Bostock*, males and females are not similarly situated when it comes to sports; sex is relevant to such decisions.

differences between males and females in sports).  In comparison, because skin color is almost always irrelevant, the Supreme Court finds racial classifications are "inherently unequal." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 229 (2023) (citation omitted).

It makes no difference that only a man can be a "transgender women" and only a woman can be a "transgender man."  In *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Supreme Court rejected the notion that a restriction on abortion was sex discrimination, even though only women can get pregnant.  *Id.* at 236-37.  In reaching that conclusion, the Supreme Court relied on *Geduldig v. Aiello*, 417 U.S. 484 (1974), which had reached the same conclusion with respect to a law that drew a distinction based on pregnancy.  *See* 417 U.S. at 496 n.20.  So too here.

The conclusion would be no different even if sex discrimination were at issue here.  For equal protection challenges, sex-based classifications must satisfy intermediate scrutiny. This requires the proponent of a sex classification to show it "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Virginia*, 518 U.S. at 533 (citations and quotation marks omitted)).  The Sports Order easily satisfies intermediate scrutiny.  Because of the inherent physiological difference between males and females, the Sports Order's policy of "oppos[ing] male competitive participation in women's sports" is substantially related to the important government interest of safety, fairness, and ensuring "women and girls the equal opportunity to participate and excel in competitive sports."  Sports Order § 1.

Plaintiffs do not dispute that sports should be separated by sex—if not their relief would insist that all sports must be completely co-ed.  Instead, they complain that the Sports Order's

definitions of male and female do not correspond to their preferred definitions, and they are thus not included as beneficiaries of Order's protection of equal opportunities for girls. This is not an attack on the classification itself, but rather an under-inclusiveness challenge to the contours to the classification. This under-inclusiveness itself is not subject to heightened scrutiny because "[t]he prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955). The government is not bound to address every potential issue in a single policy or approach any particular problem the same way. *See Semler v. Or. St. Bd. Of Dental Examiners*, 294 U.S. 608, 610-11 (1935). Accordingly, a "statute is not invalid under the Constitution because it might have gone farther than it did." *Roschen v. Ward*, 279 U.S. 337, 339 (1929). Instead, the government "may select one phase of one field and apply a remedy there, neglecting the others." *Williamson*, 348 U.S. at 489; *accord Katzenbach v. Morgan*, 384 U.S. 641, 656-57 (1966) (applying rational basis where Congress extended benefit to citizens educated in "American-flag schools" in Puerto Rico but did "not extend . . . the relief . . . to those educated in non-American-flag schools"); *cf. Peightal v. Metro. Dade Cnty.*, 940 F.2d 1394, 1409 (11th Cir. 1991) ("The Equal Protection Clause does not require a state actor to grant preference to all ethnic groups solely because it grants preference to one or more groups.").

Plaintiffs' under-inclusiveness challenge to the Sports Order's is therefore subject to rational-basis scrutiny. *E.g.*, *Katzenbach*, 384 U.S. at 656-57. The Order's definitions that correspond to biology, rather than gender identity, are rationally related to the physical advantages of males in sports and serve the legitimate government purpose of ensuring "women and girls the equal opportunity to participate and excel in competitive sports." Sports Order § 1; *see Heller v. Doe,* 509 U.S. 312, 319-20 (1993) (Rational-basis review simply requires a "rational relationship between the disparity of treatment and some legitimate governmental purpose.").

The Amended Complaint's references to "transgender status" do not save Plaintiffs' equal protection claim. First, the Sports Order does not classify based on "transgender status"; it permissibly makes distinctions based on sex because males and females are not similarly situated in sports. Second, even if the Sports Order did classify based "transgender status," that is not a suspect class meriting any heightened scrutiny. Neither the Supreme Court nor the First Circuit has recognized "transgender status" or "gender identity" as a suspect class. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985) (listing five protected classes). Heightened scrutiny classes are reserved for groups that "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). "Unlike existing suspect classes," Plaintiffs' "gender identity" is not "definitively ascertainable at the moment of birth." *L.W. v. Skrmetti*, 83 F.4th 460, 487 (6th Cir.), *cert. granted*, 144 S. Ct. 2679 (2024). Plaintiffs are not defined by "immutable" characteristics, as "detransitioners" show, *id.*, and a person can change their "transgender status" at will. Nor is the purported class characterized by a specific defining feature; rather, it includes a huge variety of gender identities and expressions, incapable of accurately describing and can sweep in anyone who is not cabined by their sex stereotype. Thus, Plaintiffs' purported group is not tied to anything immutable like race or sex. Plaintiffs' alleged group is also not "politically powerless." *See Skrmetti*, 83 F.4th at 487. Accordingly, even if the Sports Order classified based on "transgender status" it simply must pass rational-basis review. And as above, the Sports Order's classification is rationally related to the physical advantages of males in sports and serves the legitimate government purpose of ensuring equal opportunities for females.

Nor is there any basis for thinking any classifications at issue here to be an impermissible "proxy" for sex discrimination. A so-called "proxy" discrimination claim may be stated only if it

is "unexplainable on grounds" other than discrimination. *Vill. of Arlington Heights v. Metro. Housing Development Corp.*, 429 U.S. 252, 266 (1977). Here, the lines drawn by the Sports Order are well explained by a desire to recognize and respect the biological reality of the differences between the sexes, rather than to discriminate against men or women as such.

This Court accordingly should dismiss Plaintiffs' Fifth Amendment equal protection claim under Rule 12(b)(6).

### 2. The Title IX Claim Fails.

In Count VI, Plaintiffs assert that the Sports Order discriminates based on sex in conflict with Title IX, 20 U.S.C. § 1681. The crux of their allegation is that "[u]nder Title IX, discrimination 'on the basis of sex' encompasses discrimination against individuals because they are transgender." Amended Compl. ¶ 145. Plaintiffs' Title IX claim fails because Title IX protects against discrimination based on sex, not "transgender status" or "gender identity."

Title IX requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Because the statute does not define "sex," the term should "be interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted). When Congress passed Title IX in 1972, contemporaneous dictionaries defined "sex" as what the term has always meant: biological sex. *See Adams v. Sch. Bd. Of St. Johns County*, 57 F.4th 791, 812-13 (11th Cir. 2022) (consulting nine contemporary dictionaries for definitions); *see also id.* at 812-15 (finding Title IX refers to biological sex). And Title IX's statutory text uses the term consistent with biological sex, referring to a binary classification based on biological differences. For instance, right after the general prohibition in 20 U.S.C. § 1681(a),

the statute expressly provides that this "section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of the *other sex*." 20 U.S.C. § 1681(a)(8) (emphasis added).  The statute elsewhere also clarifies that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  20 U.S.C. § 1686. Similarly, the statute provides a grace period for an "institution which admits only students of *one sex* to being an institution which admits students of *both sexes*."  20 U.S.C. § 1681(a)(2) (emphasis added).

Historical context further confirms that Congress used the word "sex" in its ordinary biological sense and that Congress's bar on sex discrimination still allowed separating biological males and females in sports. "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities, which was documented in hearings held in 1970 by the House Special Subcommittee on Education." *McCormick v. School Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *see also North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523 n.13 (1982).  Against that backdrop, members of Congress voting on Title IX and any politically engaged citizen would have understood the statute as directed at eliminating discrimination in education based on biological sex—*i.e.*, unequal treatment of men and women— consistent with the term's ordinary meaning.

Contemporaneous post-enactment history confirms Title IX refers to biological sex and does not include discrimination based on "gender identity."  Shortly after Title IX was enacted in 1972, Congress passed the Javits Amendment that directed the Education Department's predecessor to create regulations "implementing . . . [T]itle IX," which "shall include" regulations

on "intercollegiate athletic activities." 88 Stat. 484, 612 (1974). The agency then issued regulations that allow sex separation in many contexts—including sports. 40 Fed. Reg. 24,128, 24,141-43 (June 4, 1975).[4] Those contemporaneous regulations, nearly all of which still exist today, are strong evidence of Title IX's original public meaning. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); *id.* at 370 ("Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time."). Moreover, that evidence is particularly strong here because Congress got the chance to disapprove these regulations before they went into effect and chose not to. *See Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530-35 (1982).

Congress's actions more than 50 years following Title IX's enactment further confirm that "sex" in this statute does not encompass "transgender" status. In other statutory contexts, Congress has acted affirmatively to address gender-identity discrimination as a distinct category separate

---

[4] *E.g.*, 40 Fed. Reg. 24,137, 24,142-43 (July 4, 1975) (presently at 34 C.F.R. §106.41(b) ("a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.43 ("If use of a single standard of measuring skill or progress in physical education classes has an adverse effect on members of one sex, the recipient shall use appropriate standards that do not have that effect.")); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.32(b) (A recipient "may provide separate housing on the basis of sex" provided the housing provided "to students of one sex, when compared to that provided to students of the other sex, shall be" proportionate and comparable.); 40 Fed. Reg. at 24,141 (presently at 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."). These contemporaneous and longstanding agency interpretations also confirm that Title IX refers to biological sex.

from sex discrimination.  For example, when Congress enacted the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009, Pub. L. No. 111-84, Div. E., 123 Stat. 2190 (2009), Congress found that the "incidence of violence motivated by the actual or perceived race, color, religion, national origin, *gender, sexual orientation, gender identity*, or disability of the victim poses a serious national problem."  34 U.S.C. § 30501(1) (emphasis added).

Similarly in 2013, Congress amended the Violence Against Women Act to create a federal government enforcement action that protected the separate bases of sex and gender identity. *See* 34 U.S.C. § 12291(b)(13)(A) (2013), *as amended by* Pub. L. No. 113-4, § 3, 127 Stat. 56 (2013) (prohibiting discrimination in certain federally funded programs "on the basis of actual or perceived race, color, religion, national origin, *sex, gender identity* (as defined in [18 U.S.C. § 249(c)(4)]), *sexual orientation,* or disability" (emphases added)).

These post-Title IX enactments illustrate that Congress knows how to prohibit discrimination based on "gender identity" when it wishes to do so.  *DHS v. MacLean*, 574 U.S. 383, 394 (2015).  "If Congress had meant to prohibit . . . transgender discrimination" in Title IX, "surely the most straightforward way to do so would have been to say so—to add . . . 'transgender status' or 'gender identity' to the list of classifications protected under" Title IX.  *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 338 (5th Cir. 2019) (Ho, J., concurring) (addressing Title VII).  Congress did not do so.

Finally, dismissal here aligns with the many courts that have concluded that Title IX allows separating the sexes and that Title IX does not include discrimination based on "gender identity." *See, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2-3 (6th Cir. July 17, 2024); *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *4-5 (11th Cir. Aug. 22, 2024) (collecting cases).

This Court accordingly should dismiss Plaintiffs' Title IX claim pursuant to Rule 12(b)(6).

### 3.  The Separation of Powers Claim Fails.

In Count VII, Plaintiffs allege that the Executive Orders "violate the separation of powers and impermissibly abrogate to the Executive power that is reserved to Congress" because they "unilaterally amend or cancel appropriations."  Amended Compl. ¶¶ 153 & 157.  This claim is essentially just a reiteration of Plaintiffs' claim that the Executive Orders violate Title IX.  *Cf.* Amended Compl. ¶¶ 142-50.  Indeed, Title IX is a statute that places a condition on federal funds, so the lawfulness of the Executive Branch's application of Title IX is coterminous with its ability to withhold funds based on that application.  The purported misapplication of the statute does not establish a separate constitutional claim.  *See Dalton v. Specter*, 511 U.S. 462, 473-74 (1994) (noting that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review").  Otherwise Plaintiffs could turn every purported executive branch violation of a statute into a constitutional claim.

But Plaintiffs' separation of powers claim fails for the additional reason that the Executive Orders do not purport to withhold federal funding without legal basis.  Instead, the Executive Orders set a policy for evaluating federal funding within the confines of existing law.  Indeed, both Executive Orders explicitly limited their instructions to lawful actions the appropriate agencies may take.  The Gender Order explicitly states that any withholding of federal funds must only be implemented "as permitted by law."  Gender Order § 3(e). Similarly, the Sports Order directs agencies to rescind funds "where appropriate."  Sports Order § 3(b).  Moreover, both Executive Orders contain a provision stating that the Orders "shall be implemented consistent with applicable law and subject to the availability of appropriations."  Sports Order § 5(b); Gender Order § 8(b).

Directing executive agencies to act *consistent with applicable law* cannot be interpreted as an order to violate or abrogate the law.  It is plainly lawful for the President to instruct agencies to act within their own statutory authorities to implement the President's priorities consistent with applicable law.  *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981); *see also Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) (rejecting the argument that an executive order that "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law" exceeded constitutional authority).

Accordingly, Plaintiffs' separation-of-powers claim fails and should be dismissed

## IV.    CONCLUSION

For the above reasons, this Court should dismiss Plaintiffs' claims against the Federal Defendants.

Respectfully submitted,

RICHARD LAWSON
Deputy Associate Attorney General


 /s/ Matthew J. Donnelly
MATTHEW J. DONNELLY
Attorney
Illinois Bar No. 6281308
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
Telephone: (202) 616-2788
Email: matthew.donnelly@usdoj.gov


Counsel for the Federal Defendants

Dated:  June 6, 2025

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent on this date to all counsel of record via the Court's Electronic Filing System.


Dated:  June 6, 2025


  /s/ Matthew J. Donnelly
MATTHEW J. DONNELLY
Attorney for the United States